## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CATHERINE A. JORITZ,

Plaintiff, *pro Se*

-vs-                                                    Case No. 5:17-cv-04002-SAC-KGS

THE UNIVERSITY OF KANSAS,

Defendant.

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
## AND MEMORANDUM IN SUPPORT

COMES NOW the Plaintiff, Catherine A. Joritz (hereafter "Plaintiff"), *pro Se*, and submits her response in opposition to the University of Kansas' (hereafter "Defendant") Motion to Dismiss and Memorandum in Support. For the reasons set forth below, Plaintiff respectfully requests that this Court deny the Defendant's Motion to Dismiss in its entirety.

## I.    BACKGROUND

This is a case in which Plaintiff alleges discrimination by Defendant, willful prevention of Plaintiff from reporting discrimination, retaliation for engaging in protected activities, hostile work environment, denial of 1st and 14th Amendment rights and wrongful termination, all by and permitted by Defendant. The setting for this case is Defendant's university campus. Plaintiff was employed by Defendant as a tenure-track Assistant Professor in the Film & Media Studies Department, from August 2012 – May 2017. Plaintiff received her non-reappointment letter from Defendant in May, 2016.

Plaintiff's Complaint sketches her background as an "internationally recognized, award-winning animator and educator", who "lived and worked in Germany as an animator, freelance

artist and educator for over thirty years.", was "fluent in German" and "moved from Dortmund, Germany to Lawrence, Kansas, USA, in order to begin a tenure-track Assistant Professor appointment at the University teaching primarily animation, special effects and experimental video production." Plaintiff's Compliant relates a consistent history of Plaintiff's achievements in all performance categories evaluated by Defendant: Teaching, Research and Service. Plaintiff includes in her Complaint examples of major research accomplishments achieved during her employment at the university, such as having "her German-related animated short film "Zapf Dingbats – A Tribute to Hermann Zapf""… "accepted to a renowned short film festival in Germany: 62nd International Short Film Festival Oberhausen" and being "awarded several competitive University (Defendant) grants and other university (Defendant) funding in order to research a long-term project about the (German) silhouette animation pioneer, Lotte Reiniger (1899 – 1981)." (EXHIBIT 1, Joritz CV);

On January 14, 2015, prior to Plaintiff's 2015/16 Progress Toward Tenure Review (PTTR or PTT Review), Defendant awarded Plaintiff "the highly competitive University's Hall Center for the Humanities Creative Fellowship for her creative research", only to rescind it *after* Plaintiff's PTT Review, unlawfully breaching the contract Defendant and Plaintiff had both signed. On May 2, 2016, 11 days before Defendant terminated Plaintiff's employment, Defendant awarded Plaintiff a competitive, student-nominated teaching award and $1,000.

Plaintiff alleges that Defendant violated the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. " 2000e, *et seq*., for employment discrimination on the basis of perceived national origin and her sex. Also, pursuant to Title VII, Plaintiff alleges that Defendant prevented her from reporting discrimination (a protected activity), retaliated against her for having reported discrimination and subjected her to a hostile work environment in which her

Freedom of Speech was stifled, her performance was disparaged and she was denied due process, all culminating in unlawfully terminating Plaintiff's employment.

Defendant offers various reasons why Plaintiff's Complaint should be dismissed. Some reasons are technical in nature; others question the sufficiency of Plaintiff's Complaint. Defendant sometimes trivializes the issues Plaintiff has raised and other times Defendant offers a distorted narrative related to Plaintiff's Complaint. For example, Defendant claims on page 15 of its Motion to Dismiss that, "First, as Plaintiff acknowledges, the reason for her non-reappointment was due to her insufficient research, not her teaching component." Defendant points to Plaintiff's Exhibit 1 as alleged proof of this statement. Plaintiff, however, never acknowledged "insufficient research" as a reason for her non-reappointment, but rather structured her Complaint's narrative to expose how Defendant systematically and abusively, through tiers of dishonest administrators and a few faculty members, fabricated "insufficient research" and "behavioral issues" as **pretexts** for terminating Plaintiff's appointment. (Please see Plaintiff's Complaint, pages 4-7.) Plaintiff offers as proof of this dishonesty a letter composed by the University Faculty Rights Board (FRB), sent to Chancellor Grey-Little on May 11, 2016, (EXHIBIT 2, FRB letter); excerpts here are related to Plaintiff's research:

*"The Faculty Rights Board (FRB) has reviewed the appeal of Professor Cathy Joritz. After carefully considering the record, FRB finds that the Department Chair of Film and Media Studies, the College Committee on Appointments, Promotion and Tenure (CCAPT), and the Dean of CLAS (College of Liberal Arts, Dean Lejuez) relied on factually inaccurate information in their review of Professor Joritz's progress toward tenure."*

And

*"In Department Chair Baskett's letter to CCAPT, he stated that multiple obstacles*

*existed which would prevent Professor Joritz from completing her proposed book on Lotte Reiniger. He stated (1) officials at the Stadtmuseum in Tubingen, Germany have denied Professor Joritz access to an archive of materials necessary to the completion of the project, and (2) potential interviewees for the project were "lapsing into senility and ill health". These statements were then repeated in CCAPT's recommendation and likely influenced Dean Lejuez' conclusion that the status of Professor Joritz's proposed book on Lotte Reiniger was unclear.*

*FRB finds that these specific statements ((1) and (2) above) were not correct: Professor Joritz has access to the necessary archive, and she has been able to tape discussions with a healthy 83-year-old interviewee. Because the statements were inaccurate, FRB recommends that they be disregarded in your independent judgment of the record. Also, the Dean and CCAPT's mistaken reliance on this inaccurate information should be taken into account when weighing their respective recommendations regarding Professor Joritz's research record.*

*Additionally, we not that it does not appear that Department Chair Baskett met with Professor Joritz to discuss CCAPT's evaluation as contemplated by the policy on the Progress Toward Tenure Review for the College of Liberal Arts and Sciences. Although we do not believe this omission significantly prejudiced Professor Joritz in the PTTR process, we believe the University should nevertheless ensure that the Department of Film Studies facilitates this meeting in all future reviews."*

## II.  STANDARD OF REVIEW

When reviewing a motion to dismiss filed pursuant to K.S.A. 60-212(b)(6), "...a court must accept the plaintiff's description of that which occurred, along with any inferences reasonably to be drawn therefrom." *Grindsted Products, Inc.* v. *Kansas Corp. Corn 'n.,* 262 Ran. 294, 303, 937 P2d 1,7(1997). "Dismissal is justified only when the allegations of the petition clearly

demonstrate plaintiff does not have a claim.' *Id.* at 302. *See also Miller* v. *Sloan, Listrom, Eisenbarth, Sloan and Glassman,* 267 Ran. 245, 978 P.2d 922 (1999).

Additionally, a motion must be denied "unless the allegations in the petition, viewed in the most favorable light to the plaintiff, clearly demonstrate the plaintiff is not entitled to relief under any set of facts which could be proved in support of the claim." *Palmer v. Brown,* 242 Kan, 893, 895, 752 P.2d 685, 687(1988). *See also Sampel v. Balbernie,* 20 K.A.2d 527, 889 P.2d 804 (1995) (Kansas Court of Appeals held every doubt is to be resolved in plaintiff's favor).

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citing Twombly, 550 U.S. at 556). When determining whether a claim has facial plausibility, "a court must view a complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1066 (11th Cir. 2007).

Kansas Courts have supported the completion of discovery over immediate dismissal:

> *There are sound reasons for exercising judicial skepticism towards dismissal of a petition for failure to state a claim prior to the completion of discovery.*
> Noel v. Pizza Hut, Inc., 805 P. 2d 1244 - Kan: Court of Appeals 1991

### III ANALYSIS AND ARGUMENT

Defendant argues that Plaintiff's Complaint should be dismissed for the following reasons: (1) Title VII Does Not Include "Perceived National Origin" Claims, (2) The 2014

Student Comments Do Not Give Rise To An Inference of Discrimination For Her 2016 Termination, (3) Plaintiff Has Failed to Plead a Claim for Gender Discrimination or Hostile Environment, (4) Plaintiff Has Failed to Plead a Claim for Retaliation. Defendant also argues: (A) Plaintiff is Precluded from Refiling Her Employment Discrimination Claims Dismissed by the State Court Order, (B) Defendant University Of Kansas Is Immune From Plaintiff's 1983 Claims, (C) Plaintiff's Title VII Claims are Time-Barred and (D) Plaintiff Fails to State a Claim Under Title VII.

Each argument is addressed in turn.

## 1. Title VII Does Not Include "Perceived National Origin" Claims

Defendant cites *Yousif* to support its claim, a 2013 case in which was found, "Plaintiff cites no valid authority recognizing perceived discrimination claims under Title VII, and the court finds none."[1]

Plaintiff cites the Code of Federal Regulations (CFR) as the valid authority, as well as the Equal Employment Opportunity Commission (EEOC). Plaintiff had originally qualified her German national origin status with the word "perceived", but need not, as she meets the CFR's definition of "national origin". The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination includes the following (Plaintiff's emphasis):

> *The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the* physical, *cultural or linguistic characteristics of a national origin group.*

Plaintiff stated in the Introduction of her Complaint: "Prior to the Petitioner's appointment as

---

[1] HUBERT YOUSIF, Plaintiff, v. LANDERS MCCLARTY OLATHE KS, LLC, and RLJ-McCLARTY-LANDERS AUTOMOTIVE HOLDINGS, LLC, Defendants, Case No. 12-2788-CM., October 29, 2013 Memorandum and Order

Assistant Professor at the University, she lived and worked in Germany as an animator, freelance artist and educator for over thirty years." Defendant does not dispute that Plaintiff was a resident of Germany and is fluent in German, as explained in Plaintiff's Complaint: "The Petitioner is fluent in German. While still a resident of Germany, the Petitioner also held full-time teaching positions at universities in the United States for a total of four academic years prior to 2012." Defendant does not contest that Plaintiff, after having lived in Germany for over thirty years, has noticeable cultural characteristics of Germans.

Regarding Plaintiff's linguistic characteristics: Petitioner, having lived in Germany for over 30 years and being under the age of sixty, spoke German for most of her adult life. Defendant does not dispute this. Plaintiff recounted in her Complaint how students specifically complained about the Petitioner's "linguistic characteristics" in their evaluation comments, claiming that Plaintiff *"drove us nuts frequently mispronouncing well-known words..."* and *"...pronounced words absurdly. I would like nothing more to see her fired from the film department."*

The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination also includes (Plaintiff's emphasis):

> ***The Commission will examine with particular concern charges alleging that individuals within the jurisdiction of the Commission have been denied equal employment opportunity for reasons which are grounded in national origin considerations, such as…***
>
> ***(b) membership in, or association with an organization identified with or seeking to promote the interests of national origin groups;…***

It was well known to Defendant's staff, faculty and administrators that Plaintiff was involved with organizations that promoted German culture. For example, Plaintiff's CV, submitted at every evaluation and always available to Defendant's administrators through

Defendant's online program "Academic Pro", shows that Plaintiff's films are/were included in multiple German film archives, where they are identified as German productions. The purpose of such archives is to promote German culture through German films. Plaintiff's CV also listed her animated films as included in multiple international tours by the Goethe Institute, Munich, Germany, and representative of quality German animation production, again, promoting German culture. Plaintiff's CV showed that was a member of the German Studies Association and that, while employed by Defendant, Plaintiff attended and presented papers at multiple annual German Studies Association Conferences. The German Studies Association describes itself thus (excerpt, Plaintiff's emphasis)[2]:

> **The German Studies Association is the premier multi- and interdisciplinary association of scholars focused on German,** *Austrian, and Swiss* **history, literature, culture studies, political science, and economics.** *A non-profit educational organization,* **GSA promotes research and study of Germany**, *Austria, and Switzerland.*

The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination also includes:

**(d) because an individual's name or spouse's name is associated with a national origin group.**

Defendant does not dispute that Plaintiff's last name, "Joritz", is German. The website Geneanet.org points to Germany as the most prevalent location of origin for persons with the surname "Joritz"[3] (EXHIBIT 3, screenshot of Geneanet's "Origin of the name JORITZ). Ancestry.com identifies the Joritz Family Origin as Sleviz, Germany[4] (EXHIBIT 4, screenshot ancestry.com). Ancestry is the original and undisputed basis of coverage for national origin discrimination.

---

[2] *About GSA*, https://www.thegsa.org/about/index.html
[3] https://en.geneanet.org/surnames/JORITZ
[4] https://www.ancestry.com/name-origin?surname=JORITZ

The U.S. Equal Employment Opportunity Commission (EEOC), a federal agency tasked with enforcing Title VII, is another valid authority. The EEOC cites the CFR's definition of national origin discrimination on its website and adds the following[5] (emphasis added):

> **Harassment**
> **Title VII prohibits national origin harassment when it is so severe or pervasive that it creates a hostile work environment.  A hostile work environment based on national origin can take different forms, including ethnic slurs**, *workplace graffiti, physical violence,* **or other offensive conduct directed towards an individual** *because of birthplace, ethnicity,* **culture, language,** *dress,* **or foreign accent.  Employers are required to take appropriate steps to prevent and correct unlawful harassment**. *Likewise, employees are* **responsible for reporting harassment at an early stage to prevent its escalation.**

There is no slur more offensive to a German or person affiliated with Germany than "Nazi" or "Nazi sympathizer". Defendant does not dispute that Plaintiff was referred to as a "Nazi Sympathizer" by Defendant's students nor that Defendant's students ridiculed Plaintiff's pronunciation of words. Plaintiff's Complaint describes how Defendant's students even complained that Plaintiff spoke about Germany:

> *"Talked about Germany all the time", she talked about "German feminism"... "I've heard she told a student that schools don't grade like KU in Germany, but we're at KU."*

In its Motion to Dismiss, Defendant refers to these slurs as "stray remarks" by "non-decision-makers". Would Defendant argue the same if an African American faculty member was complained about by students, who used the "n word" to describe the professor? Would Defendant trivialize students' use of the term "kike" as "stray remarks" when evaluating a Jewish faculty member? Also, anyone who has ever worked at a university knows that student evaluations exert tremendous influence over the retention of faculty members. Every single performance evaluation Plaintiff has undergone at Defendant-University included and focused on student evaluations.

---

[5] Facts About National Origin Discrimination, https://www.eeoc.gov/eeoc/publications/fs-nator.cfm

Student evaluations are anonymous; Plaintiff never knew which of the Defendant's students had made the discriminatory comments nor how many students denigrated her for her German background among each other. The fact that the anti-German animus toward Plaintiff was shared by at least some of her faculty colleagues intensified Plaintiff's discriminatory, hostile work environment and threatened her employment. The 2014-2015 PTT Review Committee faculty members, on whom Plaintiff's employment was dependent for positive evaluations, blamed the Plaintiff's German background as the root of her "difficulties". No concern was expressed about the Plaintiff facing such animosity, nor was it reported, as Defendant's policy dictates. Defendant does not dispute, but instead trivialized the following quote, which was included in Plaintiff's 2014-2015 PTT Review and stemmed from Plaintiff's colleagues, the PTT Review Committee members:

> *"they* (hostile student comments*) may also be due to the fact that she taught extensively in*
> *Germany for many years before teaching at KU, and she has had some difficulty in*
> *adjusting her communicative and teaching skills to her new environment and culture"*

Defendant argued that this comment did not "give rise to an inference of national origin" and "is not a slight to her perceived national origin." Again, would Defendant trivialize the faculty performance evaluation of a Jewish colleague, if it included, *"they* (hostile student comments referring to the faculty member as "kike"*) may also be due to the fact that she taught extensively in Israel for many years before teaching at KU, and she has had some difficulty in adjusting her communicative and teaching skills to her new environment and culture"*?

Despite Plaintiff then reporting her concerns of discrimination and hostile work environment to Defendant's faculty and administrators, nothing was done to correct, prevent or rectify the harassment/discrimination. From Petitioner's Complaint:

*The Petitioner's complaints of discrimination were trivialized, ignored and/or became a catalyst for retaliation by University administrators.*

The devastating effect this had on Plaintiff is described in her Complaint:

*The Petitioner became "a closet German" in her workplace, fearing end-of- semester student evaluations to the point of panic and near nausea.*

Plaintiff's Complaint contends that she was discriminated against based on her national origin and that Plaintiff meets the standard for this claim. Plaintiff's Complaint clearly demonstrates that Defendant deprived her of her incontrovertibly established constitutional rights, causing her loss of property (income), and that she is entitled to relief.

**2.      The 2014 Student Comments Do Not Give Rise To An Inference of Discrimination For Her *(Plaintiff's)* 2016 Termination**

The description of the Progress Toward Tenure Review (PTTR) process, which Defendant provided to the Court on page 2 in its Motion to Dismiss, omitted key aspects of the evaluation process and their relevancy to this case. Defendant failed to explain, for example, that the termination (non-reappointment) of a tenure-track professor can be a long, tiered process that takes multiple years for Defendant to execute. Defendant argues that because Plaintiff's contract was not renewed until after her second, 2015/16 PTT Review, the discriminatory, anti-German comments from both anonymous students and professors in Plaintiff's 2014/15 PTT Review, did not play a role in Plaintiff's termination. Defendant failed to mention that the student comments were included in Plaintiff's 2014/15 PTT Review, her 2015/16 PTT Review and <u>EVERY</u> meaningful performance evaluation thereafter. It is unreasonable to think that the inflammatory, negative comments bore no influence on evaluators, whether cited in evaluations or not.

In fact, then-Department Chair, Tamara Falicov was so alarmed by the Petitioner's 2014 Spring student evaluations, that she violated the Departmental evaluation policy by referring to

them in Plaintiff's **2013** annual merit evaluation, which was Plaintiff's first performance evaluation. In Plaintiff's 2013 annual merit report, Falicov/Defendant referred to Plaintiff as having "some teaching difficulties in 2014", recommended that Plaintiff "improve" and attend a time-consuming "teaching triad program" during Plaintiff's unpaid, free time, "to continue to improve your teaching". This demoralized Plaintiff and punished her for student anti-German animus that was beyond her control and oppressive. Defendant's decision to reference Plaintiff's 2014 student evaluations in Plaintiff's evaluation for the year prior, revealed their importance, indicated Defendant's tacit support for the students and began a premature "paper trail" of Plaintiff's purported "difficulties". It also meant that Plaintiff's very first performance evaluation through to her very last were tainted with the ever-present (because never removed), anti-German comments (EXHIBIT 5, 2013 Merit Report letter). Chair Falicov did not report the discrimination, in violation of Defendant's policy.

The discriminatory student evaluation comments were included in Plaintiff's 2014-2016 PTT Reviews. Defendant employed Plaintiff's first 2014/15 PTT Review as a means to INITIATE Plaintiff's termination, i.e. the 2014/15 PTT Review was the first part of a lengthy, 2-part, multiple-year process. Faculty are given no more than two chances to pass a PTT Review. Had Plaintiff passed it the first time, her employment would have continued at least four years until her Tenure Review. In a step-by-step process of termination, Defendant had to ensure that Plaintiff would fail the first PTT Review (2014/15), so she would be forced to undergo it a second time, and could then be terminated.

Defendant raises the issue of causal connection and "time gaps", referencing *Proctor v United Parcel Services* and *Piercy v Makata (sic)* as guides to formulaic "acceptable" or "not acceptable time gaps". University evaluation schedules and termination processes are very

different than those of UPS or El Paso jails. A four-month gap between protected activity and retaliation is nothing in a world where summer breaks last three months, schedules are ruled by semesters and performance evaluations occur in annual or longer cycles. As also confirmed in the *Piercy v Maketa* case, "temporal remoteness is not necessarily dispositive".

Plaintiff describes in her Complaint multiple examples of a hostile work environment that include, but are not limited to, a) denying Plaintiff access to evaluation documents, thus prohibiting Plaintiff from responding/taking action, b) faculty and administrators maligning Plaintiff's performance evaluations with outright lies about her research and "behavior" with the goal of having Plaintiff terminated, c) denying Plaintiff freedom of speech, d) stonewalling Plaintiff's emails, e) criticizing Plaintiff for reporting discrimination, f) denying Plaintiff her right to meet with the Provost (freedom of association, due process), g) violating Defendant's own policies and procedures in order to have Plaintiff terminated, h) diminishing Plaintiff's German-related research accomplishments in order to have Plaintiff terminated, i) denying Plaintiff academic freedom, as prescribed by Defendant's own policy, j) isolating Plaintiff from her colleagues, k) breaching a contract with Plaintiff, stripping Plaintiff of a potential second office, $1,000 and a semester "off", freeing Plaintiff to conduct research, and more (Please see Plaintiff's Complaint).

*"...a court must accept the plaintiff's description of that which occurred, along with any inferences reasonably to be drawn therefrom."* It is reasonable to infer that Plaintiff's hostile work environment was created by Defendant's retaliation against Plaintiff, catalyzed by a generalized, discriminatory hostility toward Plaintiff and Plaintiff engaging in protected activity. The fact that Defendant took no measures whatsoever to address Plaintiff's discrimination concerns/complaints underscores this theory.

In its Motion to Dismiss pp 6-7, Defendant wrote,

*Plaintiff claims that she "brought [Dr. Jacobsen's] sexist and aggressive behavior toward her to the attention of her supervisor, Chair Baskett, and requested that the faculty member be recused from a committee that would evaluate her." Id. Plaintiff does not identify what constitutes "sexist and aggressive behavior." Plaintiff then claims that the Chair evaluated her performance to retaliate against her and the male professor was not disciplined.*

Plaintiff would first like to correct Defendant's "Facts Related to Purported Gender Discrimination" (p.6 of Defendant's Motion to Dismiss), which reveals Defendant's pro-male bias, this time through its counsel. Defendant refers to Professor Jacobson as "**Dr**. Jacobsen"*(sic)*, assuming that the male colleague that Plaintiff complained about has a higher level of education and status than Plaintiff. In reality, Professor Jacobson's terminal degree is a MFA, as noted on his faculty webpage.[6] This is a telling example of Defendant's sexist, pro-male culture, which automatically assumes the highest status for a male professor, despite facts to the contrary so readily at hand (KU website).

Defendant describes Professor Jacobson as having "served on several of the Petitioner's performance evaluation committees", omitting the fact that Jacobson is named on page 3 of Plaintiff's Complaint as being a *faculty committee member who Plaintiff had reported discrimination to, and who had not reported it*, as required by Defendant's own policy.

Although Plaintiff did not detail the "sexist and aggressive behavior" of this male colleague in her Complaint, Plaintiff's reporting of is protected activity: Sexism by definition is discrimination. Plaintiff's Complaint (pp. 7-8) relates how her Department Chair, Professor Baskett, used Plaintiff's discrimination complaint in an evaluation letter he construed in order to terminate her employment: In Baskett's 2015/16 PTT Review evaluation letter, Baskett

---

[6] https://film.ku.edu/matthew-jacobson#link1

recommended, *against the recommendation of the PTT Review committee members,* that Plaintiff's employment be terminated, referencing Plaintiff's complaint with the thinly-veiled comment, "On other occasions, the candidate has disparaged and impinged the reputation of PTTR Committee members in unsolicited emails to the Chair without producing credible evidence." (EXHIBIT 6) Chair Baskett did not seek "credible evidence", nor do faculty members' departmental complaints require "solicitation". If Plaintiff required "solicitation" before contacting the Chair, but others did not, Plaintiff was subject to disparate treatment. In this instance and in others, proving disparate treatment necessitates discovery.

Chair Baskett continued his letter (Plaintiff's emphasis): "Further, the risk of excessive and unwanted contact **(and possibility litigation)** by the candidate was a reason cited by faculty who declined to serve on her PTTR committee this year." Baskett's bizarre inclusion of "possible litigation" in a performance evaluation letter about Plaintiff, a letter that would be in turn referenced by every subsequent administrator and decision-maker, all agreeing, based on this letter, to terminate Plaintiff's employment, is inexplicable, shocking and revealing. Plaintiff had never mentioned litigation. Plaintiff had complained about discrimination. Baskett raised the threat of Plaintiff entering into "litigation" – a red flag for administrators – in a performance evaluation about Plaintiff, which should have solely addressed three evaluation criteria: Teaching, Research and Service. It is reasonable to infer that Defendant brought up the subject of "litigation" because Plaintiff complained about discrimination. Baskett's (Defendant's) inclusion of the threat of litigation in Plaintiff's critical-to-Plaintiff's-livelihood-performance evaluation was a retaliatory, materially adverse employment action. Even worse, Defendant denied a copy of Baskett's letter to Plaintiff, who, as a result, was prevented from knowing its content, filing a response, filing a grievance, or in any way addressing Baskett's retaliatory action. The denials by

administrators, Baskett and others were more retaliatory, materially adverse employment actions. Baskett's letter was passed from administrator to administrator, all of whom not only tacitly condoned Baskett's inclusion of Plaintiff's purported "threat of litigation", but took heed: Straight up the Chain of Command every administrator recommended that Plaintiff's employment be terminated. The "non-decision-makers", who were privy to Baskett's letter excoriating Plaintiff, did nothing.

Returning to the subject of "aggressive behavior": Aggressive behavior, even described with so few words, can symptomize sex discrimination if it represents disparate treatment, i.e. male colleagues are not met with aggression. Again, the nature of this Complaint is such that discovery is necessary to proving Plaintiff's claim.

In *Twombly/Iqbal*, the Supreme Court considered the pleading standard sufficient to satisfy the requirement that a plaintiff make "a short and plain statement of the claim that the pleader is entitled to relief." Plaintiff asserts that she has more than met this standard.

## 1.   Plaintiff Has Failed to Plead a Claim for Retaliation.

Plaintiff's Complaint consistently alleges retaliation for having reported discrimination, a protected activity. Plaintiff's Complaint includes a narrative, which is related in an informal, chronological fashion. The chronology, though not detailed with dates, gives an account of how Plaintiff discovered, early on, an anti-German animus directed at her by students and faculty, how Plaintiff then repeatedly reported the discrimination to staff, faculty and administrators, and how Plaintiff was subsequently met with indifference, a hostile work environment and ever-escalating assaults on her personal reputation and position/livelihood (i.e. materially adverse actions).

For an employee to prove a prima facie case of retaliation, three elements must be met[7]:

1. The employee participated in a protected activity
2. The employer undertook a materially adverse action against the employee, and
3. The employer's materially adverse action against the employee was in response to the protected activity–that is, there is a causal connection between the protected activity and materially adverse action.

1. Defendant does not dispute that Plaintiff repeatedly engaged in a protected activity by reporting and opposing discrimination to Defendant's staff, faculty and administrators.

2.a Defendant does not dispute that Defendant faculty and administrators failed to report Plaintiff's complaints of discrimination, as required by Defendant's own policy and the EEOC.

b Defendant does not dispute that it terminated Plaintiff's employment (materially adverse action).

3. Defendant omits from its arguments the causal connections linking Plaintiff reporting discrimination (the protected activity) to the series of materially adverse actions taken by Defendant's faculty and administrators, including but not limited to, Chancellor Bernadette Grey-Little. Such actions included, but were not limited to, terminating Plaintiff's employment and damaging Plaintiff's reputation. Plaintiff clearly asserts in her Complaint, p.7:

> *After the Petitioner reported the anti-German discrimination and policy/procedural violations to several University administrators, the same University administrators did nothing to address the violations. Instead, the University began the process to terminate the Petitioner's employment.*

---

[7] *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1252 (10th Cir.2001)

On 4.15.16 Plaintiff met personally with Chancellor Bernadette Grey-Little and reported the discrimination Plaintiff faced. Grey-Little's non-reappoint letter to Plaintiff was signed less than one month later, on 5.13.16. The temporal proximity of these actions shows a reasonable inference of retaliation. Plaintiff asserts in her Complaint that there are more examples of causal connections between Plaintiff's reporting, or attempting to report, discrimination and Defendant's subsequent retaliation(s) (materially adverse actions). Plaintiff has, since filing her original complaint, uncovered more details and will filed a Motion for Leave to Amend her Complaint in order to include them.

Already this case has clear examples in which the temporal proximity of Plaintiff's protected activity is in close relation to Defendant's subsequent adverse employment actions. Example 1:

**3.24.16** Plaintiff meets with Defendant's College of Liberal Arts, Dean Lejuez and reports her concerns about the discrimination she has faced. Plaintiff suggests a solution for hindering student discrimination in faculty performance evaluations in the future. (EXHIBIT 7, 03.24.16 Joritz Letter to Lejuez follow-up after meeting, see especially letter "h" and the following paragraph.)

**4.08.16** Two weeks later, Dean Lejuez signs a recommendation for Plaintiff's termination. In his letter, Lejuez makes reference to the fact that Plaintiff has contacted him and "several others" with her discrimination concerns (EXHIBIT 8, 04.08.16 Joritz, C_FMS_PTTR 2016_Dean's letter), excerpt:

> *"It is notable that during the PTTR process, you raised a number of concerns with me (and several others), including that prejudicial statements were included in the departmental review."*

(Note: Lejuez never addressed Plaintiff's concerns of discrimination, nor did he take action to address the general issue of discrimination by students against faculty in performance evaluations. He simply signed off on Plaintiff's termination.)

Example 2:

**4.15.16** Plaintiff met personally with Chancellor Bernadette Grey-Little and reported the discrimination Plaintiff faced.

**5.13.16** One month later Grey-Little signs the non-reappointment letter to Plaintiff.

(Please see #4.)

**2.   Plaintiff Has Failed to Plead a Claim for Gender Discrimination or Hostile Environment.**

Since filing her Complaint, Plaintiff has been made aware of the completion of an internal "investigation" of Plaintiff's complaints of discrimination/retaliation by Defendant's IOA, dated June 28, 2017. Defendant sent Plaintiff a 12-page version of the results and gave Plaintiff *ten days* to respond/appeal the results. (The 10 days were later expanded to a few weeks.) On the same day, Defendant's IOA Director, Shane McCreery, also emailed Plaintiff a letter stating that his "evaluation of the "merits" of three of Plaintiff's claims of discrimination/retaliation were deemed as not "actionable" and were closed "without investigation". Plaintiff was informed she had "ten working days" to appeal why closing "the complaint without an investigation was in error". Months prior, Plaintiff had filed two lawsuits against Defendant. McCreery mentioned them in his letter.

(EXHIBIT 9), 6.28.17 Shane McCreery findings letter, excerpt:

> *Although you allege Dr. Cateforis and the Board's review of the two lawsuits you filed against the University were the basis for the discrimination and retaliation…*

Defendant's refusal to investigate Plaintiff's allegations of discrimination and retaliation constitutes a materially adverse action as well as an unconstitutional practice. Defendant's refusal was employed to silence Plaintiff for engaging in protected activity as well as to communicate to her, and to others who knew of her complaints, the sheer pointlessness of reporting discrimination/retaliation to Defendant. This action also shielded Defendant's employees, who Plaintiff accused of discrimination/retaliation.

Defendant (McCreery) then informed Plaintiff that a second, 36-page version of Defendant's IOA "investigation" findings existed, upon which began Defendant's (Diane Goddard, Vice Provost for Administration and Finance) corresponded run-around of refusals to provide Plaintiff with the 36-page investigation. (EXHIBIT 10 screenshot Goddard email dated 7.11.17 to Plaintiff), excerpt:

*If you would like to review the full investigation report, you may review at copy at the IOA office.  However, the University does not provide copies of the IOA report to the complainant and it will not be emailed to you.*

These events are not included in Plaintiff's original Complaint as they occurred several months after Plaintiff's filing, but they will be included in Plaintiff's forthcoming EEOC Complaint. <u>For this reason and more, Plaintiff will file immediately after this Response a Motion for Leave to Amend her Complaint.</u>

Because the aforementioned occurrences make it reasonable to conclude that Plaintiff was both discriminated against and retaliated against for engaging in protected activity, and because it is reasonable to assume that discovery will turn up more evidence, Defendant's Motion to Dismiss must be denied.

**A.  Plaintiff is Precluded from Refiling Her Employment Discrimination Claims Dismissed by the State Court Order**

Defendant argues, "Because Plaintiff has previously sued the University of Kansas for many of the events alleged in this federal court case and because the state district court ordered that those claims be dismissed with prejudice, under the doctrine of res judicata, Plaintiff is precluded from refiling those claims and they must be dismissed." Defendant is referring to Plaintiff's earlier Petition against Defendant, Case No. 2016-CV-000254 (a Kansas Judicial Review Act case), which previously included allegations of discrimination and retaliation under "Count VI" of Plaintiff's earlier petition.

On page 4 of Defendant's Motion to Dismiss, listed under STANDARD OF REVIEW, Defendant provides the Court with ample case law (Plaintiff's emphasis added): "When considering a motion to dismiss based on res judicata, this court **may** take judicial notice of records both from this Court and state courts in determining the relevant facts." Defendant also cites, ("[W]e **may exercise our discretion** to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.")

On page 11, Defendant alleges, "Because all of the elements are met, Plaintiff's employment discrimination claims are barred by res judicata."

Plaintiff vehemently disagrees. Defendant's attempt to have this case dismissed on the basis of res judicata is disingenuous and plays "fast and loose" with the Courts. Although there was a procedural dismissal made with Defendant's and Plaintiff's consent, there was never an adjudication based on the merits, nor could there be.  As Defendant previously argued in the above-mentioned case in Defendant's very thorough, 5-page "PARTIAL MOTION TO

DISMISS", filed on 9.19.16, p.4 (EXHIBIT 11), excerpt:

> *Prior to bringing a lawsuit under Title VII and the Kansas Act Against Discrimination, Plaintiff Joritz must have first filed a charge of discrimination with the requisite agencies and received an administrative determination. Under Title VII, a plaintiff must obtain an administrative determination, most often in the form of a right to sue letter, from the United States Equal Employment Opportunity Commission ("EEOC") as a prerequisite to suit. See 42 U.S.C. § 2000e–5(f)(1); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 797–98, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Exhaustion of administrative remedies is a jurisdictional prerequisite to bringing suit under Title VII. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999); Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 799 (10th Cir.1997).*

> *Similarly, under the Kansas Act Against Discrimination ("KAAD"), employees claiming unlawful employment practices are required to file charges of discrimination with the KHRC. Griffin v. Dodge City Co-op. Exch., 23 Kan. App. 2d 139, 148, 927 P.2d 958, 965 (1996) (citing K.S.A.1995 Supp. 44-1005(a)).*

Defendant was correct: Plaintiff had not obtained a right to sue letter prior to filing her petition and had not filed charges of discrimination with the KHRC, as required. For these reasons, the Title VII portion of Plaintiff's Judicial Review Act case was moot from the outset and could not be adjudicated. It was for this reason, and this reason alone, that Plaintiff agreed to a Motion for Partial Dismissal, which she expressed in an email to Defendant dated 10.10.16, along with some other concerns (EXHIBIT 12), excerpt, emphasis added:

> *This email is **in response to your Partial Motion to Dismiss in which you make the case to dismiss Count VI of my petition**. I am in agreement with removing Count VI. Please write your agreed-upon motion and email it to me for review.*

On 10.13.16 Defendant sent Plaintiff an email with the attached documents, *Proposed Joint Stipulation of Partial Dismissal* and *Proposed Stipulated Order of Partial Dismissal* (EXHIBITS 13-15). In the correspondence exchanged between Defendant and Plaintiff regarding the proposed "Motion for Partial Dismissal", the words "with prejudice" or "without prejudice" were

not included – nor would Plaintiff, at that point, have understood them! Plaintiff was *pro Se*, had no experience in law and, as Plaintiff's emailed excerpt above demonstrates, had just learned from Defendant's September "PARTIAL MOTION TO DISMISS", that Plaintiff had made a mistake by including discrimination and retaliation claims without having "exhausted her remedies" beforehand. By agreeing to sign the "joint stipulation", Plaintiff acted in good faith to remedy the situation. Plaintiff had no intention, and did not know it was possible, to "sign away her rights" to future litigation with a Stipulation for a Motion for Partial Dismissal, nor did Plaintiff think Defendant would try to trick her into doing so. Had Plaintiff known that Defendant had misrepresented/omitted the implications of the agreement, Plaintiff would have not agreed to the agreed-upon-motion at all.

The purpose of res judicata is to protect "the integrity of the judicial process". Plaintiff respectfully requests that the Court take notice of the aforementioned circumstances and use its discretionary power to further justice, rather than permit justice to be thwarted through a deceptive "agreement" akin to fraud. In support of her request, Plaintiff quotes Defendant's cited case law:

*A party cannot raise an issue in a new case that it could have raised previously without "seriously undercutting the orderly process of the law." Celotex Corp. v. Edwards, 514 U.S. 300, 313, 115 S.Ct. 1493 (1995)*

Plaintiff **could not** have raised the issues at hand previously, as Defendant correctly and repeatedly identified in its PARTIAL MOTION TO DISMISS, filed nearly a month prior to the "agreed-upon-motion". From Defendant's PARTIAL MOTION TO DISMISS, p.4, an excerpt:

*Prior to bringing a lawsuit under Title VII and the Kansas Act Against Discrimination, Plaintiff Joritz must have first filed a charge of discrimination with the requisite agencies and received an administrative determination.*

Five months later, Plaintiff, still *pro SE*, made efforts to proceed correctly when she filed this Complaint in Federal Court, properly including the EEOC's right-to-sue letter. It is in the interest of justice to permit this case to move forward.

## B. Defendant University Of Kansas Is Immune From Plaintiff's 1983 Claims

Defendant claims that it is immune from Fourteenth Amendment Due Process claims and deprivations under the First Amendment, claims that are generally brought against individuals under 42 U.S.C. 1983. The balance between the 11th Amendment (ratified in 1795) and the 14th Amendment (ratified in 1868) is a widely discussed and debated subject. The 14th Amendment, signed nearly a century after the 11th, sought to restrain the states by limiting their ability to "deprive any person of life, liberty or property without due process of law."[8]

Plaintiff contends:

1. Defendant is not immune from liability for injunctive relief.

2. In limited circumstances, these Constitutional claims can be brought against an employer if the evidence, or plausible allegations on a motion to dismiss, show the employer had an unconstitutional policy or practice. Plaintiff argues that, even pre-discovery, Plaintiff has shown multiple unconstitutional practices exercised by Defendant as practice and policy. For example, the fact that Defendant gave Plaintiff a few weeks to appeal Defendant's lengthy, 36-page "investigative" discrimination-report, which Defendant refused to send to Plaintiff, is one such practice. Please see #4, in which Defendant's administrator, Diane Goddard, states as practice a refusal to provide Plaintiff a copy of the discrimination-report Plaintiff is to appeal: *"However,*

---

[8] https://harvardlawreview.org/2016/02/reconciling-state-sovereign-immunity-with-the-fourteenth-amendment/

*the University does not provide copies of the IOA report to the complainant and it will not be emailed to you.".*

Another example of Defendant's unconstitutional practice is the practice of affording its students a venue for unfettered and unaccountable discrimination against faculty members in anonymous end-of-semester evaluations. Discriminatory evaluations are not only emotionally hurtful: They can destroy faculty members' reputations and directly, negatively impact faculty members' employment.

On page 5 of Plaintiff's Complaint another unconstitutional practice is described. For weeks Defendant "initially refused to provide the Petitioner with the (2014-15) PTTR Evaluation Document", before finally emailing it to Petitioner (by accident). This was the same document in which the faculty PTT Review committee had included the discriminatory comment about the Petitioner's "German background". Plaintiff relates in her Complaint how "Chair Falicov told the Petitioner that she was not entitled to a copy of the PTTR Evaluation Document and instructed her to delete it." Chair Falicov told the Plaintiff that she was not entitled to a copy of the PTTR Evaluation Document, because this was the Defendant's accepted practice. Refusing to permit faculty from seeing an evaluation of their own performance, in which discriminatory statements and underhanded practices can be hidden, is unconstitutional. It not only denies faculty their rights to due process; It hides and supports Defendant-wrongdoing, such as engaging in illegal, discriminatory practices and/or violating policies. This practice can become the vehicle for retaliation, wrongful termination, defamation and…? The sky is the limit.

3. Plaintiff points out that Defendant's denial of 1st and 14th Amendment rights are symptomatic of retaliation by Defendant against Plaintiff. Defendant's Constitutional denials of

free speech and due process contributed to isolating Plaintiff and creating a hostile work environment, again symptomatic of Defendant retaliating against Plaintiff.

4. Plaintiff will file immediately following this Response a Motion for Leave to Amend her Complaint. Since her original filing, Plaintiff has acquired additional information and evidence and has experienced continued discrimination/retaliation by Defendant. Plaintiff requests the Leave to Amend in order to add specificity to her Complaint, additional facts and individual parties.

### C. Plaintiff's Title VII Claims are Time-Barred

Defendant argues that Plaintiff's claims are time-barred "as she did not file her charge "within three hundred days" of the alleged unlawful act", referring to the Plaintiff's summer of 2014 discovery of the discriminatory student evaluation comments. Defendant further quotes, "…"Because the timely filing of a discrimination charge with the EEOC is not a jurisdictional prerequisite to a suit in federal court…"

Defendant's argument is without merit for the following reasons:

First, Defendant does not dispute the fact that the student evaluation comments were included in Plaintiff's records for *every* PTT Review she underwent (2014/15 and 2015/16). In other words, "the alleged unlawful act" was not a single act with a specifically associated date, but rather an ongoing continuum, because the discriminatory student comments continued to taint Plaintiff's record for the 2015/16 PTT Review, for potential merit pay raises and throughout the remainder of Plaintiff's career at the University. Defendant does not dispute that passing the 2015/16 PTT Review was necessary to Plaintiff's continued employment, nor does Defendant dispute never having removed the discriminatory student comments from Plaintiff's record, despite Plaintiff's repeated requests to Defendant to do so.

Second, as an employee of the Defendant-University of Kansas, Plaintiff was obligated to first exhaust the remedies available to her within the University (Defendant) before submitting her complaints for investigations to the EEOC and Kansas Commission on Human Rights. Plaintiff did so, making multiple good faith efforts to report, discuss and attempt to remedy the issues of discrimination with colleagues and superiors (Defendant's employees). These efforts, as well as Defendant's responses, took time to complete. They fairly afforded Defendant multiple opportunities to address/rectify the issues Plaintiff raised. As described in Plaintiff's Complaint Addendum, pp 3-4:

> The Petitioner recognized that the student comments were evidence of anti- German discrimination against her. (She later discovered the EEOC's category, "national origin", which includes perceived national origin.) She was concerned about the anger in the student comments, which reflected a hostile work environment. At various times the Petitioner met with the following faculty members to discuss the discrimination and her concerns: former Department Chair Professor Tamara Falicov, current Department Chair Professor Michael Baskett, and members of the Faculty Evaluation Committee consisting of Professors Matthew Jacobson, Catherine Preston and Kevin Wilmott.

> The Petitioner also met with, on separate occasions, University administrators including the College of Liberal Arts Dean Carl Lejuez, Director of the School of Arts Professor Henry Bial and Chancellor Bernadette Gray-Little. All of the aforementioned persons had a University-policy obligation to report allegations of discrimination to the University's Institutional Opportunity and Access (IOA) office. Henry Bial did so one time. The others did not.

> The Petitioner requested that the University remove the anti-German comments from her record and she suggested ways to address the issue of student discrimination against faculty in the future, specifically in student evaluations. The Petitioner's complaints of discrimination were trivialized, ignored and/or became a catalyst for

*retaliation by University administrators. The University did not remove the discriminatory student comments from the Petitioner's record and took no action to prevent such discrimination from occurring in the future.*

*Early in December 2015 the Petitioner approached the University's Office of Institutional Opportunity and Access (IOA) to discuss her concerns of discrimination based on national origin, including the discriminatory student comments, which would negatively impact her performance record on an ongoing basis, forever..."*

Third, the EEOC Employment Discrimination Complaint form makes clear on page one: "**NOTE**: *In order to bring suit in federal district court under Title VII, you must first obtain a right-to-sue letter from the Equal Employment Opportunity Commission.*" Plaintiff's right-to-sue letter is dated 10.13.16. Plaintiff timely filed her Complaint on 1.06.17.

**D. Plaintiff Fails to State a Claim Under Title VII.**

Plaintiff's Complaint alleges national origin discrimination and has stated what national origin is in question (German). Plaintiff's complaint has already, without discovery, included ample examples of anti-German animus directed at her by both Defendant's employees and Defendant's students. Plaintiff alleges in her Complaint that her German-related research was disparaged and ignored by Defendant; Defendant in turn claims Plaintiff's research was deficient. "Viewed in the most favorable light to the plaintiff," and in light of Plaintiff's history of over-achievement, the reasonable inference is that Plaintiff's employment was terminated based on the pretext of insufficient research. In short, Plaintiff's Complaint alleges sufficient facts to state a claim of national origin discrimination and demonstrates that Plaintiff is entitled to relief. Plaintiff also includes sufficient facts to state claims of sex discrimination as well as retaliation for engaging in protected activity. Additionally, please see Plaintiff's arguments 1-4.

Plaintiff concurs:

> *"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection."*[9]

### III.   CONCLUSION

Defendant, through its Motion to Dismiss, is attempting to convince this Court, for the reasons stated above, that Plaintiff's complaint should be dismissed. Plaintiff asserts to the contrary that she has clearly set out in her Complaint and in this Response, sufficient cause to permit this case to move forward. Plaintiff further asserts that Defendant has misled the Court regarding important facts and information, that Defendant purposely omitted facts and that Defendant disingenuously claimed res judicata, which Plaintiff has proven not applicable in this case.

Moreover, Plaintiff has acquired new evidence that supports her Complaint, and has since been subject to continued discrimination/retaliation by Defendant. Plaintiff will file a second EEOC complaint in the coming weeks. For these reasons, Plaintiff requires leave to amend her Complaint and add the EEOC's second right-to-sue letter to this lawsuit.

It would be premature to dismiss Plaintiff's complaint at this stage. Plaintiff has not begun discovery, which is necessary to the development and detailing of her case and to substantiating that Plaintiff's allegations are grounded in fact. It is in the interest of justice to grant Plaintiff the chance to conduct discovery, be given the opportunity to prove her case and have her "day in court".

---

[9] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803).

WHEREFORE, Plaintiff respectfully requests this Court deny the Motion to Dismiss filed by Defendant in its entirety.

Respectfully submitted,

Catherine A. Joritz, *pro Se*
PO Box 422
Perry, KS 66073
T: (630) 857-8907
E: cjanimate@aol.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**


CATHERINE A. JORITZ,

                    Plaintiff, *pro Se*


              -vs-                       Case No. 5:17-cv-04002-SAC-KGS

THE UNIVERSITY OF KANSAS,
                    Defendant.


**NOTICE**

      TO:    Megan K. Walawender, *Attorney for Respondent University of Kansas*

You are hereby notified that Cathy Joritz, *pro Se*, did on December 29, 2017 cause to be filed per email:

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT**

You have been emailed a copy of this motion on December 30, 2017 to

megan.walawender@ku.edu and have been sent on January 2, 2018 a copy via postage pre-paid

certified U.S. Mail, upon:

      Megan K. Walawender, *Attorney for Respondent University of Kansas*
      Associate General Counsel and  Special Assistant Attorney General
      245 Strong Hall
      1450 Jayhawk Blvd.
      Lawrence, KS 66045


                        Respectfully Submitted,


Cathy Joritz                             Cathy Joritz, *pro Se*
PO Box 422
Perry, KS 66073

Joliet, Illinois 60436
(630) 857-8907

## CERTIFICATE OF SERVICE

The undersigned Plaintiff, *pro Se*, certifies that a true and correct copy of the foregoing was filed

with the Court via email on the 29th day of December, 2017, and that on December 30th, 2017,

sent via email, and on January 2nd, 2017, sent a paper copy via postage pre-paid certified U.S.

Mail, upon:


    Megan K. Walawender, *Attorney for Respondent University of Kansas*
    Associate General Counsel and  Special Assistant Attorney General
    245 Strong Hall
    1450 Jayhawk Blvd.
    Lawrence, KS 66045
    Tel: (785) 864-3276
    megan.walawender@ku.edu

                              /s Catherine A. Joritz, *pro Se*