# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CATHERINE A, JORITZ,** | ) | |
| **Plaintiff,** *pro Se* | ) | |
| | ) | |
| **-vs-** | ) | **Case No. 5:17- 04002-SAC-KGS** |
| | ) | |
| **THE UNIVERSITY OF KANSAS,** | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

COMES NOW Plaintiff Cathy Joritz, *pro Se*, who, pursuant to Fed. R. Civ. P 15(a)(2), moved this Court for leave to amend her Complaint and filed, along with her motion, an amended complaint [Doc 29]. Plaintiff has not amended her complaint prior to this filing. With Defendant's RESPONSE TO PLAINTIFF'S MOTION TO AMEND [Doc 34], Defendant opposes Plaintiff's motion. Defendant, in its pleading, acknowledged that "Under Fed. R. Civ. P. 15, leave to amend is to be freely granted;", however omitted a key phrase of Rule 15: "when justice so requires". Plaintiff asserts that justice *does* require leave to amend and respectfully prays that the Court grant her Motion for Leave to file an Amended Complaint and order that the Amended Complaint, previously submitted with her motion, be deemed filed.

Plaintiff states her reasons below.

## NATURE OF THE CASE

Plaintiff Cathy Joritz is an internationally recognized independent animator, who was employed by Defendant University of Kansas as a tenure-track Assistant Professor in the Film &

Media Studies Department from August 2012 - May 2017. Prior to working for Defendant, Plaintiff lived for most of her adult life in Germany. Plaintiff's last name is German, Plaintiff is fluent in German and Plaintiff is strongly associated with Germany and German culture. Plaintiff received her non-reappointment letter from Defendant on May 13, 2016.

This is a civil action for violations of Title VII of the Civil Rights Act of 1964 as codified under the 42 U.S.C. § 2000e, *et seq.,* and violations of the 1st, 5th and 14th United States Constitutional Amendments. This legal action seeks damages and injunctive relief against Defendants for committing acts under color of law, with the intent and for the purpose of depriving Professor Joritz of rights secured under the Constitution and laws of the United States; for wrongfully discriminating against Professor Joritz on the basis of national origin and sex/gender; for arbitrarily and capriciously denying Professor Joritz of property and liberty interests; for retaliating against Professor Joritz for her exercise of constitutionally protected speech; for subjecting Professor Joritz to a hostile work environment and for refusing or neglecting to prevent such deprivations and denials to Professor Joritz. In addition, Defendants violated related provisions of Kansas' Constitution and breached Professor Joritz's contract with the University, also arising from the same case and controversy as the aforementioned federal law claims.

## ARGUMENTS & AUTHORITIES

1. Plaintiff has not previously amended her complaint.

2. On page 2 of its response, Defendant quoted "*Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1366 (10th Cir. 1993) quoting *Las Vegas Ice & Cold Storage Co. v. Far West Bank,* 893 F.2d 1182, 1185 (10th Cir. 1990) (internal quotations omitted)":

> "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."

Plaintiff cites the following arguments and authorities:

Amendments to pleadings should be freely allowed. "Motions to amend under Rule 15(a) may be filed to cure a defective pleading, to correct insufficiently stated claims, to amplify a previously alleged claim, to change the nature or theory of the case, to state additional claims, to increase the amount of damages sought, to elect different remedies, or to add, substitute or drop parties to the action." Wausau Underwriters Ins. Co. v. Schifler, 190 F.R.D. 341, 343. (E.D. Pa. 1999) (citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1474 (1990)); see also Goodman v. Mead Johnson & Co., 534 F.2d 566, 569 (3d Cir. 1976) (district court improperly denied amendment to add claims and substitute parties), cert. denied, 429 U.S. 1038(1977); Martin Herend Imports, Inc. v. Diamond and Gem Trading, 195 F.3d 765, 777 (5th Cir. 1999).

3. The decision on a motion to amend is within the sound discretion of the district court. Nonetheless, "the leave sought should, as the rules require, be 'freely given.'" Foman v. Davis, 371 U.S. 178, 182 (1962). Absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment," the moving party should be allowed to test his claim on the merits. Id. Courts have interpreted Rule 15(a) "liberally, in line with the Federal Rules= overall goal of resolving disputes, insofar as possible, on the merits and in a single judicial proceeding."

*Page 3 of 26*

Spartan Grain & Mill Co. v. Ayers, 517 F.2d 214, 220 (5th Cir. 1975); see also Hurn v. Retirement Fund Trust, 648 F.2d 1252, 1254 (9th Cir. 1981) (leave to amend should be freely given since "the purpose of pleadings is to facilitate a proper disposition on the merits"); Shipner v. Eastern Air Lines, 868 F.2d 401, 407 (11th Cir.) (The policy of Rule 15 "circumscribes the exercise of the district court's discretion; unless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial").

4. Rule 21 of the Federal Rules of Civil Procedure gives this Court authority to add named plaintiffs to this lawsuit. Rule 21 of the Federal Rules of Civil Procedure states, in pertinent part, that:

> Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.

Courts have held that, as long as notice and an opportunity to be heard are given, parties may be added in the judge's discretion. Gentry v. Smith, 487 F.2d 571 (5th Cir. 1973), Aero Corp. v. Department of the Navy, 493 F. Supp. 558 (D.C.D.C. 1981)

5. It is premature and incorrect for Defendant to declare Plaintiff's complaint as futile or lacking merit. At this early stage in the proceedings, discovery has not yet begun. A complaint is a living document that will likely be amended again, as discovery bears out new facts.

6. This case requires the acquisition and piecing together of actions, quotes, documents, policies and other evidence in order to develop and understand the complete picture. Defendant has and continues to deny Plaintiff documents imperative to this case. For example, Defendant

purported to have investigated Plaintiff's allegations of discrimination, then refused to provide Plaintiff with the results of Defendant's 32-page "investigation results" (EXHIBITS 1 & 2). Plaintiff recently filed a KORA request for the 32-page document, and Defendant again refused to provide Plaintiff with a copy (EXHIBIT 3).

While Plaintiff has individual "pieces of the puzzle", Plaintiff requires discovery to more thoroughly compile and contextualize the transgressions Defendant committed against her. As Anthony Gambol wrote for the *Fordham Law Review*, Volume 79 Issue 5, *The Twombly Standard and Affirmative Defenses: What is Good for the Goose is Not Always Good for the Gander* (excerpt):

> "A defendant is at a gratuitous disadvantage in the acquisition of factual material at the pleading stage…A blanket standard that does not account for this discrepancy shocks the conscience."

7. Plaintiff should be afforded her right to have her complaint decided on its merits. As cited by Dane Westermeyer in the *Washington Law Review* [Vol. 89:1467][1],

> "Rule 15 is in place in order to allow "maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities."[14]

Dane Westermeyer further commented:

> "…nothing in *Twombly* or *Iqbal* expressly requires a court to infringe on the relationship between original complaints and subsequent pleadings.[16]"

and

> "…courts should decline to adopt this comparative approach to amended complaints for two reasons. First, from a stare decisis viewpoint, this practice

---

[1] Washington Law Review [Vol. 89:1467], *AMENDED COMPLAINTS POST-TWIQBAL: WHY LITIGANTS SHOULD STILL GET A SECOND BITE AT THE PLEADING APPLE* by Dane Westermeyer

> is in tension with a large body of case law defining the purpose of amended
> complaints. Second, it levies undue pressure on plaintiffs to plead their
> complaints with particularity and foresight. …plausibility analysis does not
> alter the long-standing relationship between original and amended
> complaints."

8. Plaintiff's original and amended pleadings meet the standard of the Federal Rules of Civil

Procedure:

> The Federal Rules of Civil Procedure only require that a complaint contain "a
> short and plain statement of the claim." [FED.R.CIV.P.8(a)(2)]

> The pleader's obligation to provide the grounds upon which his claim rests requires
> "more than labels and conclusions . . . ." Id.; see also Ashcroft v. Iqbal, 129 S. Ct.
> 1937, 1949 (2009)

> The pleader's obligation to provide the grounds upon which his claim rests requires
> "more than labels and conclusions . . . ." Id.; see also Ashcroft v. Iqbal, 129 S. Ct.
> 1937, 1949 (2009)

Even at this pre-discovery stage, Plaintiff has provided ample grounds and evidence that

satisfy this standard.

9. Plaintiff's allegations are sufficient at this early stage of the litigation if they "nudge[ ] [her]

claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 127 S.Ct.

1955. (Hale v Emporia State University, Case No. 16–4182–DDC–TJJ). Plaintiff has more

than demonstrated this sufficiency.

8. A plaintiff is not required to establish a prima facie case of discrimination at the pleading

stage. That said: For an employee to prove a prima facie case of retaliation, three elements

must be met:

1. The employee participated in a protected activity.

2. The employer undertook a materially adverse action against the employee, and

3. The employer's materially adverse action against the employee was in response to the protected activity–that is, there is a causal connection between the protected activity and materially adverse action.

This standard has been met. Defendant does not dispute that Plaintiff repeatedly engaged in a protected activity by reporting and opposing discrimination to Defendant's staff, faculty and administrators. Defendant does not dispute that Defendant faculty and administrators failed to report Plaintiff's complaints of discrimination, as required by Defendant's own policy and the EEOC. Defendant does not dispute that it terminated Plaintiff's employment (materially adverse action).

10. The Court should accept the facts asserted in the Complaint as true and view them in the light most favorable to plaintiff. *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).

11. The Court should construe Plaintiff's allegations liberally because she proceeds *pro Se*. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that courts must construe pro se litigant's pleadings liberally and hold *pro Se* litigants to a less stringent standard than formal pleadings drafted by lawyers). Pleadings by *pro Se* litigants are held "to less stringent standards than formal pleadings drafted by lawyers" (*Haines v. Kerner, 404 US 519 - Supreme Court 1972*)

10. Beginning on page 5 of its Response, Defendant alleges that "Plaintiff's 1983 Claims against Drs. Gray-Little, Lejuez, Macdonald and Baskett in Their Individual Capacities are Time-Barred". This is incorrect. Plaintiff filed her motion to leave to amend her complaint and her amended complaint on 4.23.18. Defendant cites*:* K.S.A. § 60-513(a)(4) Actions limited to

two years. On pages 6 and 7 of Defendant's Response, Defendant claims, "More than two years have passed since she claims defendants denied her due process during the review which culminated in her notice of non-reappointment." Defendant's statement is misleading and incorrect.

Chancellor Gray-Little's Notice of Non-Reappointment letter to Plaintiff, communicated to Plaintiff by (former) Provost Sara T. Rosen, is dated 5.13.16, clearly less than two years prior to Plaintiff's filing her Motion to Leave to Amend and Amended Complaint.

11. Regarding the other named parties: Plaintiff first became aware of many of their actions and allegations through documents that Plaintiff first acquired <u>on or after 4.30.16, again less than two years</u> prior to Plaintiff's filing her Motion to Leave to Amend and Amended Complaint<u>.</u>

On 4.25.16 Plaintiff submitted an appeal listing the procedural violations that vitiated her 2015 & 2016 PTT Reviews/Evaluations to Defendant's "Faculty Rights Board" (EXHIBIT 4). At the time, Defendant continued to deny Plaintiff a copy of Chair Baskett's letter/recommendation for Plaintiff's termination, which he had inserted into Plaintiff's dossier *months* prior, as well as other documents. This purposely prevented Plaintiff from appealing and/or protesting the content of the "secret" (from Plaintiff) documents and "secret" (from Plaintiff) actions conducted in order to have Plaintiff fired. On 4.30.16, Defendant's General Counsel responded to Plaintiff's appeal, sending Professor Jan Sheldon, Chair of the Faculty Rights Board, a 10-page letter and 44 pages of exhibits. Plaintiff received copies of Defendant's letter and exhibits (EXHIBIT 5). The letter and exhibits included, in part, documents and information that Defendant had either denied Plaintiff and/or was not previously available to Plaintiff, including, for example, the Chair's

letter/recommendation for Plaintiff's termination, which he had inserted into Plaintiff's PTT Review evaluation "dossier" without her knowledge. **The Chair's letter was key to putting all of his actions and the actions of all administrators involved in Plaintiff's termination, into context.**

12. Defendant's response and exhibits also revealed discriminatory, retaliatory and other transgressive activity by (former) Dean of the College of Liberal Arts, Carl Lejuez, Professor Michael Baskett, and the Chair of the CCAPT Committee, Professor/Dr. Stuart MacDonald. The documents that implicate the above-mentioned Defendant-parties include, but are not limited to:

   a.  The letter written by Defendant's counsel, Rachel Rolf. Plaintiff described what Ms Rolf revealed, listed as No. 117 in Plaintiff's Amended Complaint:

> Rachel Rolf, Associate General Counsel for the University, confirmed that Dean Lejuez – not a member of the CCAPT committee – grossly violated University procedures by directing the focus of the CCAPT committee faculty members:

> *"When Professor Joritz's record was discussed in CCAPT, Dean Carl Lejuez encouraged CCAPT to focus on Professor Joritz's existing record and documented evidence of progress towards completion of her book. CCAPT followed that direction."*

> Lejuez had no right to influence the CCAPT Committee members at all. The tiered PTT Review process dictated that the CCAPT report their findings to the Dean. The CCAPT Committee was to remain objective. The Dean of Liberal Arts is the CCAPT Committee faculty members' "boss". How could CCAPT Committee members act impartially when the "boss" was directing their "focus"?

This demonstrated willful violation of Defendant's own policy and COLLUSION between Lejuez and MacDonald in order to have Plaintiff's employment terminated.

Further, the "book" referenced in Ms Rolf's statements referred to Plaintiff's German-related research. Although Dean Lejuez knew at the time that Plaintiff's animated short film about the German type designer, Hermann Zapf, *A Tribute to Hermann Zapf*, had been accepted to a major international film festival in Germany, he refused to acknowledge this and Plaintiff's other major research accomplishments. The CCAPT Committee and Stuart MacDonald also ignored Plaintiff's accomplishments, which were, in part, cited by the Departmental PTT Review committee members in the document referred to in "b", below: The Film & Media Studies' Departmental *Initial Review Composite Evaluation and Recommendations, Progress Toward Tenure Review 2015 – 2016* (Defendant's exhibit 1). Instead, Dean Lejuez and the CCAPT Committee members, including CCAPT Chair Stuart MacDonald, violated Defendant's own policy by subverting the University's tiered evaluation process in order to continue the attack on Plaintiff's German-related research record, not only discriminating and retaliating against Plaintiff, but also creating a pretext for terminating Plaintiff's employment.

b. The Film & Media Studies' Departmental *Initial Review Composite Evaluation and Recommendations, Progress Toward Tenure Review 2015 – 2016* document, dated 2.04.16, was reviewed and signed by Professor Baskett but not provided to Plaintiff until Ms Rolf did so, months later, on or after 4.30.16. This document is a detailed account of the Departmental Committee's PTT Review, which had resulted in overall positive evaluation findings. According to the Departmental PTT Review Committee, which

consisted of two female professors (Falicov and Preston) and one male professor (Tibbetts), Professor Joritz's record demonstrated "Evidence sufficient for continuing tenure track appointment" in every faculty evaluation category: 1) Teaching and Advising, 2) Research, Scholarship, Creative or Artistic Performance and Service (Defendant's Exhibit 1). This document is important because it proves that the named parties, Chair Baskett, Stuart Macdonald, Dean Lejuez and Chancellor Gray-Little, as well as every other administrator involved in Plaintiff's termination, willfully ignored Plaintiff's achievements and ignored the positive evaluation Plaintiff received from the Departmental Committee.

c.  A letter/recommendation for Plaintiff's termination by Professor Baskett, dated 2.05.16 (Defendant's Exhibit 2), which included negative/false statements about Plaintiff's German-related research, disparaging and false allegations about Plaintiff's alleged "behavior", Baskett's expressed "doubts" that Plaintiff was not capable of completing a book about the German silhouette animation pioneer, Lotte Reiniger (a subject of Plaintiff's research) and other disparaging statements. Baskett's letter claimed that graduate teaching assistants had made "numerous requests to not to be assigned to (Plaintiff's) courses", an allegation that Plaintiff had never been made aware of. Baskett had inserted this letter into Plaintiff's PTT Review dossier without Plaintiff's knowledge, assuring that Plaintiff could not respond, refute or take any other action to defend herself against Baskett's statements. Defendant refused to provide Plaintiff with a copy and Plaintiff first saw the letter as Defendant's exhibit on or soon after 4.30.16.

d.  The letter written by CCAPT Chair Stuart Macdonald, who is named in the amended

complaint, had been seen by Plaintiff in April 2016. However, without a copy of Professor Baskett's letter (see "c" above), Plaintiff could not know that Macdonald – who claimed that the CCAPT's findings were based on Baskett's letter – distorted, misstated and had expanded Baskett's negative and false allegations about Plaintiff's German-related research into grosser, more absurd distortions of fact, even more outrageously damaging to Plaintiff, in order to have Plaintiff's employment terminated. (Defendant's Exhibit 3). Prior to receiving a copy of Baskett's letter, Plaintiff was unable to compare the two letters.

e.  (Former) Dean Carl Lejuez's recommendation that Plaintiff be terminated is dated April 12, 2016. Plaintiff received a copy of Lejuez's letter around that time. However, Plaintiff had no knowledge of the content of Baskett's letter at the time, which Lejuez referenced in his own recommendation for Plaintiff's termination. Thus Plaintiff, previous to 4.30.16, could not know how defamatory and false Baskett's allegations were and could not contextualize or understand the extent of the deceit by the parties, who referenced Baskett's letter and/or the letter by Stuart MacDonald. This included the letter written by Dean Lejuez, recommending Plaintiff's termination.

f.  Not listed as a separate exhibit, but included among Defendant's exhibits (p. 42), was the *Intermediate Review Composite Evaluation and Recommendations Progress Toward Tenure Review 2015-2016* form, dated 4.07.16, completed (apparently) by Stuart MacDonald and signed by both Stuart MacDonald and Carl Lejuez. This single page form was comprised of:

**Summary of Intermediate Level Review (Schools with Departments, Office of Research):**

OVERALL EVALUATION. This evaluation should reflect the composite assessment of the individual's record of teaching or professional performance, research, and service in relation to progress toward meeting the University's criteria for promotion and/or tenure.

_____  Evidence sufficient for continuing tenure track appointment at this time

_____  Evidence requires a subsequent formal probationary review within one academic year

\_\_X\_\_\_  Evidence supports a recommendation for non-reappointment*

This form proved that MacDonald and Carl Lejuez, intent on terminating Plaintiff's employment, completely disregarded the Film & Media Studies Departmental PTT Review Committee's evaluation, which supported Plaintiff's re-appointment:

> *"Evidence sufficient for continuing (Plaintiff's) tenure track appointment"*
> *in every faculty evaluation category: 1) Teaching and Advising, 2)*
> *Research, Scholarship, Creative or Artistic Performance and Service".*

Instead, the two men (MacDonald and Lejuez) decided that only Professor Baskett's opinion "counted" and wrongly checked that the "OVERALL EVALUATION" (described as a "summary") supported Plaintiff's termination of employment:

> "\_X\_ Evidence supports a recommendation for non-reappointment*"

g.  An affidavit, written and signed by Michael Baskett on 4.28.16 was included as an exhibit along with Ms Rolf's response (Defendant's Exhibit 6). Baskett's affidavit revealed (Plaintiff's emphasis added):

  1)  That Professor Baskett insisted on claiming that he was an "*ex officio*" member

of the Departmental PTT Review committee, when in fact, he improperly

served as CHAIR of the PTT Review Committee:

> *"I served as an ex officio member of the departmental review committee*
> *for the Progress Toward Tenure Review (PTTR) for Assistant Professor*
> *Cathy Joritz.*

Associate Dean Henry Bial and former Interim Dean Don Steeples had assured Plaintiff

that Professor Baskett was **not** a member of the committee (excerpt from an email sent

by Henry Bial to to Plaintiff on 1.26.16), which, as Plaintiff learned from Baskett's

affidavit, was not true:

> *As promised, we have sought clarification from the Provost's Office*
> *regarding the makeup of the ad hoc review committee, and they have*
> *advised us that the department chair should not be considered one of the*
> *three members of this committee. Accordingly, we have advised Professor*
> *Baskett that he should appoint a third member (along with Professors*
> *Falicov and Preston) to serve in this capacity.*

  2) That Professor Baskett **did not deny threatening Plaintiff in her office,** as

Plaintiff had alleged in her appeal to the Faculty Rights Board. Baskett's written

statement:   "I do not *recall* ever telling Assistant Professor Joritz that "You're not doing

yourself any favors by making the department look bad" and this is not something I

would have said."

  3) That **Professor Baskett admitted that he did not permit Professor Joritz to**

**speak with members of the Departmental PTT Review Committee**, veiling

his/Defendant's prohibition of Plaintiff's freedom of speech and association as a

"positive" and an "accepted practice". According to Baskett: "Through experience, the

department has found that feedback from a single point of contact during this process prevents inconsistent information and confusion."

4) That Professor Baskett claimed that the information in his letter/ recommendation for Plaintiff's termination was "true and accurate" and based on Plaintiff's research "dossier" and Plaintiff's "own statements". Baskett admitted, "I did not contact a third-party about her research" after falsely claiming in his letter/recommendation for Plaintiff's termination that "officials (at the Stadtmuseum in Tübingen) have denied her requests for access to … materials." Baskett had never contacted any "officials", but his absurd and damaging claims were kept secret from Plaintiff.

5) That Baskett claimed to have "received concerns from students, faculty and staff about (Plaintiff's) conduct within the department,…" and admitted to not having informed Plaintiff of the "concerns".  Complaints kept "secret' from a faculty member but then employed to "discipline" the faculty member by terminating employment, violated Defendant's own policy and denied Plaintiff her right to due process:

> *(Problems of performance or conduct should be addressed in a timely manner, and when feasible, adequate time should be allotted for improvement to occur. Before any disciplinary action is taken, if possible the supervisor will first advise the employee of the misconduct or the inadequacy of his/her performance and will attempt to reach a solution to the problem. (*Handbook for Faculty and Other Unclassified Staff, p. 23))

 Baskett's affidavit confirmed that he willfully violated Defendant's own policy in order to have Plaintiff's employment terminated. Every Defendant-administrator in the chain of command facilitated Baskett's actions.

Professor Baskett and every administrator in the Defendant's chain of command denied Plaintiff a copy of Baskett's letter and other documents and information necessary, in order to prevent Plaintiff from knowing what transpired **and being able to object.** By denying Plaintiff a copy of the letter Baskett wrote in order to destroy Plaintiff's livelihood, by denying Plaintiff knowledge of alleged student complaints, by refusing to report and investigate Plaintiff's complaints of discrimination, Defendant University including Baskett and all parties involved, made it impossible for Plaintiff to object, thus denying Plaintiff's speech by gagging her with the secrecy of the actions and allegations employed by Defendants to destroy her career and silencing her complaints of discrimination by burying them.

6) The entire affidavit is full of Professor Baskett's denials. Plaintiff received a copy of the affidavit on or after 4.30.18, approximately 2 weeks prior to (former) Chancellor Gray-Little's decision to terminate Plaintiff's employment.

13. Plaintiff acquired other documents that Defendant denied her less than two years prior to filing her Motion for Leave to Amend and Amended Complaint, which involve the named parties and are vital to her case:

A. Chair Baskett's class observation, dated 11.30.15 (EXHIBIT 6)

Again, Chair Baskett made negative claims about Plaintiff's behavior, negative statements about her teaching, and Baskett criticized Plaintiff for allegedly making comments on "the immigration situation in Europe" in class. Baskett refused to permit Plaintiff to see his observation as did other administrators, thus gagging Plaintiff again by not permitting her to know its content and subsequently be unable to refute, rebut or

respond to it and even know who his observation had been made available to. Predictably, this "secret"-to-Plaintiff observation became a part of Plaintiff's permanent record.

B. Plaintiff's annual performance evaluation, written by Chair Baskett

Once again, Chair Baskett denied Plaintiff due process by denying to her a copy of her annual evaluation for more than 6 months after it was due. Baskett again violated Defendant's own faculty evaluation procedures by appointing a non-tenured faculty member to the evaluation committee. Despite Plaintiff's stellar teaching and research record, Baskett did not recommend Plaintiff for a merit salary increase. When Plaintiff attempted to petition Provost Neeli Bendapudi for a merit salary increase, as permitted by policy, Provost Neeli Bendapudi refused to allow Plaintiff to do so, denying Plaintiff due process, property interests, and treating Plaintiff disparately from other similarly situated faculty members. Ms Bendapudi also informed Plaintiff via email something similar to: "We both know that you weren't discriminated against", although Ms Bendapudi had never met Plaintiff and had refused to meet with Plaintiff, despite Plaintiff's requests for a meeting.

14. It is important to note that this Court has granted both parties multiple, agreed-upon extensions of time for various documents prior to Plaintiff filing her motion to leave to amend her complaint. Plaintiff agreed to Defendant's requests for extensions of time as courteous civil discourse; Plaintiff assumed that Defendant did the same. Plaintiff informed Defendant that her reasons for extensions of filing times were to enable Plaintiff to fight for the rights of Plaintiff's elderly mother (email excerpt, sent by Plaintiff to Defendant's counsel on August 8, 2017, EXHIBIT 7):

*"I am still working on trying to get a rehearing for my Mom's guardianship and she is still confined and being sedated in a "Memory Care Facility" where she does not belong."*

For Defendant to now allege an overrun of the "statute of limitations" in an attempt to disqualify Plaintiff's claims, after itself requesting repeated extensions of time, is disingenuous to say the least.

15. Plaintiff was entitled to have her PTT Reviews – on which her livelihood depended – follow Defendant's preexisting policies. Due process requires no less. *See also Unruh v. U.SD. No. 300,* 245 Kan. 35 (1989) (failure of the reviewing board to review the claim in good faith denied teacher due process); *In the Matter of the University of Kansas,* 2 Kan. App. 2d 416 (1978) (holding that procedural irregularities undermined the constitutional requirements of due process).

16. The fundamental requirements of due process are notice and the opportunity to be heard. By denying Plaintiff documents and information, Defendant denied Plaintiff the right to speak about documents and information and the right to be heard. "Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment…

17. In support of allowing Plaintiff to amend her complaint and to permit this case to move forward: The Supreme Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. *Wolff v. McDonnell,* 418 U. S. 539, 557-558 (1974). See, *e. g., Phillips v. Commissioner,* 283 U. S. 589, 596-597 (1931). See also *Dent v. West Virginia,* 129 U. S. 114, 124-125 (1889). The "right to be heard

before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965). See *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914)." (Mathews v. Eldridge, 424 US 319 - Supreme Court 1976 at 333.)

and:

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009). This principle applies to administrative agencies just as it applies to courts. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). A denial of due process renders the administrative agency's decision void. *See Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 947 (2009).

18. On page 7 of DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO AMEND, Defendant claims, "Plaintiff fails to state a claim to specifically provide how Drs. Gray-Little, Lejuez and Macdonald violated her First Amendment rights." On page 8, Defendant states, "Count VII Fails to State a Claim for Breach of Contract as to the Individual Defendants". Plaintiff asserts: Kansas Courts have supported the completion of discovery over immediate dismissal:

> *There are sound reasons for exercising judicial skepticism towards dismissal of a petition for failure to state a claim prior to the completion of discovery.* Noel v. Pizza Hut, Inc., 805 P. 2d 1244 - Kan: Court of Appeals 1991

19. Further, Plaintiff asserts that her allegations of Defendant's violations of Plaintiff's clearly

established Constitutional rights (Amendments 1, 5 and 14) can be inferred from Plaintiff's original and amended complaints. For example, (former) Dean Carl Lejuez and (former) CCAPT Chair, Dr. Stuart MacDonald and Professor/Department Chair Michael Baskett all denied Plaintiff her Freedom of Speech by ignoring her complaints of discrimination, then retaliating against her and silencing her by destroying Plaintiff's reputation, denying Plaintiff due process and recommending Plaintiff's termination, all of which led to (former) Chancellor Gray-Little's termination of Plaintiff's employment.

20. Defendant's culture of administrative Machiavellian secrecy, perpetuated by Defendant in general and by all named parties, assured that Plaintiff would be denied her voice throughout evaluation procedures that were directed at terminating Plaintiff's employment.

21. Plaintiff alleges discrimination based on country of origin and sex/gender. Plaintiff believes that she was treated differently and held to a different standard than similarly situated male colleagues and colleagues without foreign and/or German backgrounds. As described in Plaintiff's amended complaint, Plaintiff was denied a "Research Intensive Semester" (RIS) twice by Chair Baskett. Baskett expressed in an evaluation letter/recommendation for termination – which he and every University administrator kept secret from Plaintiff – that he doubted Plaintiff's research capabilities. Plaintiff's behavior was criticized in Baskett's evaluations of her, then simply believed by every subsequent administrator, despite an utter lack of substantiation. Plaintiff was held to a different standard than similarly situated colleagues. Discovery is necessary to better establish proof of disparate treatment.

22. Plaintiff's amended complaint was made in good faith and not for purpose of delay, but rather for the purpose of justice.

23. Plaintiff would be harmed if denied leave to amend.

24. Denying Plaintiff's motion would deny Plaintiff access to the court and result in undermining the public's respect for, and confidence in, the legal system.

### The Issue of Qualified Immunity

25. Defendant has raised the issue of "qualified immunity". The Defendant University and Defendants are not protected by state sovereign immunity under the Eleventh Amendment. Qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[2] The Supreme Court has recognized that when government officials abuse their offices, "actions for damages may offer the only realistic avenue for vindication of constitutional guarantees."[3] The circumstances of this case will show that the individual Defendants violated a clearly established constitutional right of which a reasonable official should have known, and no Defendants are entitled to qualified immunity.

If a state official is under no obligation to follow their stated policy before terminating an employee, the stated policies have no purpose. The circumstances of this case show that the individual Defendants violated clearly established constitutional rights of which a reasonable official should have known, and no Defendants are entitled to qualified immunity.

---

[2] Harlow v. Fitzgerald , 457 US 800 (1982).
[3] Anderson v. Creighton , 483 U.S. 635, 638 (1987) (internal citations omitted).

26. The well-established test for qualified immunity requires the court to engage in a two-step inquiry. First,[4] the court must determine whether a public official's conduct deprived a §1983 plaintiff of a "clearly established" constitutional or statutory right. The constitutional right must be sufficiently clear to put a reasonable officer on notice that certain conduct violates that right.[5] When a qualified immunity defense is raised following a jury verdict, courts have held that the evidence must be construed in the light most hospitable to the party that prevailed at trial.[6] In other words, a court considers whether the evidence is "'so one-sided that defendants were entitled to prevail as a matter of law' on the constitutional claim."[7]

27. Title VII prohibits employers from retaliating against employees who complain about or challenge sex discrimination. Title VII's anti-retaliation provision protects an employee who opposes unlawful employment discrimination:

> 42 U.S.C. § 2000e-3(a) (2012) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.")

---

[4] *Pearson v. Callahan*, 555 U.S. 223 (2009)(holding that these "inquiries may be undertaken in any order the court, in its discretion, finds appropriate").

[5] *Sanchez v. Swyden*, 139 F.3d 464, 466-467 (5th Cir. 1998); *Anderson* 483 U.S. at 639(*internal citations omitted*)(finding that the determination of "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally "turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were "clearly established" at the time it was taken...)

[6] See *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739 (10th Cir. 2009)*; Hill v. McKinley*, 311 F.3d 899, 902 (8th Cir. 2002); *Iacobucci*, 193 F.3d at 23*; Thompson v. Mahre*, 110 F.3d 716, 721 (9th Cir. 1997); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995); *Posr v. Doherty*, 944 F.2d 91, 94-96 (2d Cir. 1991).

[7] *Marshall*, 474 F.3d at 739 (citing *Hill*, 311 F.3d at 903).

28. The 11th Amendment was initially created to protect states from "outside forces" that could, theoretically, sue states and deplete their coffers. Initially, the 11th Amendment did not protect states from lawsuits filed by its own citizens.

> "We need not leave our common sense at the doorstep when we interpret a statute." (U.S. Supreme Court PRICE WATERHOUSE v. HOPKINS, 490 U.S. 228 (1989) 490 U.S. 228 PRICE WATERHOUSE v. HOPKINS CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT No. 87-1167)

Common sense informs us that the 11th Amendment was never meant as a "free pass" for state agencies, or individuals employed by such, to freely trample upon the constitutional rights of citizens.

29. Quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 US 261 - Supreme Court 1997

> If Congress pursuant to its § 5 remedial powers under the Fourteenth Amendment may abrogate sovereign immunity, even if the resulting legislation goes beyond what is constitutionally necessary, see, *e. g., Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976) (concluding that Title VII's authorization of federal-court jurisdiction to award money damages against a state government to individuals subjected to employment discrimination does not violate the Eleventh Amendment since Congress was exercising its § 5 remedial powers), it follows that the substantive provisions of the Fourteenth Amendment themselves offer a powerful reason to provide a federal forum.

And Idaho v. Coeur d'Alene Tribe of Idaho, 521 US 261 - Supreme Court 1997, at 2038:

> "where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar. Indeed, since *Edelman* we have consistently allowed suits seeking prospective injunctive relief based on federal violations to proceed." (Ellis v. University of Kansas Medical Center, 163 F. 3d 1186 - Court of Appeals, 10th Circuit 1998)

30. Quoting Fitzpatrick v. Bitzer, 427 US 445 - Supreme Court 1976:

> The impact of the Fourteenth Amendment upon the relationship between the Federal Government and the States, and the reach of congressional power under § 5, were examined at length by this Court in *Ex parte Virginia,* 100 U. S. 339 (1880)… The Court first observed that these Amendments "were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress." *Id.,* at 345. It then addressed the relationship between the language of § 5 and the substantive provisions of the Fourteenth Amendment:
>
>> "The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial. Such enforcement is no invasion of State sovereignty… But in exercising her rights, a State cannot disregard the limitations which the Federal Constitution has applied to her power. Her rights do not reach to that extent."

and

> "…we think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, see *Hans v. Louisiana,* 134 U. S. 1 (1890), are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority. We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts.[11] See *Edelman v. Jordan,* 415 U. S. 651 (1974); *Ford Motor Co. v. Department of Treasury,* 323 U. S. 459 (1945)."

31. The State of Kansas itself, through THE KANSAS ACT AGAINST

DISCRIMINATION, employs firm and decisive language, declaring it "POLICY OF

THE STATE" "**to eliminate and prevent discrimination in all employment relations**"

(Plaintiff's emphasis):

> **44-1001. Title of act; declaration of state policy and purpose.** It shall be deemed an exercise of the police power of the state for the protection of the public welfare, safety, health and peace of the people of this state. **The practice or policy of discrimination against individuals in employment relations,** in relation to free and public accommodations or in housing by reason of race, religion, color, sex, disability, national origin or ancestry or in housing by reason of familial status **is a matter of concern to the state,** since **such discrimination threatens not only the rights and privileges of the inhabitants of the state of Kansas but menaces the institutions and foundations of a free democratic state. It is hereby declared to be the policy of the state of Kansas to eliminate and prevent discrimination in all employment relations**…

## CONCLUSION

In light of new evidence as well as significant factual and procedural developments – including ongoing retaliation – since Plaintiff's initial Complaint, good cause for amending the Complaint is apparent. The Court should grant Plaintiff Cathy Joritz's Motion for Leave to file an Amended Complaint and order that her Amended Complaint, previously submitted with her motion, be deemed filed. Plaintiff has asserted multiple, viable claims against Defendant. This case is still at its inception; discovery has not yet begun. Plaintiff has not previously amended her complaint, and should be afforded this right, which under Fed. R. Civ. P. 15, is "to be freely granted".

## PRAYER

WHEREFORE, Plaintiff Cathy Joritz, pro Se, respectfully prays that the Court grant her Motion for Leave to file an Amended Complaint and order that the Amended Complaint, previously submitted with her motion, be deemed filed.

DATED: August 6, 2018

Respectfully submitted,

Catherine A. Joritz, *pro Se*
PO Box 422
Perry, KS 66073
T: (630) 857-8907
E: cjanimate@aol.com

## NOTICE AND CERTIFICATE OF SERVICE

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR LEAVE TO FILE AMENDED COMPLAINT**

Cathy Joritz, the undersigned Plaintiff, *pro Se*, certifies that a true and correct copy of the foregoing was filed with the Court per email to ksd_clerks_topeka@ksd.uscourts.gov on August 6, 2018, and that same day emailed to Megan K. Walawender,  megan.walawender@ku.edu .
A paper copy was served on August 7, 2018 via first-class, prepaid U.S. Mail upon:

Megan K. Walawender,
Associate General Counsel and  Special Assistant Attorney General
245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, KS 66045
Tel: (785) 864-3276
Fax: (785) 864-4617
megan.walawender@ku.edu
*Attorney for Respondent University of Kansas*