## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CATHERINE A. JORITZ,                              Civil Action/Case No.:

           Plaintiff, *pro Se*.        17-4002-SAC-KGS

v                                                 Honorable Judge Sam Crow

                                                  Honorable Magistrate Judge K. Gary
                                                  Sebelius


THE UNIVERSITY OF KANSAS,
CHANCELLOR BERNADETTE GRAY-LITTLE
(in her individual capacity as Chancellor of the
University of Kansas), DEAN CARL LEJUEZ,
(in his individual capacity as Dean of the College of
Liberal Arts & Sciences of the University of Kansas),
Professor STUART J. MACDONALD (in his individual
capacity as Chair of the Chair of the College Committee on
Appointments, Promotion and Tenure Committee
of the University of Kansas), Professor MICHAEL
BASKETT (in his individual capacity as Department Chair
of Film & Media Studies of the University of Kansas),

                              Defendants.

---

### FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND

---

NOW COMES Plaintiff, CATHERINE JORITZ, *pro Se,* (hereafter "Professor Joritz") and

for her Complaint against Defendants, the University of Kansas (hereafter "University"), (former)

Chancellor Bernadette Gray-Little (in her individual capacity as Chancellor), Dean Carl Lejuez (in

his individual capacity as Dean of the College of Liberal Arts & Sciences), Professor Stuart J.

Macdonald (in his individual capacity as Chair of the College Committee on Appointments,

Promotion and Tenure Committee), and Professor Michael Baskett (in his individual capacity as Chair of the Film & Media Studies Department), hereby states as follows:

## NATURE OF ACTION

1.      This is a civil action for violations of Title VII of the Civil Rights Act of 1964 as codified under the 42 U.S.C. § 2000e, *et seq.,* and violations of the 1st, 5th and 14th United States Constitutional Amendments. This legal action seeks damages and injunctive relief against Defendant(s) for committing acts under color of law, with the intent and for the purpose of depriving Professor Joritz of rights secured under the Constitution and laws of the United States; for wrongfully discriminating against Professor Joritz on the basis of national origin and sex/gender; for arbitrarily and capriciously denying Professor Joritz of property and liberty interests; for retaliating against Professor Joritz for her exercise of constitutionally protected speech; for subjecting Professor Joritz to a hostile work environment and for refusing or neglecting to prevent such deprivations and denials to Professor Joritz. In addition, the University violated related provisions of Kansas' Constitution and breached Professor Joritz's contract with the University, also arising from the same case and controversy as the aforementioned federal law claims. Therefore, these claims are properly before this Court pursuant to Article III of the United States Constitution.

## JURISDICTION AND VENUE

2.      Professor Joritz filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The first charges were filed on August 13, 2016. Professor Joritz faxed a second charge to the EEOC on February 21, 2018 and amended that charge with additional material on April 17, 2018.

3.      Professor Joritz received a notice of right to sue letter from the EEOC on October

13, 2016, (EXHIBIT A).

4.      This case arises under the United States Constitution, 42 U.S.C. Sections 1983 and 1988, as amended, 42 U.S.C. section 2000e *et seq..*   This Court has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1343.

5.      All individual Defendants are sued in their individual capacities under Sec. 1983, COUNT VI.

6.      This Court has supplemental jurisdiction over any and all state law claims made herein pursuant to 28 U.S.C. Section 1367(a), as they form part of the same case or controversy under Article III of the United States Constitution.

7.      The facts and issues of Professor Joritz's state law claims are inextricably intertwined with those of her federal law claims.   This Court is an appropriate venue for these causes of action pursuant to 28 U.S.C. 1391 (b)(I) and (b)(2). The actions complained of took place in this judicial district; evidence and employment records relevant to the allegations are maintained in this judicial district; Professor Joritz would be employed in this judicial district but for the unlawful actions and practices of the Defendants; and the University is present and regularly conducts affairs in this judicial district.

## PARTIES

8.      Professor Joritz is an individual, an American citizen and an internationally recognized, award-winning animator and educator.  Prior to Professor Joritz's appointment as Assistant Professor at the University, she lived and worked in Germany as an animator, freelance artist and educator for over thirty years. Professor Joritz is fluent in German and has communicated in German for most of her adult life. Her surname "Joritz" is of German origin.

9.      Professor Joritz earned her Masters of Fine Arts degree at the Bauhaus University

in Weimar, Germany, a historic, innovative school of art founded by Walter Gropius in 1919. Professor Joritz has taught animation at higher educational institutions in Germany, Switzerland and the USA. While still a resident of Germany, Professor Joritz also held full-time teaching positions at universities in the United States for a total of four academic years prior to 2012.

10.     Professor Joritz has been awarded eighteen grants for her independent animated shorts and research; ten awarded in Germany. Her films are included in two German film archives, where they are identified as German productions. Professor Joritz received 20 international awards for her animated films, which have been screened on TV and in film festivals in Germany, Holland, England, Ireland, Italy, Finland, France, Portugal, East Germany, Poland (when the latter two were still Eastern Bloc countries) and in the USA. A major film festival award qualified one of her animated shorts for Oscar Nomination consideration. Professor Joritz's animated films have been included in multiple international film tours organized by the Goethe Institute (Munich, Germany), selected to represent German animation production and to promote German culture. Professor Joritz's German animation productions also toured with the British Film Institute and Spike & Mikes Festival of Animation (USA & Canada). Professor Joritz is recognized internationally as primarily a German filmmaker and her films are distributed by distribution companies in both Germany and France.

11.     In 2012, the University's Department of Film & Media Studies at its School of the Arts contracted Professor Joritz as a tenure-track assistant professor.

12.     Professor Joritz is a resident of Kansas and member of the protected class of females and was at all times material to this case a tenure-track Assistant Professor employed by the University in the College of Liberal Arts & Sciences Film & Media Studies Department.

4

*The Defendant University and University Defendants*

13.     The University of Kansas ("University") is a public university operating and situated in the State of Kansas. It receives federal funding and is governed by the Kansas Board of Regents.

14.     The individual Defendants are not protected  by state sovereign immunity  under the Eleventh Amendment. Qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[1]  The Supreme Court has recognized that when government officials abuse their offices, "actions for damages may offer the only realistic avenue for vindication of constitutional guarantees."[2] The circumstances of this case will show that the individual Defendants violated a clearly established constitutional right of which a reasonable official should have known, and thus are not entitled to qualified immunity.

15.     At all times material to this Complaint, individual Defendants BERNADETTE GRAY-LITTLE, CARL LEJUEZ, STUART J. MACDONALD and MICHAEL BASKETT were employed by the University and were residents of Kansas. Each of these Defendants approved, facilitated, and/or voted for Professor Joritz's non-reappointment/termination.

16.     Defendant BERNADETTE GRAY-LITTLE was the Chancellor and Chief Executive Officer of the University of Kansas during time material to this Complaint, and is sued in her individual capacities as Chancellor.

17.     CARL LEJUEZ was the University's Dean of the College of Liberal Arts & Sciences during time material to this Complaint, and is sued in his individual capacities as Dean.

---

[1] *Harlow v. Fitzgerald*, 457 US 800 (1982).
[2] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (*internal citations omitted*).

18.     Professor STUART J. MACDONALD was the University's Chair of the College Committee on Appointments, Promotion and Tenure Committee (CCAPT) during time material to this Complaint, and is sued in his individual capacities as Chair of the CCAPT Committee.

19.     Professor MICHAEL BASKETT began his position as the University's Department Chair of the Film & Media Studies Department during summer of 2015, and is sued in his individual capacities as Department Chair.

20.     At all times material to this Complaint, Defendants acted under color of state law.

## CLAIMS

21.     Based upon the facts stated herein, Plaintiff asserts the following claims against the University:

A.      COUNT I – TITLE VII – Title 42 United States Code § 2000e-2 DISCRIMINATION BASED ON NATIONAL ORIGIN

B.      COUNT II – TITLE VII – Title 42 United States Code § 2000e-2 DISCRIMINATION BASED ON SEX/GENDER

C.      COUNT III – TITLE VII – Title 42 United States Code § 2000e-3 RETALIATION FOR OPPOSING UNLAWFUL EMPLOYMENT PRACTICES

D.      COUNT IV – TITLE VII – HOSTILE WORK ENVIRONMENT

E.      COUNT V – TITLE VII – WRONGFUL TERMINATION

F.      COUNT VII – KANSAS COMMON LAW BREACH OF CONTRACT

Based upon the facts stated herein, Plaintiff also asserts the following claims against the individually named Defendants:

G.      COUNT VI – US CONSTITUTION, 1st, 5th and 14th Amendments DENIAL OF FREEDOM OF SPEECH, VIOLATIONS OF DUE PROCESS

## STATEMENT OF FACTS
## ADMINISTRATIVE PROCEDURAL HISTORY

22.     Professor Joritz incorporates herein by reference paragraphs 1 through 21 above as though fully set forth herein.

23.     The setting for this case is the University campus in Lawrence, Kansas.

24.     The University hired Professor Joritz as a tenure-track Assistant Professor of primarily Animation, Experimental Production and digital Video Effects in the Film & Media Studies Department, School of the Arts, College of Liberal Arts & Sciences. At the start of her employment on August 18, 2012, Professor Tamara Falicov was the Chair of the Film & Media Studies Department.

25.     As a tenure-track professor, Professor Joritz's contract presumed contract renewal absent some cause to the contrary.

26.     Professor Joritz was annually evaluated on Teaching (40%), Research: Creative and/or Scholarly Activity (40%), and Service (20%).

27.     Professor Joritz always received "Good" or "Very Good" ratings for these categories. "Good" or "Very Good" ratings are consistently defined throughout University evaluation policies as meeting or exceeding expectations for tenure.

28.     Professor Joritz was awarded merit pay raises for her first two years of employment at the University. Chairperson Tamara Falicov confirmed via an email dated June 11, 2016 that she believed there was a merit pay freeze after this time.

29.     Professor Joritz garnered praise from every faculty member who attended and observed her classes. In 2013, Professor Hurst observed Professor Joritz's After Effects class, commenting in his evaluation (excerpt):

> *"It was clear from the conversational nature of the tutorial that Cathy has a command*

7

*of the application, and she was able to explain very clearly the steps in the process. In this tutorial it was also clear that she was building upon previous instruction done in the application. A lot of planning goes into a tutorial like this and it's clear she was well prepared."*

*"When a problem arose, Prof. Joritz solved it quickly. She also provided the GTA with pointers when necessary. The general tone of the classroom was relaxed, professional and encouraging."*

30.     In 2014, Professor Hayes observed two of Professor Joritz's classes: Animation and

Experimental (film) Production, commenting in her evaluation (excerpt):

*"I was most impressed by the way Joritz made connections to film history and contemporary technology, reminding students of their location in a tradition. I felt fortunate to be able to share in her original research about Lotte Reiniger, and admired the way she made the work of a previous century resonant in the present moment."*

*"It is clear that she is very knowledgeable in her area of expertise and excited to share her passion with her students as they discover new skills as well as the context of their historical development and contemporary value."*

31.     In 2015, Professor Preston observed Professor Joritz's Animation class,

commenting in her evaluation (excerpt):

*"Throughout her lecture she dropped in anecdotes from her own experience as an artist and a working professional. As an artist, she talked about what it meant to switch media, from sand to painted glass animation, as Leaf had. As a working professional she talked about what one could expect to be paid for the kind of short commercial animation she screened, and how to negotiate price with an employer or client. Talking to them about her own professional and artistic experiences seemed to be a good way to connect with them, and position herself as a mentor and role model.*

*She talked about the kinds of practices a professional engages with, the importance of discipline and continually challenging the limits in yourself and your art. Professor Joritz is very enthusiastic and clearly passionate about animation, and she enjoys teaching. The students responded well to that in both the lecture and studio sections."*

32.     In 2016, Professor Tucker observed Professor Joritz's Animation class,

commenting in her evaluation (excerpt):

*"I was happy to see KU student animators hard at work in the surprisingly comfortable set-up of those economically arranged set of small rooms. It was during the tour that I had the opportunity to see you interact with the students one-on-one. It was very clear*

*to me that the students respected you and that you respected them. This I observed in your familiarity with each student's project and your ability to quickly offer very specific praise and/or tips on how to improve a technical aspect of their work."*

*"You then showed a delightful selection of very different examples including student work as well as professional work of a variety of styles. I was very impressed with the way you teach basic skills, while honoring those skills and their histories and possibilities; effectively transmitting to students a respect for the artform, while inspiring creative thinking among students who bring many different kinds of interests and training."*

33.     In 2016, Professor Joritz received the University's annual *J. Michael Young Academic Advisor Award*. The J. Michael Young Academic Advisor Awards is student-nominated and has been awarded to exceptional professors since 2006. Professor Joritz was the first and only Film & Media Studies faculty member to win this award. Christina Highsmith, the student who nominated Professor Joritz, wrote (excerpt):

*Professor Cathy Joritz has continually put her students in positions where they can succeed in their career goals by offering her time and energy. She gives up her lunch breaks and weekends to help students who have questions about their projects or career goals. I have not met a professor yet in any department that goes so far out of their way to drive students to events, provide us with scholarship and internship opportunities, and help students meet their goals in animation classes. During her classes, she always maintains a professional and un-biased attitude toward every student. I genuinely feel that she does all she can to help students succeed…"*

34.     Professor Joritz was an active member of her department; she developed new courses and she outfitted two new University/departmental animation studios.

35.     In addition to teaching, Professor Joritz continued to receive prestigious national and international recognition for her creative work (i.e. research) and began new scholarly and creative research projects at the University. In 2014, Professor Joritz's animated short Negative Man was selected for the curated exhibit *Das Schwache Geschlecht – Neue Mannsbilder in der Kunst; The Weak Sex: How Art Pictures the New Male*", exhibited in the Museum Fine Arts, Bern, Switzerland. It is extremely rare for animators to have their works exhibited in major Fine Arts

9

museum exhibits; Upon reason and belief Professor Joritz was the only faculty member in the Film & Media Studies Department to have her work honored in this way.

36.    Professor Joritz was awarded three competitive University grants and other University funding in order to research the life and work of the German silhouette animation pioneer, Lotte Reiniger (1899 – 1981). Professor Joritz continued this research throughout her employment at the University, teaching silhouette animation techniques and the history of Lotte Reiniger to her students.

37.    In May 2014, Professor Joritz was selected, in a peer-reviewed process, to present a paper about her digitally collaged images of the Virgin Mary at the Eighth International Conference of Iconographic Studies: Christian Iconography and Modern and Contemporary Art, held at the University of Rijeka in Croatia. The following year, Professor Joritz's paper was published by Brepols Publishers in Belgium in the international journal *IKON 8, Christian Iconography in Modern and Contemporary Art*.  The University website featured an article about Professor Joritz's work on its main page, a rare honor, especially for a new professor.

38.    In addition to the aforementioned projects, Professor Joritz had also begun new short animated film productions.

39.    As a production faculty member, Professor Joritz was expected to teach a Basic Video Course on a rotating basis every few years. She did so for the first time in the spring semester 2014. The Basic Video Production course had a syllabus and course design that had been used for years. Both the syllabus and course design were completely overhauled by the department *after* Professor Joritz taught the course.

40.    Several students were dissatisfied with the course but did not inform Professor Joritz. Instead, they complained to the Department Chair Falicov, who did not send them to

10

Professor Joritz to seek resolution, as is accepted university practice, but instead informed them that they could express their dissatisfaction at the end of the semester, in writing, via anonymous student evaluations.

41.     On March 28, 2014, Chair Falicov emailed Professor Joritz to set up a meeting regarding "how Basic Video is going" and "some issues students have". Later the same day, she wrote to Professor Joritz, "…they aren't urgent issues."

42.     Professor Joritz was first able to meet with Chair Falicov to discuss the student issues on April 22, 2014. The semester ended soon thereafter and Professor Joritz left the country for Germany and Croatia.

43.     Professor Joritz received her copies of the student evaluations from the Basic Video course during the summer of 2014, after the semester was over and students had dispersed. Several evaluations included handwritten angry, aggressive, anti-German comments, including criticizing Professor Joritz's pronunciation of words: *"She is a Nazi sympathizer",* she *"drove us nuts frequently mispronouncing well-known words…Talked about Germany all the time,* she talked about *"German feminism",* etc. Some students called for Professor Joritz to be fired.

44.     The student comments were scanned and thereafter became a permanent part of Professor Joritz's University performance record. These comments were included in every meaningful evaluation Professor Joritz underwent and thus tainted all subsequent evaluation processes with discrimination.

45.     Professor Joritz was concerned about the anger in the student comments, which indicated a hostile work environment. She found out later that national origin was a basis for discrimination recognized by federal and Kansas state law. At various times Professor Joritz met with the following faculty members to discuss the discrimination and relate her concerns:

Department Chair Professor Tamara Falicov, Department Chair Professor Michael Baskett (Falicov's successor), members of the Faculty Evaluation Committee consisting of Professors Jacobson, Preston and Wilmott, University administrators including the College of Liberal Arts Dean Carl Lejuez, Associate Dean Henry Bial and Chancellor Bernadette Gray-Little. Professor Joritz requested that the discriminatory comments be removed from her record and suggested ways to address the issue of student discrimination against faculty in the future, specifically in student evaluations. Professor Joritz had been made aware by other women faculty that they too, experienced discrimination via anonymous, end-of-semester student evaluation evaluations. One female professor related to Professor Joritz how a student had called her a "New York bitch".

46.    The University did not remove the discriminatory student comments from Professor Joritz's record and took no action to prevent such discrimination from occurring in the future.

47.    According to the University website, the Office of Institutional Opportunity and Access (IOA) "has an institutional responsibility to enhance and strengthen diversity and inclusion at the University of Kansas which includes the Lawrence and Edwards campuses". According to the *Institutional Opportunity and Access Discrimination Complaint Resolution Process Policy* p. 3:  *Who must report discriminatory actions*?

> *Unit heads and others who serve in leadership roles in the university are responsible for nondiscrimination in their employment and academic environments."*

Also on p. 3:

> *…all employees at the University of Kansas are required to contact the Office of Institutional Opportunity and Access (IOA) at 785-864-6414 or ioa@ku.edu to report incidents of discrimination and sexual harassment, including sexual violence, of which they know or have reason to believe may have occurred.*

48.     Although Professor Joritz had brought the issue to his attention in 2014, Associate Dean Bial finally reported Professor Joritz's concerns to the IOA on April 6, 2016. Professor Joritz brought her discrimination concerns to Chancellor Gray-Little on March 14, 2016, during a meeting in the Chancellor's office. None of the "unit heads" in "leadership roles" (Department Chairs Falicov and Baskett, Associate Dean Bial, Dean Lejuez, Chancellor Gray-Little) other than Associate Dean Bial reported discrimination against Professor Joritz to the IOA, as is required by University policy.

49.     On July 1, 2014, after the semester ending with the discriminatory student evaluation comments, Professor Joritz received an email from Department Chair Tamara Falicov regarding "the research portion" of Professor Joritz's work. In her email, the Chair narrowed Professor Joritz's research activity to "making animations", despite the fact that the *COLLEGE OF LIBERAL ARTS & SCIENCES PROCEDURE Promotion and Tenure Procedure, Film and Media Studies* expressly prohibited limiting a faculty member's scope of "scholarship" (EXHIBIT B, p.3, ¶4):

*In the Department of Film and Media Studies, each faculty member is expected to engage in scholarly and/or creative research. No absolute or rigid criteria can be established to measure research quality and quantity for all candidates.*

50.     The restriction to exclusively "making animations" excluded research that Professor Joritz had invested time in – creating digital collages of the Virgin Mary, for example, and her scholarly research on Lotte Reiniger. The limitation violated Professor Joritz's position description (EXHIBIT C, p.1, bottom paragraph), which included scholarly research as well as creative production: "Conduct creative and/or scholarly research in film and media production and studies".

51.     All tenure-track professors were required to undergo a major performance evaluation, the Progress Toward Tenure Review (PTTR) at the 2.5-year mark of their employment.

13

It was now nearly two years after Professor Joritz began her Assistant Professor position, and the University Department Chair was communicating research requirements contradictory to Professor Joritz's employment contract. Chair Falicov herself had no idea how long Professor Joritz's animated piece(s) should be, nor did she seem to understand that the "length" of an animation bears no relation to its quality or the amount of work invested in it. In her email dated July 1, 2014, she wrote, "I don't know what is a reasonable length of time for an animated piece to be considered for tenure – we'd need to look at other animation professors at other research one institutions."

52.     The University's undefined, never stated, never agreed upon tenure expectations constituted a violation of the University Faculty Senate Rule and Regulation FSRR 6.1.2, which states:

> *6.1.2 Academic Freedom and Tenure Policy… The University of Kansas subscribes to the 1940 American Association of University Professors (AAUP) statement on Academic Freedom and Tenure and/or any amendments or revisions to that statement adopted by the Kansas Board of Regents.*

The AAUP 1940 Statement (and therefore the FSRR 6.1.2) states: *The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.*

53.     The preparation for Professor Joritz's first Progress Toward Tenure Review (PTTR) took place in December/January 2014-2015. The PTT Review is a multi-tiered evaluation process, for which a faculty member must prepare a "dossier". The PTTR dossier includes all student evaluations including student comments, peer evaluations (class observations by other faculty members), a faculty member's teaching statement and research statement and a list of the

faculty member's published and completed work. The *COLLEGE OF LIBERAL ARTS & SCIENCES POLICY, Progress Toward Tenure Review for the College of Liberal Arts & Sciences* outlines the purpose of the PTT Review on p.1 (EXHIBIT D):

> *The progress toward tenure review is intended to provide faculty members with a meaningful appraisal of their progress toward tenure and orient them toward basic aspects of the tenure process.*

54.     The Departmental PTTR committee, consisting of departmental faculty colleagues, conducts an Initial Review of the "candidate's" dossier and writes a narrative for each of the evaluated criteria: Teaching, Creative Research/Scholarship and Service. They then evaluate if the candidate, for each category:

    (  ) Demonstrates progress toward tenure
    (  ) Improvements required for continued progress toward tenure
    (  ) Record not sufficient for progress toward tenure

55.     On March 16, 2015, after the Review was concluded, Professor Joritz received a letter from then-Interim Dean Steeples, which included an assessment of the Review, suggestions for improvement and the determination that "improvement is required for continued progress towards tenure". Professor Joritz was informed that she must submit to another review in 2015-2016. Failing the next year's review would result in "non-reappointment", i.e. employment termination.

56.     Professor Joritz was befuddled by the content of the Dean Steeple's letter. One of his recommendations stated, "In preparation for your mandatory review for promotion and tenure, however, an increase your service commitments on both the national and international level would be advised."

57.     The demand for service on "the national and international level" was unreasonable and capricious because it failed to follow the proscribed *Film & Media Studies (FMS) Promotion and*

*Tenure Procedures* for promotion from assistant to associate professor. The FMS policy, p. 5, §2, included no expectations for service on a national or international level (Professor Joritz's emphasis):

> ***For promotion to associate professor, a candidate's service contributions is expected to be focused at the departmental level, but also at the level of the School of the Arts, the College, and the University****. Greater amounts of service to national or international professional organizations, and the larger community will be expected later in one's career.*

And on p. 5, §5:

> ***Greater amounts of service*** *at the School, College and University levels,* ***in national or international professional organizations, and the larger community will be expected later in a faculty member's career.*** *These additional service expectations are expected for promotion to the rank of professor.*

58.     On March 26, 2015 Professor Joritz emailed Erin Spiridigliozzi, Assistant Dean for Faculty and Staff Affairs, seeking information that might explain the negative PTTR decision. Professor Joritz asked if she could appeal the decision.

59.     On April 1, 2015 Erin Spiridigliozzi emailed Professor Joritz, informing her, *"THERE ARE NOT (sic) APPEAL PROCEDURES AVAILABLE FOR THE PTTR REVIEW."*

60.     Ms Spiridigliozzi attached a pdf document entitled "Initial Review Evaluation Documents" to her email. This document was the detailed review that the Film & Media Studies Departmental 2015 PTTR Committee members had written about Professor Joritz (EXHIBIT E).

61.     The Initial Review Evaluation arrived moments before Professor Joritz was scheduled to meet with Chair Falicov to discuss the results of the PTT Review. Professor Joritz informed

Falicov that she had just been emailed the Initial Review Evaluation but had not yet read it.

62.     Chair Falicov told Professor Joritz that she was not supposed to have a copy of the Initial Review Evaluation and told her to delete it.

63.     Professor Joritz told Chair Falicov that she thought transparency in such matters was best. Because there is no University policy that states that a faculty member may not see the Initial Review Evaluation, and the Initial Review Evaluation was not marked "confidential", Professor Joritz did not delete the Initial Review Evaluation.

64.     The meeting between Professor Joritz and the Chair lasted 30 minutes. The Initial Review Evaluation was not discussed. After the Chair left, Professor Joritz read it.

65.     The Initial Review Evaluation revealed itself as the source for the Dean's policy violation, as it included the same unreasonable, policy-violating expectation of service, which Dean Steeples had repeated in his letter. The Initial Review Evaluation also exposed many more procedural and policy violations, including but not limited to, a restrictive, invalid description of Professor Joritz's scope of research and misleading statements about the results of Professor Joritz's student evaluations.

66.     The Initial Review Evaluation also revealed that Department Chair Falicov, who should have been an ex-officio member of Professor Joritz's 2015 PTT Review Committee, violated University procedures by serving as its Chair. (This was later confirmed by the University Faculty Rights Board, see p.23, #85.) Chair Falicov also filled out the "Overall Evaluation" ratings incorrectly, leaving an incorrect and falsely negative impression of the candidate's record. Despite Professor Joritz having received positive reviews in all three performance categories – Teaching, Research, Service – Falicov impermissibly checked boxes that read "Improvement required for continued progress toward tenure" (see p. 15, #54).

67.     The Department's PTTR Initial Review Evaluation included two descriptions of expectations for Professor Joritz's research: One description, which the Professor Joritz viewed and signed in agreement and another, which Professor Joritz never saw and did not agree to. The second description wrongly described Professor Joritz's research as "creative research leading to short and long form animation works". Not only was this description not a part of Professor Joritz's position description; It violated University policy. Further, the inclusion of "long form animation works" described a Herculean task. It created misleading and unobtainable research expectations in the minds of University committee members and administrators unfamiliar with animation production, guaranteeing that Professor Joritz's creative work would fall short of their expectations.

68.     The Department's Initial Review Evaluation also revealed "secret" procedures, which faculty were not privy to. For example, Professor Joritz was never informed that the Department Chair had an option to "not concur" with the departmental PTTR committee's recommendation and could insert a letter into her dossier with his/her reasons for non-concurrence. This secret procedure in particular would prove extremely destructive to Professor Joritz the following year, when her employment depended on a positive PTT Review.

69.     The Initial Review Evaluation included a narrative that cited Professor Joritz's German background as reason for negative student evaluations, negative student evaluation comments and for her purported communication and teaching inadequacies. The narrative was written by an unidentified PTTR faculty committee member:

*Some of the student observations may also be due to the fact that she taught extensively in Germany for many years before teaching at KU, and she has had some difficulty in adjusting her communicative and teaching skills to her new teaching environment and*

18

*culture*.

70.     Not only did this narrative blame Professor Joritz for the anti-German discrimination and hostile work environment she faced; it reinforced the idea that Professor Joritz's German background was the problem. Further, there was no mention of positive contributions that Professor Joritz brought to the University and its students directly *because* her background was German.

71.     During the same review, Film & Media Studies' Professor Matthew Jacobson violated the Faculty Senate Rules and Regulations (FSRR), 6.1.4.1, p. 10, cited under *Conflicts of Interest*, by serving on both the Film & Media Studies departmental PTTR committee and the CCAPT committee. Department Chair Falicov violated the same policy by appointing him to the PTTR committee while he was a member of the CCAPT committee. This conflict of interest should have been prohibited by the University but was not.

72.     The procedural and policy violations committed during Professor Joritz's 2014/2015 PTT Review negatively impacted and tainted it, making it impossible for any subsequent committee and/or administrator to make a fair and valid evaluation of Professor Joritz's performance.

73.     Despite the multiple procedural and policy violations committed during her Review, Professor Joritz was informed by the University that there were no means to appeal the PTTR decision, violating Professor Joritz's right to due process.

74.     Despite being refused a chance to appeal the PTT Review outcome, Professor Joritz took note of the Dean's suggestions for improvement. She continued her creative and scholarly research and continued to receive international recognition. For example, Professor Joritz was invited to illustrate the cover of a book published in Germany, which included writings and images

from renowned women German experimental filmmakers and scholars.

75.    On January 14, 2016, prior to her second PTT Review, Professor Joritz was awarded the highly competitive University's *Hall Center for the Humanities Creative Fellowship* for her animated short entitled *Film Feast.* Per University policy, creative work constituted research, i.e. this was a research award. The Fellowship would afford Professor Joritz a semester free of teaching in order to concentrate on the production of an animated short. It also included an additional office space in the Hall Center and a $1,000 stipend to spend as Professor Joritz wished. The Fellowship was slated for the Fall Semester 2016. No other Film & Media faculty member had ever been awarded the Creative Fellowship.

76.    Despite such achievements, when evaluated again in 2016 during her second PTT Review, on which her employment depended, the University refused to consider Professor Joritz's research record as a whole: Chair Baskett, the CCAPT committee members, Dean Lejuez, Provost Rosen and Chancellor Gray-Little all ignored, misrepresented or diminished Professor Joritz's research projects and achievements.

77.    On November 13, 2015 Department Chair Michael Baskett suggested that he conduct a class observation of Professor Joritz's animation class, stating *"Second, if you would send me a list of the classtimes (sic) you have available for the rest of the semester, I will be there to evaluate you so that there isn't a lack of proper department faculty evaluations for you."* Class observations are an important component of a faculty member's teaching record, and Chair Baskett's offer made it seem as though he was supportive. The Chair observed Professor Joritz's class on November 23, 2016.

78.    The Chair's written class observation was to be included in Professor Joritz's 2016 PTT Review dossier along with other class observations. Previously, Professor Joritz always read

class observations and discussed them with the faculty members who wrote them. Chair Baskett, however, refused to allow Professor Joritz to see the observation he wrote and would not discuss his observations with her. This violated University policy, which allows faculty to review their PTTR dossiers, of which class observations are a part. It also contributed to a hostile work environment, causing Professor Joritz anxiety about the content of Chair Baskett's "observation". Despite repeated requests to Chair Baskett and, after Baskett's refusals, to Associate Dean Bial, Dean Lejuez, Vice Provost Mary Lee Hummert and the Provost, Professor Joritz was still denied Baskett's observation.

79.     Tenure-track faculty are offered one Research Intensive Semester (RIS) – a semester without teaching – at a time of their choosing prior to their tenure review.  On November 12, 2015 Professor Joritz requested a RIS from Chair Baskett for the 2016/2017 academic year. She had requested one from him earlier for the spring semester 2016, which he denied her, citing a "lack of faculty". A RIS would provide Professor Joritz an opportunity to focus exclusively on her research. Baskett delayed his response, emailing Professor Joritz that he would let her know "Probably Feb-Mar. 2016". By not granting Professor Joritz the RIS she requested, the Chair denied Professor Joritz the opportunity to focus on her research that other similarly situated professors were afforded.

80.     In December 2015 Professor Joritz approached the University's Office of Institutional Opportunity and Access (IOA) to discuss her issues of discrimination based on national origin, including the discriminatory student comments, which would again be included in her PTTR dossier and negatively impact her performance record on an ongoing basis, forever. The IOA representative asked Professor Joritz when the student comments had been made, then promptly told her that the time limit for a complaint had passed (180 days). However, IOA policy does not

cite a 180-day deadline in its *Discrimination Complaint Resolution Process Policy*. Instead it "encourages" complainants to file their complaints within 180 days:

> *Complainants are encouraged to file their complaints within one hundred eighty (180) days of the most recent occurrence of the alleged discrimination*.

Over time, the 180-day excuse was cited by multiple IOA "investigators", who refused to investigate Professor Joritz's complaints regardless of when she reported them. The University's unlawful discrimination and related unlawful practices against Professor Joritz were never investigated or addressed, but rather allowed to continue.

81.     The PTTR process began again for Professor Joritz the following year (2015/16) with muddled instructions. In November 2015 Professor Joritz and other College of Liberal Arts & Sciences' evaluation candidates received conflicting information regarding the submission of PTTR materials. Professor Joritz sought clarity by contacting several University administrators, including Dean Steeples. Steeples agreed, "*...we need to clarify the instructions so that we are fully compatible internally within CLAS and also with the instructions from the Provost."*

82.     Prompted by Professor Joritz's inquiry, the University attempted to change the PTTR policy without going through the proper procedures (i.e. by violating procedures).

83.     Professor Joritz had the reasonable expectation that the departmental 2016 PTTR process would begin early December 2015, as it did the year prior, and would remain the same, as she had not been informed of any altered procedures.

84.     Instead, the 2016 process was vitiated with procedural violations that began immediately. The process began late (January 2016), was extremely rushed and Professor Joritz had to fight for the adherence to policies/procedures every step of the way.

85.     The Department Chair Michael Baskett, who should have been an ex-officio member of the 2016 PTT Review Committee, violated University procedures by serving as the committee's

Chair, a procedure violation that occurred during both of Professor Joritz's PTT Reviews. The University Faculty Rights Board called attention to this impropriety (among other issues) in its letter to Chancellor Gray-Little dated May 11, 2016 (EXHIBIT F, Professor Joritz's emphasis) :

> *Finally, FRB notes that in both years of Professor Joritz's pre-tenure reviews, the previous and current department chairs signed both as chair of the Faculty Evaluation Committee and as Department Chair…* **Especially in cases where the department chair does not concur with the committee evaluation, this dual chair role suggests a lack of independent judgment of the candidate's record.**

86.     Chair Baskett began the PTTR process a month later than the year prior, and only after Professor Joritz prompted its initiation by emailing him.

87.     On January 1st 2016, Professor Joritz requested that Professor Jacobson not serve on the PTTR committee, citing sexist bias and a conflict of interest, as Jacobson was serving on the CCAPT committee, a committee that would also review Professor Joritz's record. According to University policy, Professor Joritz had the right to make this request.

88.     The Chair responded on January 5, 2016, informing Professor Joritz that the "selection of committee membership is decided by the department" when, according to the *Film & Media Studies Promotion and Tenure Procedures*, p. 7, the committee members should be appointed by the Chair: "*In the department the Initial Review Committee is made up of 3 members appointed by the department Chair as an ad hoc promotion and tenure committee of faculty that gathers and evaluates relevant material.*"

89.     On January 7th, 2016, the Chair's part-time assistant, Sarah Sahin, informed Professor Joritz via email that Professor Joritz was not permitted to communicate with other members of the PTT Review committee: "any questions for or communication with the committee needs to go

through Michael or me." Michael = Chair Michael Baskett.

90.   On January 11, 2016, Chair Baskett confirmed to Professor Joritz via email that she was not to communicate with other PTTR committee members, stipulating that the only communication, including feedback, would occur exclusively through himself and Sahin. Assistant Sahin was not an academic and thus could not give Professor Joritz proper feedback. This isolated Professor Joritz from the very faculty members who should have served as her strongest advocates and it violated Professor Joritz's constitutional rights. It also enabled the Chair to manipulate the evaluation process by controlling all communication between Professor Joritz and the committee members, with no one present to participate in or hear their conversations.

85.   Chair Baskett controlled and manipulated all of the communication that Professor Joritz received and relayed during the evaluation process on which her livelihood depended. This practice was not "policy"; it was purposely implemented by Baskett in order to prevent her from communicating freely with members of the committee, who were tasked with writing detailed evaluations of her work. It was also a means to demoralize Professor Joritz when she was most vulnerable, fighting to keep her job.

86.   Professor Joritz brought up the issue in a meeting with Dean Steeples, who said that he had never heard of a faculty member not being allowed to contact PTTR committee members. Associate Dean Bial was present at the meeting. At another time an Ombudsperson confirmed the same to Professor Joritz.

87.   On February 1, 2016 Professor Joritz emailed Associate Dean Bial, informing him that Professor Baskett was prohibiting her from speaking with committee members. Associate Dean supported Professor Joritz's imposed isolation, declaring that this had been "historically been the practice". No University policy supports Bial's claim of actionable procedure.

88.    On January 11, 2016, Chair Baskett refused to follow PTTR procedures by appointing only two faculty members to the PTTR committee instead of three.  There were less than 3 weeks to go before Professor Joritz was to turn in her final PTTR documents/dossier. Committee members would need time to review her materials, and Professor Joritz needed their albeit indirect advice in order to refine her dossier.

89.    On January 13, 2016 Professor Joritz emailed Chair Baskett and cc'd Assc. Dean Bial, expressing many concerns about how the PTTR process was being conducted. She requested again, that Professor Jacobson be recused from the committee. Chair Baskett, the only committee member she was permitted to communicate with, did not respond to her email until January 19th, nearly a week later.

90.    On January 14, 2016 Professor Joritz was informed that she had been awarded the highly competitive *Hall Center for the Humanities Creative Fellowship* for 2016. She communicated this research-achievement to Chair Baskett and Associate Dean Bial. Neither responded.

91.    On January 19, 2016 the Chair finally emailed Professor Joritz the names of the PTTR committee members. He still had the wrong number of faculty members appointed; one of them was former Chair Falicov. He still had not finalized a PTTR schedule. Professor Joritz's deadline to submit her materials – for which she needed feedback and time to make revisions – was a mere 2 weeks away.

92.    On January 21, 2016 Professor Joritz requested that Chair Baskett recuse former Chair Falicov from the committee, citing the fact that Falicov had asked Professor Joritz to destroy the Initial Review Evaluation document the prior year, twice. This was the document that exposed Falicov violating PTTR procedures to Professor Joritz's detriment, ultimately forcing Professor

Joritz to have to undergo the PTT Review twice, this time with her employment at stake. In a gross breach of confidentiality, Chair Baskett refused to recuse Falicov, unnecessarily cc'ing his assistant Sahin his refusal, knowing Sahin was friends with Falicov.

93.     On January 25, 2016 Professor Joritz met with Interim Dean Steeples in a final effort to seek remedy for past and ongoing PTTR policy violations.

94.     Steeples invited Associate Dean Bial to the meeting, unbeknownst to Professor Joritz. Professor Joritz gave each administrator a list of the PTTR 2015 & 2016 policy violations, which included violations committed by Professor Matthew Jacobson, former FMS Chair Tamara Falicov, Interim Dean Steeples and FMS Chair Michael Baskett.

95.     Professor Joritz requested that the new Dean of the College of Liberal Arts & Sciences, Carl Lejuez, be given a copy of the violations. Carl Lejuez became the Dean of the College of Liberal Arts & Sciences on February 1, 2016.

96.     The following day, on January 26, 2016, Assc. Dean Bial emailed Professor Joritz thanking her for meeting with him and Dean "Staples" "regarding your PTTR process." He informed Professor Joritz, that *"they"* (the Provost's office) *"have advised us that the department chair should <u>not</u> be considered one of the three members of this committee. Accordingly, we have advised Professor Baskett that he should appoint a third member (along with Professors Falicov and Preston) to serve in this capacity."* This was the only policy violation that was corrected. Professor Joritz now had 8 days to turn in her complete PTTR dossier.

97.     On the same day, a day after Professor Joritz reported the PTT Review procedural violations to the Dean, Chair Baskett and Professor Falicov attended a department colloquium, during which Professor Joritz informally presented her research. Both were frowning deeply.

98.     Afterwards, Chair Baskett came into Professor Joritz's office and angrily told her,

*"You're not doing yourself any favors by making the department look* (bad)!" Professor Baskett stood directly in front of Professor Joritz when he said this, intimidating her both physically and psychologically. Note: Professor Joritz is less than 5 feet tall. Also, she was utterly dependent on her Chair for feedback, as he had stipulated she not speak with anyone else on the committee. Months later, in an affidavit signed by Chair Baskett on April 28, 2016, he did not deny threatening Joritz but claimed loss of memory: *"I do not recall ever telling Assistant Professor Joritz that "You're not doing yourself any favors by making the department look bad"…"* and went on to blame Professor Joritz for *"her efforts to manipulate the process…"*

99.    On Jan 27, 2016 Professor John Tibbetts told Professor Joritz he was named to the PTTR committee. This was one week before Professor Joritz was to turn in her final materials. It gave Professor Tibbetts very little time to review her record or provide feedback and even less time for Professor Joritz to make revisions to her documents based on the feedback she hoped to receive from Tibbetts through her Department Chair, as she was not permitted to communicate with Tibbetts directly.

100.    On January 29, 2016 Professor Joritz emailed Dean Steeples her concerns about PTTR-related issues, including but not limited to, retaliation by the former Chair, Professor Falicov and Chair, Professor Baskett. She attached a list of the many PTTR policy violations from 2015 & 2016 so he would have a digital copy to reference.

101.    Chair Baskett still had not recused Professor Falicov from the departmental PTTR committee and so she remained a member.

102.    Late January/early February: Chair Baskett told Professor Joritz that she was to turn in her dossier two days early (February 3rd instead of February 5th), and informed her that *he* would be sending it to CLAS rather than having his assistant sent it, which was the procedure the year

prior. When Professor Joritz asked (similar to), "Isn't Sara (Sahin) sending it over?" he responded, "Don't assume you know everything." Professor Joritz posed no further questions and left his office, resigned to the hostile environment she had now come to expect.

103.    On March 16, 2016, Professor Joritz emailed Dean Lejuez the news that her animated short *"Zapf Dingbats - A Tribute to Hermann Zapf"* had been accepted to the 62nd International Short Film Festival Oberhausen, Germany, one of the most prestigious short film festivals in the world. She informed him that the acceptance to this renowned festival counts as a "major peer-reviewed accomplishment". Dean Lejuez acknowledged Professor Joritz's achievement via email, but would later ignore it when he would claim that her "research indicates serious deficits" and recommend her termination.

104.    On March 24, 2016 Professor Joritz met with Dean Lejuez and informed him of the many PTTR procedural violations that occurred in both 2015 and 2016. On the same day in a follow-up letter sent via email, she reiterated to him her fears of retaliation by Professor Baskett, Professor Falicov, Associate Dean Bial and other FMS professors for implicating them in the procedural violations she had reported. Professor Joritz attached the list of procedural violations to her email.

105.    On April 2, 2016, Professor Joritz emailed Associate Dean Bial, querying how the School of Arts was dealing with discrimination based on sex and country of origin, *"...specifically related to the discrimination I have experienced?"* Professor Joritz informed Associate Dean Bial that she had sought help *"previously with you, with Professor Baskett (10/22/15), with the FEC members (7/16/2015) and I recently discussed the matter with Dean Lejuez (3/24/16). To date, I have not seen these issues addressed."* She also explained why she had requested that Professor Jacobson be recused from her PTTR committee and described what she felt was his sexist,

discriminatory and biased behavior toward her.

106.     On April 6, 2016, Associate Dean Bial informed Professor Joritz that he had *"...referred the matter to the office of Institutional Opportunity and Access (IOA) for review."* On June 6, 2016 Bial emailed Professor Joritz that he had spoken with an IOA staff member on April 13 *"and was told that an investigator had been assigned".* The IOA did not investigate.

107.     On April 8, 2016, Professor Joritz responded to Associate Dean Bial's email, including her request, *"I hope you will ensure that the IOA understands our annual and long term faculty evaluation processes…"*

108.     On April 8, 2016, Professor Joritz received a letter via email from Anne Sawyer, executive assistant to the Dean Lejuez, with his letter recommending her termination. Lejuez' conclusion: *"Your research record indicates serious deficits"* was not supported to the appropriate standard of proof by evidence that was substantial when viewed in light of Professor Joritz's record as a whole, but instead based solely on an evaluation letter written by Chair Baskett, which included no proof whatsoever. Lejuez's claim to Professor Joritz, *"the quantity of your major works was not sufficient as evidence of progress toward tenure"* was unsubstantiated and violated the *College of Liberal Arts Procedure, Promotion and Tenure, Film and Media Studies,* which did not stipulate "quantities" and clearly stated on p.2: *"No absolute or rigid criteria can be established to measure research quality and quantity for all candidates."*

109     Lejuez ignored the positive departmental Initial 2015/16 PTT Review that had been written about Professor Joritz's research, at length and in detail, by the 2016 PTTR departmental committee members, all of which was based on the solid evidence of the Professor Joritz's dossier. Instead, Lejuez repeated the unsubstantiated allegations written in a letter by Chair Baskett regarding Professor Joritz's "inappropriate behavior". Lejuez decreed, without basis in policy or

procedure, that Professor Joritz's "behavior" "weakened" her service record. He omitted Professor Joritz's manifold examples of service, including her international service, which was a level of service expected from professors two ranks higher than Professor Joritz.

110.    Prior to the Dean's letter recommending her termination, Professor Joritz had no idea that Chair Baskett had written a letter that he submitted along with her PTT Review dossier. According to University policy, faculty members had the right to review their dossiers before they were forwarded up the chain of review. Chair Baskett purposely did not inform Professor Joritz that he had inserted a toxic letter into her dossier and she had no way of knowing, as he submitted it directly himself. (See p. 28, #102) But now she knew, and Professor Joritz needed to rebut it.

111.    On April 8, 2016, Professor Joritz emailed Professor Baskett twice: The first time she asked for a copy of the letter he had included with the Department Initial Review. The second time she requested a copy of the class observation he wrote. Chair Baskett refused to provide the Professor Joritz with either. Professor Joritz repeatedly requested the documents and the University administrators supported the Chair's repeated refusals.

112.    On April 10, 2016, Professor Joritz requested, via email, the following PTTR documents from Anne Sawyer, who was Executive Assistant to the Dean: the PTTR Departmental Initial Review, Chair Baskett's letter, any other documents submitted that were related to her PTT Review and the CCAPT's findings. Ms Sawyer responded, *"The PTTR process does not provide for sharing of the materials you have requested."* No University policy supported this denial.

113.    On April 12, 2016, Professor Joritz emailed Dean Lejuez with questions about his letter dated April 8, 2016. Among other issues, Professor Joritz was especially concerned about the Dean's allegations regarding her "behavior", which were apparently based on a letter from her Chair. Professor Joritz informed the Dean that, *"this is the first I ever hear of them"* and asked him

to point to a policy that justifies using "behavior" as a PTTR evaluation criteria. Again, Professor

Joritz requested documents necessary to understanding the content of the Dean's letter, such as the

Initial Review, the Chair's letter, etc.

114.     In an email dated April 12, 2016, Dean Lejuez refused to provide Professor Joritz

with documents and instructed her to direct her questions to Vice Provost Mary Lee Hummert.

Whenever Professor Joritz asked for details about alleged complaints made about her and her

purported "inappropriate behavior", University personnel and administrators violated University

policy by stonewalling her and refusing to provide her with anything, citing issues of

"confidentiality".

115.    On April 12, 2016, Mary Lee Hummert responded to Professor Joritz's email via email,

reaffirming the tiered process of the PTT Review, stating that it was the responsibility of the

CCAPT Committee to *"…report the Committee's recommendation on the progress toward tenure*

*of the faculty member to the Dean of the College."* Hummert attached a copy of the CCAPT's

letter to the Dean, which recommended that Professor Joritz's appointment be terminated

(EXHIBIT G). Hummert did not provide the Professor Joritz with any other documents Professor

Joritz requested.

116.     The letter from the CCAPT Chairperson, Dr. Stuart Macdonald, dated April 7, 2016,

claimed to be *"based on the letter CCAPT received from Professor Michael Baskett"* yet

inexplicably "grew" Baskett's bizarre and false statements about Professor Joritz's research

conditions to a new, even more disturbing level: Baskett's fabricated claim that *"(Professor*

*Joritz's) access to the private collection of* [NAME REDACTED] *in Canada is becoming limited*

*due to his declining mental and physical condition"* morphed into Stuart MacDonald's statement,

*"…potential interviewees are lapsing into senility and ill health."* Both men wrongly declared,

31

*"officials at the Stadtsmuseum in Tubingen, Germany have denied access to an archive of materials necessary to the completion of the project."*, a libelous claim that the Professor Joritz clarified within days by sending a simple email inquiry to the "officials" at the Stadtmuseum.

117.    Just how did this happen? Rachel Rolf, Associate General Counsel for the University, confirmed that Dean Lejuez – not a member of the CCAPT committee – grossly violated University procedures by directing the focus of the CCAPT committee faculty members:

> *"When Professor Joritz's record was discussed in CCAPT, Dean Carl Lejuez*
> *encouraged CCAPT to focus on Professor Joritz's existing record and documented*
> *evidence of progress towards completion of her book. CCAPT followed that*
> *direction."*

Lejuez had no right to influence the CCAPT Committee members at all. The tiered PTT Review process dictated that the CCAPT report their findings to the Dean. The CCAPT Committee was to remain objective. The Dean of Liberal Arts is the CCAPT Committee faculty members' "boss". How could CCAPT Committee members act impartially when the "boss" was directing their "focus"?

118.    MacDonald's letter also extrapolated on Professor Joritz's alleged "dismissive" and "disruptive" "behavior", which was based on the hearsay in the Chair's letter. MacDonald repeated Baskett's claim that Professor Joritz's "inappropriate behavior" "weakened" her service, a punitive concept not found in University policy. And fact was, Baskett had never called Joritz into his office for any behavioral issues, ever.

119.    April 13, 2016, morning: Knowing that the Provost was the next person to "sign off" on her termination, Professor Joritz phoned with and emailed the Provost's secretary, Linda Bonebrake, describing to Bonebrake the multiple policy violations that occurred in the PTTR

process(es). Professor Joritz requested a meeting with Provost Sara Rosen asap so she could inform the Provost of the malfeasance.

120.    The same morning, Vice Provost Mary Lee Hummert emailed Professor Joritz, chastising her for attempting to meet with the Provost: *"…it is not appropriate for her to talk with you while she is reviewing the PTTR recommendation.",* denying Professor Joritz her Freedoms of Speech and Association, violating University policy and contributing to Professor Joritz's hostile work environment.

121.    A mere six hours later, Professor Joritz received a letter via email from Provost Rosen informing her of the Provost's recommendation for her termination. In her letter, the Provost repeated the allegations about Professor Joritz's "behavior" without question or proof:

> *"…a pattern of inappropriate behavior toward colleagues, staff, and GTAs that has affected functioning of the department and weakened your service record."*

The Provost provided no basis of proof for concluding that Professor Joritz's research was insufficient other than referring to Dean Lejuez, who *"had stated* (so) *in his letter"* (EXHIBIT H). And Lejuez had stated so because Baskett stated so. As its poison made its way up the chain, the University continued to refuse Professor Joritz a copy of Baskett's letter.

122.    The Provost's recommendation for her termination informed Professor Joritz that *"Under F.S.R.R. 6.4.3.3, you may appeal this recommendation to the Faculty Rights Board within fourteen (14) days of receipt of this letter by filing an appeal with the Office of University Governance, 33 Strong Hall. Grounds for appeal are limited to violation of the procedures for non-reappointment as outlined in F.S.R.R. 7.3.2."* So began Professor Joritz's Trial by Ordeal: with classes still in session and other University obligations ongoing, the Professor Joritz had 2 weeks to file her appeal (i.e. fight for her job), which could be based only on procedural/policy

violations.

123.     But in order to identify violations, Professor Joritz needed specific documents, which she requested repeatedly from Chair Baskett, Dean Lejuez, Mary Lee Hummert, and other University administrators. These documents included Chair Baskett's evaluation letter, Chair Baskett's observation of Professor Joritz's class, the CCAPT Committee procedures, the CCAPT notes regarding Professor Joritz's evaluation, the Film & Media Studies departmental 2016 PTTR Initial Review, position descriptions for the Film & Media Studies Department Chair, the Associate Dean of the School of Arts, the College of Liberal Arts Dean(s), the Provost and the Chancellor. The University refused Professor Joritz access to all of these.

124.     On April 15, 2016 Chancellor Gray-Little spontaneously agreed to meet with Professor Joritz in her office. The Chancellor explained to Professor Joritz that, while she was not permitted to discuss Professor Joritz's evaluation, she would listen to her for 15 minutes. Professor Joritz told the Chancellor about the procedural violations and the student discrimination she experienced. Professor Joritz told the Chancellor that there existed an extremely detrimental evaluation letter, which was untrue, written by Professor Joritz's Chair but kept secret from Professor Joritz. The Chancellor listened and advised Professor Joritz to make sure that those in the administrative chain were also informed about what Professor Joritz had related to her. Professor Joritz assured the Chancellor that they were informed…

125.     Professor Joritz met the deadline for her appeal and filed it with the Office of University Governance, which in turn sent a copy to the University's Faculty Rights Board and to the University Counsel.

126.     Professor Joritz left for Germany to be present at the screening of her new animated short film, *Zapf Dingbats – A Tribute to Hermann Zapf*, at the prestigious short film

festival, the Internationale Oberhausen Kurzfilmtage.

127.     On Saturday, April 30, 2016 Rachel Rolf, Associate General Counsel for the University, sent the Faculty Rights Board a response to Professor Joritz's appeal. On the first page of her response, University Attorney Rolf violated University policy by repeating the incorrect expectation of service that Dean Steeples and Professor Joritz's department had made during Professor Joritz's first PTT Review: *"Her* (Professor Joritz's) *service record was also identified as an area of concern"*. This exemplifies how the University failed or refused to correct its own violations in its incessant quest to terminate Professor Joritz's employment.

128.     In the University Counsel's response, Rachel Rolf also revealed that Dean Carl Lejuez had violated the *Bylaws of the College Assembly in the College of Liberal Arts and Sciences* by impermissibly inserting himself into the CCAPT committee review process. As mentioned previously, the CCAPT evaluation is required to conduct its evaluations impartially and independent of the Dean. The University Bylaws confirm this independent, tiered process (Professor Joritz's emphasis):

>    *3. The College Committee on Appointments, Promotions and Tenure (CCAPT) shall:*

>     *b. Address itself to matters of policy pertaining to faculty rank and status and*

>     <u>*report its recommendations to the Dean.*</u>

However, as Rolf revealed, Dean Lejuez had directed the focus of the CCAPT faculty members when they evaluated Professor Joritz:

>    *"When Professor Joritz's record was discussed in CCAPT, Dean Carl Lejuez*

>    *encouraged CCAPT to focus on Professor Joritz's existing record and documented*

>    *evidence of progress towards completion of her book. CCAPT followed that direction."*

129.     The response from the University General Counsel included many of the documents

that Professor Joritz had been requesting for months. The University had denied Professor Joritz these documents, which were vital to her appeal, filing grievances, due process, etc.; then used them against her in its response.

130.    The University's Faculty Rights Board (FRB), which was the recipient of Professor Joritz's appeal, met and made a determination without communicating with Professor Joritz. The FRB did not provide Professor Joritz with a hearing. However, on May11, 2016, the FRB sent a letter to Chancellor Gray-Little regarding their findings. In its letter Faculty Rights Board recommended that the inaccurate statements made by Chair Baskett in his letter to CCAPT *"be disregarded in your independent judgment of the record."* The FRB noted that these statements were repeated in the CCAPT recommendation and *"likely influenced Dean Lejuez's conclusion…"*. (see EXHIBIT F)

131.    After receiving the University response to her appeal and finally, the documents, which proved a plethora of policy and procedural violations, Professor Joritz requested permission from the Faculty Rights Board to include the (for her) newly discovered violations in an amended appeal. She was not permitted to do so.

132.    As outlined in the University *General Instructions Progress Toward Tenure Review 2015–2016* policy, Chair Baskett was required to schedule a formal feedback conference with Professor Joritz within two weeks of Professor Joritz receiving her non-reappointment letter from the Dean, i.e. by April 22, 2016. Baskett did not, thus violating yet another policy and denying Professor Joritz the due process of questioning him regarding his letter. The Faculty Rights Board made note of this violation in their letter to the Chancellor stating, *"we believe the University should nevertheless ensure that the Department of Film Studies facilitates this meeting in all future reviews."*

36

133.     Chair Baskett, the CCAPT Committee and every University administrator upwards, with the exception of the Chancellor, cited Professor Joritz's "behavior" as reason to punish her by terminating her employment. Aside from the fact that the Chair's allegations were hearsay and not true, the punitive measure of <u>terminating employment</u> is impermissible according to University policy. University policy outlines formal disciplinary policies and procedures, under Articles III, V, and VI in its *Faculty Code of Rights, Responsibilities and Conduct*, pp. 4 & 5 in order to address misconduct. Article V categorizes proscribed conduct. Article VI lists *"formal sanctions and are steps taken beyond informal complaints about one's performance, verbal admonitions to improve or change one's behavior, and negative comments concerning one's performance as stated in the annual evaluations."* The sanctions are *"listed in order of increasing severity"*, with *5. Recommendation of Dismissal* being the last, most severe sanction.

134.     Article VI then states, *"Although listed in order of severity, the sanctions need not be applied serially, and a more serious sanction may be applied without a less serious one having been previously applied."* Fortunately, Article VI is tempered by Article III, #7 which states (EXHIBIT I, p. 2, #7): *Faculty members have a right to due process in all disciplinary matters. Faculty members have the right to peer judgment through the hearing process. The sanctions listed in Article VI of this Code may not be imposed upon a faculty member without notice of the charges against him or her and the opportunity to request a hearing before the Judicial Board or the Faculty Rights Board."* Recommendation for dismissal could not be applied as a sanction because Professor Joritz was never informed of any charges against her and logically, also never received any type of hearing.

135.     Professor Joritz had never been previously sanctioned for anything. No grievances had ever been filed against Professor Joritz. Professor Joritz repeatedly requested information about

the purported charges against her, but the University refused to provide her with anything. The University even denied her the Chair's letter – the very letter, which sabotaged the PTT Review her employment depended on; a letter she saw only days before her termination.

136.     In a concerted effort to get her fired, Chair Baskett, Associate Dean Bial, Dean Carl Lejuez, Vice Provost Mary Lee Hummert and Provost Rosen violated Professor Joritz's rights by refusing to inform Professor Joritz of allegations made against her, denying her the opportunity to know of and to refute allegations made against her and denying Professor Joritz any means of defending herself against the secret allegations and egregious, ongoing policy violations.

137.     On May 2, 2016 Professor Joritz was awarded the University's *J. Michael Young Academic Advisor Award* for her teaching. Professor Joritz was the only faculty member in her department to receive this teaching award, which had been awarded annually for over a decade.

138.     On May 13, 2016, the University emailed Professor Joritz a "Notice of Non-Reappointment" letter signed by Interim Provost Sara T. Rosen informing Professor Joritz that her appointment for the 2016-2017 academic year will be a terminal appointment. This letter served as notice of *"a final agency action by the University of Kansas."* (EXHIBIT J)

139.     In the University's "Notice of Non-Reappointment" letter, the University offered no evidence to substantiate its determination; the Provost simply wrote, *"Even excluding consideration of the information in the Chair's letter, the Chancellor determined that your research record demonstrated insufficient progress toward tenure, warranting non-reappointment."*

140.     After receiving the letter, Professor Joritz requested from Provost Rosen per email *"a more detailed response",* inquiring *"2. How did my research record demonstrate insufficient*

*progress toward tenure?"* Neither the Provost, the Chancellor, nor the University provided Professor Joritz with a response.

141.     With nothing articulated to support its determination that Professor Joritz's "research record demonstrated insufficient progress toward tenure", the University's absence of argument runs counter to the clear evidence of Professor Joritz's national and international research record. The University's decision is unreasonable and without foundation in fact.

### Other Statements of Fact

142.     Until June 30, 2015, the Department Chair of the Film and Media Studies had been Professor Tamara Falicov. Professor Michael Baskett was her successor. Among the Chair's listed "duties and responsibilities" is: *e. Executes University policy in the unit effectively.*

143.     Professor Joritz's employment was terminated based on a pre-tenure review. The standards for pre-tenure should demonstrate "progress toward tenure", not the fulfillment of tenure requirements. Professor Joritz's record, based on the standard of proof by evidence that is substantial when viewed in light of the record as a whole, proved beyond a doubt that she had made progress toward tenure in all criteria subject to review: Teaching, Research and Service.

144.     According to University policy, international recognition for research is expected for the promotion from Associate Professor to Full Professor.  Although Professor Joritz was an Assistant Professor (lower than Associate), the University failed to recognize the continuous international recognition that her research received.

145.     The Defendants violated University policies, making Professor Joritz's PTT Reviews adversarial and punitive to the point of stripping from Professor Joritz her hard-won Creative Fellowship, denying Professor Joritz her livelihood and destroying Professor Joritz's reputation and career.

**"Insufficient Research" – A Pretext for Termination**

146.    The University claims to have terminated Professor Joritz's employment due to "insufficient research". Research, as delineated in all performance evaluation policies, constitutes 40% of a faulty member's responsibilities.

147.    In order to show pretext, evidence must create a genuine issue that the University's proffered reason for terminating Professor Joritz's employment was pretextual. The University claimed that Professor Joritz's research was "insufficient". Evidence shows, that claims of Professor Joritz's research as being "insufficient" was based on:

    a.  Gently put, "factual inaccuracies" fabricated by Chair Michael Baskett, which he included in a "secret" letter to the CCAPT committee. These "inaccuracies" were subsequently "grown" into larger, more absurd "inaccuracies" by Dr. Stuart MacDonald, in his CCAPT recommendation letter addressed to Dean Lejuez. The "inaccuracies" were fabricated in order to sabotage Professor Joritz's positive and internationally recognized research record.

    b.  Chair Falicov's violation of University policy in order to mischaracterize the findings of the 2014/15 PTT Review Committee's positive review of Professor Joritz's research.

    c.  The purposeful downplaying and outright omission of Professor Joritz's accomplishments in evaluations of her research.

    d.  Impermissible, restrictive criteria, in violation of University policy, erroneously applied to Professor Joritz's research.

148.    Evidence shows that Professor Joritz's creative work/research was always evaluated as "Good" or "Very Good", including in her PTT Reviews. These ratings indicated that Professor Joritz was "on track" for tenure. In Professor Joritz's annual performance evaluation

dated June 11, 2014, her Creative Research was rated by the faculty evaluation committee as "Very Good". The 2014/2015 Departmental Progress Toward Tenure Review Committee also rated Professor Joritz's research as "Very Good", praising the *"ambitious work she is undertaking on Lotte Reiniger".* Nevertheless, when Chair Tamara Falicov impermissibly, in violation of policy, filled out the "overall evaluation" on the PTTR form, she checked the box for *"Improvement required for continued progress toward tenure",* directly contradicting the committee's findings and facilitating Professor Joritz's termination. The PTTR document itself instructs,

> ***"The final judgment*** (i.e. the checked boxes) ***should reflect the detailed evaluation of each area and the accompanying documentation."***

149.    Chair Falicov, in a move she thought Professor Joritz would never see, in an evaluation document Chair Falicov instructed Professor Joritz to delete, impermissibly checked the wrong box, making it appear as though the PTTR committee found Professor Joritz's research to be under par. This began the process of firing Professor Joritz using the pretext of "insufficient research". This can also be viewed as retaliation, as Chair Falicov did the "box checking" after Professor Joritz had reported discrimination to her and Henry Bial.

150.    Chair Falicov didn't stop there: She also inaccurately checked the PTTR rating for "Teaching and Advising" as "Improvement required for continued progress toward tenure", again directly contradicting the committee's findings, which gave Professor Joritz a "Good" rating for teaching. With the two most important ratings and 80% of Professor Joritz's responsibilities wrongly checked by Chair Falicov as "Improvement required for continued progress toward tenure", Professor Joritz failed the first PTT Review and was forced to undergo it a second time the following year, this time with her employment at stake.

151.    The following year, the PTT Review (2015/16) Committee again praised Professor Joritz's Lotte Reiniger project:

*"Over the last three years, Joritz has won research grants from the department of Film and Media Studies, the College , as well as the Office of International Programs to travel to various archives in Germany and Canada where she uncovered artifacts and photographs, and conducted interviews… Professor Joritz is an ideal researcher for this project given her extensive knowledge of the history of animation and the animator, her access to undiscovered documents about the animator, as well as her proficiency in the German language.*

152.    Again, a Department Chair sabotaged Professor Joritz's PTT Review; this time it was Chair Baskett. The only way to destroy Professor Joritz's stellar record and ensure her termination was to violate policies and fabricate lies about her research. The Faculty Rights Board pointed directly to Professor Joritz's research when it determined the most obvious "inaccuracies" that were repeated up the University chain of command letters calling for Professor Joritz's termination:

*Also, the Dean and CCAPT's mistaken reliance on this inaccurate information should be taken into account when weighing their respective recommendations regarding Professor Joritz's research record.*

153.    In the University's "Notice of Non-Reappointment" letter to Professor Joritz, the Provost wrote, *"Even excluding consideration of the information in the Chair's letter, the Chancellor determined that your research record demonstrated insufficient progress toward tenure, warranting non-reappointment."* However, the University offered no evidence to substantiate its determination.

154.    After receiving the letter, Professor Joritz requested from Provost Rosen per email *"a more detailed response"*, inquiring *"2. How did my research record demonstrate insufficient progress toward tenure?"* The Provost/University/Chancellor Gray-Little provided Professor Joritz no basis for its decision.

155.    It is likely that additional evidence relating to issues of disparate treatment will be obtained through discovery

**A.**

**COUNT I – TITLE VII – Title 42 United States Code § 2000e-2**
**DISCRIMINATION BASED ON NATIONAL ORIGIN**

156.    Professor Joritz repeats and re-alleges paragraphs 1 through 155 by reference as though fully set forth herein.

157.    The Code of Federal Regulations (CFR) is a valid authority, which recognizes national origin under Title VII claims, as does the Equal Employment Opportunity Commission (EEOC). Professor Joritz meets the CFR's definition of "national origin". The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination includes the following (Professor Joritz's emphasis):

> *The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.*

158.    The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination also includes:

> *The Commission will examine with particular concern charges alleging that individuals within the jurisdiction of the Commission have been denied equal employment opportunity for reasons which are grounded in national origin considerations, such as…*
>
> *(b) membership in, or association with an organization identified with or seeking to promote the interests of national origin groups;…*

159.    It was well known to the University that Plaintiff was involved and associated with organizations that promoted German culture.

The University permitted hostile, anti-German student evaluation comments to remain in Professor Joritz's performance record permanently, thus tainting every performance evaluation that followed.

160.     When Professor Joritz complained about anonymous, hostile, anti-German comments in her student evaluations, expressing her concerns about discrimination, the University refused to take her concerns seriously, refused to remove them and did nothing to prevent such discrimination from occurring in the future.

161.     Professor Joritz became a "closet German" as a result, fearing that even talking about Germany could result in more anti-German sentiment and comments.

162.     In an evaluation critical to her career at the University, Professor Joritz's German past was blamed for the negative student comments: "*Some of these student observations may also be due to the fact that she taught extensively in Germany for many years before teaching at KU, and she has had some difficulty in adjusting her communicative and teaching skills to her teaching environment and culture.*" The University communicated to Professor Joritz that *she* was expected to change, i.e. improve her teaching skills and that students could do as they wished, even when it meant discriminating against her for her word pronunciation, the fact that she spoke about Germany, and calling her the worst, most offensive insult you can call a German: a Nazi and Nazi sympathizer.

163.     Chair Baskett and Chair Stuart MacDonald lied about the conditions of Professor Joritz's German-related research in their efforts to halt her German-related research by having Professor Joritz fired. Especially Professor Baskett also targeted Professor Joritz's German-related research in other ways. In the toxic letter he wrote with the intent of sabotaging Professor Joritz's career, Chair Baskett falsely claimed that Professor Joritz was being denied access to archival

materials by German "officials" he had never contacted. He claimed that Professor Joritz had limited access to a collection of Lotte Reiniger's work in Canada (the subject of Joritz's research) when Professor Joritz had, in fact, through her research efforts, access to a vast treasure of materials, including documents, original art, films, audio recordings, articles and more that are unknown and unavailable to the rest of the world. Chair Baskett, with the "help" of Chair Stuart MacDonald, who grew Chair Baskett's falsehoods into even larger, more grotesque falsehoods, purposely targeted Professor Joritz's German-related research ONLY. They commented on none of her other research projects, such as animation productions-in-progress, digital collages, etc.

164.    The University not only permitted the discriminatory, unethical targeting of Professor Joritz's research: at every administrative level the targeting was not questioned but instead supported. Based on outrageously false statements and omissions of fact, the University advocated for Professor Joritz's termination at every administrative level.

165.    As a result of Defendants' actions, Professor Joritz was wrongfully terminated from her employment through contract non-renewal.

**B.**
**COUNT II – TITLE VII – Title 42 United States Code § 2000e-2**
**DISCRIMINATION BASED ON SEX/GENDER**

166.    Professor Joritz repeats and re-alleges paragraphs 1 through 165 by reference as though fully set forth herein.

167.    The University wrongfully held Professor Joritz to a standard different than similarly situated employees who were male.

168.    When Professor Joritz complained to her male Department Chair, Professor Baskett, that a male professor, Matt Jacobson, had berated and acted aggressively toward Professor Joritz at a meeting about her own performance evaluation, Chair Baskett did nothing to address or

investigate Professor Joritz's concerns. Instead he used her complaint as an example of a lack of "collegiality" in a letter kept secret from her, intended to sabotage her career. Professor Joritz had informed Chair Baskett that the male professor had applied a harsher "double standard" to her, that he did not apply to himself. Professor Joritz further informed the Chair that Professor Jacobson had shown Beginning Video Production students an excerpt from a notoriously misogynist film called "Clockwork Orange", while detailing the symbolism in the film that referred to male masturbation. Professor Jacobson had berated Professor Joritz for showing in class a non-sexual, non-offensive film excerpt in which one of the adult characters said the word "rape", without giving students a "trigger-warning". Yet Professor Jacobson gave his students no trigger warning when he screened an excerpt of a film about male masturbation and no trigger warning when he described the scene in detail. Chair Baskett demonstrated a pro-male/anti-female bias by defending Professor Jacobson to the CCAPT Committee and every administrator up the chain of command, and by describing Professor Joritz's complaint as though she were malicious while omitting the context of her complaint:

> *On other occasions, the candidate has disparaged and impinged the reputation of PTTR Committee members in unsolicited emails to the Chair without producing credible evidence.*

169.    When Professor Joritz won a competitive, student-nominated advisor award, the University refused to recognize her in the School of Arts Social Media platform. When a male faulty member from the School for the Arts won the same award the following year, he was not only recognized in in the School of Arts Social Media platform; he was promoted to full professor. In further contrast, Professor Joritz was fired the year she won the award.

170.    When Chair Baskett threatened Professor Joritz in her office, he displayed a bullying, aggressive, anti-female bias. He does not display this type of behavior toward men.

171.    The fact that not a single complaint of discrimination that Professor Joritz made was taken seriously or investigated by the University is itself an indication of discrimination.

172.    As a result of the University's actions, Professor Joritz was wrongfully terminated from her employment through contract non-renewal.

## C.
## COUNT III – TITLE VII – RETALIATION

173.    Professor Joritz repeats and re-alleges paragraphs 1 through 172 by reference as though fully set forth herein.

174.    The University discriminated against Professor Joritz because she opposed illegal practices and complained about discrimination based on national origin and sex/gender.

175.    As a result of the University's actions, Professor Joritz was wrongfully terminated from her employment through contract non-renewal.

176.    The Courts recognize that engaging in the protected activity of reporting discrimination and/or seeking to end or remedy discriminatory practices may result in retaliation, a violation of Title VII. § 2000e-3(a) *et seq.*:

> *It is well-settled that retaliatory conduct is within the broad prohibition of "discrimination" made unlawful by Title IX. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).*[3]

177.    The criteria for establishing a prima facie case for retaliation is clear:

> *In order to establish a prima facie case of retaliation, Mr. Proctor must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir.2006) (citing Burlington N. & Santa Fe*

---

[3] Tackett v. University of Kansas, 234 F. Supp. 3d 1100 - Dist. Court, D. Kansas 2017
https://scholar.google.com/scholar_case?case=12102632485922536080&q=Tackett+v.+University+of+Kansas+&hl=en&as_sdt=2006

*Ry. Co. v. White, \_\_\_\_ U.S. \_\_\_\_, 126 S.Ct. 2405, 2414-15, 165 L.Ed.2d 345 (2006))*.[4] [4]

178. Professor Joritz repeatedly engaged in protected opposition to discrimination by reporting illegal discrimination practices directed against her to multiple University employees, including, but not limited to: Joshua Jones (University's Office of Institutional Opportunity and Access, December 2015), Film & Media Studies Department Chair Tamara Falicov (12.18.14 and prior), Film & Media Studies Department Chair Michael Baskett, Associate Dean of the College of Liberal Arts/Director of the School of the Arts Henry Bial (on 12.18.14 and 04.02.16), members of the Film & Media Studies faculty evaluation committee: Professor Catherine Preston, Professor Kevin Wilmott and Professor Matt Jacobson (7/16/2015), Dean Lejuez (3/24/16), Chancellor Gray-Little, Shane McCreery, Director/Title IX Coordinator of the Office of Institutional Opportunity & Access (IOA) (multiple times), and Jennifer Ananda, Deputy Title IX Coordinator of the Office of Institutional Opportunity & Access (IOA) (multiple times). After being repeatedly turned away without results and also retaliated against, Professor Joritz filed charges with the EEOC (August 13, 2016) and Kansas Human Right Commission. All this fulfills the first criteria.

179. Several of the persons listed above were University administrators, who held influence and power over Professor Joritz's continued employment. Department Chair Tamara Falicov, Department Chair Michael Baskett, Dean Lejuez, Chancellor Gray-Little and initially Henry Bial, all failed to report Professor Joritz's complaints of discrimination to the IOA, as was required by University policy. None of these University administrators took action to address or prevent the discrimination Professor Joritz reported, even though Professor Joritz had provided the

---

[4] Proctor v. United Parcel Service, 502 F. 3d 1200 - Court of Appeals, 10th Circuit 2007
https://scholar.google.com/scholar_case?case=11127325474211562443&q=Proctor+v+United+Parcel+Services+&hl=en&as_sdt=2006

Dean and Chancellor with effective ideas for doing so. Instead, they all facilitated and approved Professor Joritz's non-reappointment/termination of her employment.

180.     The Courts recognize a materially adverse employment action as one that changes "the terms and conditions" of employment. *Von Gunten* v. *Maryland,* 243 F. 3d 858, 866 (CA4 2001); see *Robinson* v. *Pittsburgh,* 120 F. 3d 1286, 1300 (CA3 1997). Because termination of employment constitutes a materially adverse employment action, which any reasonable employee would recognize, criteria No. 2 is met.

181.     Establishing a causal connection is the third criteria and can be satisfied by demonstrating a temporal relationship between Professor Joritz's engagement in protected activity and the materially adverse, i.e retaliatory, employment actions she suffered. Although case law differs on the amount of temporal proximity necessary to establish a probable causal connection, the following examples are more than sufficient to establish causation:

**EXAMPLE 1: CHAIR BASKETT'S RECOMMENDATION FOR PROFESSOR JORITZ'S NON-REAPPOINTMENT**

182.     <u>Summary:</u> On **10.22.15** Professor Joritz brought up the issue of discrimination based on country of origin during a personal meeting with Chair Baskett.

183.     **January 2016:** Chair Baskett delayed and bumbled Professor Joritz's PTT Review process, which was vitiated with his procedural violations that began immediately. Chair Baskett began the process late (January 2016; all documents, meetings, review of materials, etc. were to be completed by February 5, 2016), making the process on which Professor Joritz's career depended, extremely rushed. Professor Joritz had to fight for the adherence to policies/procedures every step of the way.

184.     On **1.04.16** Professor Joritz requested, via email, that Chair Baskett remove Professor Matt Jacobson from the PTTR committee. Professor Joritz cited a "disturbing" "double standard" (i.e. disparate treatment):

> I feel he has shown hostility and a double standard toward me that is disturbing.
>
> One example: I had mentioned to the FEC (Faculty Evaluation Committee) members last summer that some of the student evaluation comments for FMS 275 contained outright lies. My example was the following comment: "To show "dialogue" she (Professor Joritz) had to show a scene about rape WITHOUT any sort of warning." (This scene, btw, comes from the book "Master Shots Vol 2: Shooting Great Dialogue Scenes" by Christopher Kenworthy.)
> I explained that the scene was not "about rape" but rather about the love a mother had for her son, who had been the product of a rape. Matt immediately admonished me, raising his voice (almost yelling), stating that the student did not lie, reminding me of how important trigger warnings are and how we, as faculty, have a responsibility to make sure we announce potential triggers...
>
> When Matt, however, showed students a misogynist excerpt from Clockwork Orange in FMS 275, he gave students no trigger warning whatsoever. He explained in detail to students the symbolism in the clip that referred to (male) masturbation, he spoke about the notoriety of Clockwork Orange and highly encouraged students to watch the entire film on their own. No trigger warning.

185.    In the same email, Professor Joritz also mentioned how Professor Jacobson had cited her German past as being detrimental to her teaching ability in the previous year's PTT Review:

> Matt authored the PTTR narrative about my teaching and focused heavily on my student evaluations, putting them, in my opinion, in the worst light possible. He seemed to conclude that my "German past" was the problem: "Some of these student observations may also be due to the fact that she taught extensively in Germany for many years before teaching at KU, and she has had some difficulty in adjusting her communicative and teaching skills to her new teaching environment and culture."

186.    Professor Joritz went on to describe how Professor Jacobson had ignored her positive departmental contributions in the same, important PTTR and how Professor Jacobson had purposely included inaccurate, detrimental information in her PTTR, acted inappropriately and misadvised her.

187.     Professor Joritz's request was stonewalled by Chair Baskett for weeks, despite the fast approaching deadline. On **01.19.16** Chair Baskett finally informed Professor Joritz who the PTTR committee members were. They did not include Professor Jacobson. Chair Baskett then violated PTTR procedures by not appointing enough members to the committee. Professor Joritz brought this to Chair Baskett's attention to no avail. He refused to appoint another committee member.

188.     On **01.11.16,** Chair Baskett informed Professor Joritz via email that she was not to communicate with other PTTR committee members, stipulating that the only communication, including feedback, would occur exclusively through himself and his assistant, Sara Sahin. This isolated Professor Joritz from the very faculty members who should have served as her strongest advocates and it violated Professor Joritz's constitutional rights to due process, freedom of speech and freedom of association. It also enabled the Chair to manipulate the evaluation process by controlling all communication between Professor Joritz and the committee members, with no one present to participate in or hear their conversations.

189.     On **01.25.16,** Professor Joritz reported policy violations committed by Chair Baskett, former Chair, Tamara Falicov, and Professor Matthew Jacobson to interim Dean Don Steeples and Henry Bial, who was, at the time, Associate Dean of the College of Liberal Arts and Director of the School of the Arts. One violation was corrected as a result of that meeting.

190.     On **01.26.16** Chair Baskett threatened Professor Joritz in her office, telling her, "You're not doing yourself a favor by making the department look (bad)." Professor Baskett stood directly in front of Professor Joritz when he said this, intimidating her both physically and psychologically. Note: Professor Joritz is less than 5 feet tall. Also, she was utterly dependent on her Chair for feedback, as he had stipulated she not speak with anyone else on the committee.

Months later, in an affidavit signed by Chair Baskett on April 28, 2016, he claimed, *"I do not recall ever telling Assistant Professor Joritz that* "You're not doing yourself any favors by making the department look bad"…" and went on to blame Professor Joritz for *"her efforts to manipulate the process…"*

191.    On **02.05.16**, Chair Baskett sabatoged Professor Joritz's otherwise positive PTT Review by writing a toxic evaluation letter (EXHIBIT K), which he inserted into Professor Joritz's PTT Review dossier without her knowledge, leaving Professor Joritz with the impression she had seen her entire dossier before it was forwarded to the next committee. Chair Baskett included extreme, defamatory statements about Professor Joritz's "behavior" and outright lies about Professor Joritz's German-related research. Chair Baskett's letter included discriminatory speculation about Professor Joritz's ability to complete her book on Lotte Reiniger (targeting again, her German-related research), while ignoring Professor Joritz's many research-related achievements, international recognition while at the University and Professor Joritz's other research projects.

192.    Professor Joritz became aware of Chair Baskett's letter only months later, when she read references to it in subsequent non-reappointment letters. Despite Professor Joritz's repeated requests, Chair Baskett. Dean Lejuez, Henry Bial and other University administrators refused to provide Professor Joritz access to his letter, making it impossible for Professor Joritz to know of its contents, refute or respond to it. This too, was retaliation, as denying Professor Joritz access to Chair Baskett's letter denied Professor Joritz due process. Professor Joritz could not even hope for remedy by filing for example, a grievance, before the letter made its way up the University's administrative chain of command, where it garnered "recommendations for non-reappointment"

from each administrator, who read it and facilitated Professor Joritz's termination. Without access

to the letter, it was also impossible for Professor Joritz to file an EEOC complaint based its content.

193.    When Professor Joritz finally received a copy of Chair Baskett's letter on **April 30,**

**2016**, **two weeks prior to being informed of the Chancellor's decision to terminate her**

**employment,** Professor Joritz was able to see how Chair Baskett described her request to have

Professor Jacobson recused from the PTTR committee:

> *On other occasions, the candidate has disparaged and impinged the reputation*
> *of PTTR Committee members in unsolicited emails to the Chair without*
> *producing credible evidence.*

194.    Not only had Chair Baskett refused to take Professor Joritz's allegations of

discrimination seriously; he weaponized her allegations by disparaging her in his letter for even

reporting them to him, labeling them as "unsolicited". Professor Baskett used the fact that

Professor Joritz called the discriminatory behavior of a male colleague to his attention as means to

discredit Professor Joritz in an evaluation on which her career depended. Baskett described

Professor Joritz's action as a "lack of collegial behavior" and an example of "a larger pattern of

inappropriate behavior" in his letter written with the intent in order to have Professor Joritz fired.

### EXAMPLE 2: DEAN'S RECOMMENDATION FOR PROFESSOR JORITZ'S NON-REAPPOINTMENT

195.    Summary: On **03.16.16**, Professor Joritz emailed Dean Lejuez the news that her

animated short "*Zapf Dingbats - A Tribute to Hermann Zapf*" had been accepted to the "62.

Internationalen Kurzfilmtagen Oberhausen" (62nd International Short Film Festival Oberhausen,

Germany), one of the most prestigious short film festivals in the world. She informed him that the

acceptance to this renowned festival counted as a "major peer-reviewed (research)

accomplishment".

196.    On **03.16.16** Dean Lejuez congratulated Professor Joritz for her accomplishment

via email.

197.    On **03.24.16,** Professor Joritz met with the Dean of Liberal Arts, Carl Lejuez, informing him of the many PTTR procedural violations that occurred in both 2015 and 2016, which detrimentally affected the outcome of the evaluation process. She also related to him that she felt she had been discriminated against, and her fears of retaliation by faculty and administrators for implicating them in the procedural violations she had reported.

198.    That same day, **03.24.16,** Professor Joritz wrote a follow-up letter to Dean Lejuez, specifically reiterating concerns she had raised during their meeting, including additional concerns These included, among other issues, discrimination by both students and faculty based on her country of origin and ideas she had proposed to Dean Lejuez that "would increase (students') awareness of federal laws regarding discrimination and better prepare them for future employment."

199.    On **04.07.16**, the Chair of the College Committee on Appointments, Promotion & Tenure (CCAPT), Dr. Stuart Macdonald, sent a letter to Dean Lejuez, recommending Professor Joritz's termination. Dr. Stuart Macdonald claimed to base the committee's findings "*on the letter CCAPT received from Professor Michael Baskett*", yet Dr. Macdonald's letter inexplicably "grew" Chair Baskett's bizarrely inaccurate statements about the Professor Joritz's research conditions to a new, even more disturbing level: Chair Baskett had fabricated the claim that "*her* (Professor Joritz) *access to the private collection of* [INDIVIDUAL PERSON'S NAME REDACTED] *in Canada is becoming limited due to his declining mental and physical condition*" morphed into Dr. Macdonald's/the CCAPT's statement, "*… potential interviewees are lapsing into senility and ill health.*"(*see* EXHIBIT G)

200.    Just how did the reference to an individual person with an allegedly declining

condition morph into a group of persons, who were all "*lapsing into senility and ill health*" occur? Rachel Rolf, Associate General Counsel for the University, in her written response to Professor Joritz's appeal, confirmed that Dean Lejuez – not a member of the CCAPT committee – violated University *Bylaws of the College Assembly in the College of Liberal Arts and Sciences* by impermissibly inserting himself into the CCAPT committee review process. As stipulated by University policy, the CCAPT evaluation should conduct its evaluations impartially and independent of the Dean.

The University Bylaws confirm this independent, tiered process (Professor Joritz's emphasis):

> *3. The College Committee on Appointments, Promotions and Tenure (CCAPT) shall:*
>
> *b. Address itself to matters of policy pertaining to faculty rank and status and* <u>*report its recommendations to the Dean.*</u>

201.    Attorney Rolf revealed that Dean Lejuez – who was not a member of the committee –purposely and with full knowledge, directed the focus of the CCAPT faculty members when they evaluated Professor Joritz:

> "*When Professor Joritz's record was discussed in CCAPT, Dean Carl Lejuez encouraged CCAPT to focus on Professor Joritz's existing record and documented evidence of progress towards completion of her book. CCAPT followed that direction.*"

Dean Lejuez violated University policy with the intent of having Professor Joritz fired.

202**.    Two weeks after Dean Lejuez's meeting with Professor Joritz and one day after receiving his "ammunition" via Dr. Stuart McDonald's CCAPT letter**, Dean Carl Lejuez informed Professor Joritz, in a letter dated **on 04.08.16,** that he was "recommending your non-reappointment to the Provost" (EXHIBIT L). Carl Lejuez informed Professor Joritz that he had

based his decision on the "assessment of your record by CCAPT", the very "assessment" HE had improperly influenced.

203.    In his letter, Dean Lejuez tellingly referred to Professor Joritz's reports of discrimination:

> It is notable that during the PTTR process, you raised a number of concerns with me (and several others), including that prejudicial statements were included in the departmental review.

### EXAMPLE 3: CHANCELLOR GRAY-LITTLE'S RECOMMENDATION FOR PROFESSOR JORITZ'S NON-REAPPOINTMENT

204.    On **04.13.16** Professor Joritz requested a meeting with Provost Sara Rosen so she could inform the Provost of the discrimination and malfeasance she had been facing during the PTT Review(s). Vice Provost Mary Lee Hummert emailed Professor Joritz, chastising her for attempting to meet with the Provost: *"…it is not appropriate for her to talk with you while she is reviewing the PTTR recommendation.",* denying Professor Joritz her constitutional Freedoms of Speech, Association, and due process, violating University policy, contributing to Professor Joritz's hostile work environment and facilitating Professor Joritz's termination. Six hours after Professor Joritz's inquiry, she received a letter via email from Provost Rosen informing her of the Provost's recommendation for her termination. In her letter, the Provost repeated the allegations about Professor Joritz's "behavior", which had originated in Chair Baskett's letter and were repeated "up the administrative chain" without question or proof.

205.    On **04.14.16** Chancellor Gray-Little spontaneously agreed to meet with Professor Joritz in Chancellor Gray-Little's office. The Chancellor explained to Professor Joritz that, while she was not permitted to discuss Professor Joritz's evaluation, she would listen to her for 15 minutes. Professor Joritz related to the Chancellor that she had suffered procedural violations,

discrimination and had been denied due process. Professor Joritz also informed the Chancellor that she would be reading things about Professor Joritz in an extremely detrimental evaluation letter written by Joritz's Chair, but kept secret from Professor Joritz, which were untrue. Professor Joritz also informed the Chancellor that she would be reading that her research was insufficient, but that her film "A Tribute to Hermann Zapf" had just been accepted to a major international film festival in Germany, and that she had been awarded the *Hall Center for Humanities Creative Fellowship* for her research, both of which Dean Lejuez was aware of. Professor Joritz explained to the Chancellor that she had three films that would soon be finished, i.e. prior to a tenure review. The Chancellor listened and advised Professor Joritz to make sure that those in the administrative chain were informed about what Professor Joritz had related to her. Professor Joritz assured the Chancellor that they were …

206.    Professor Joritz finished her meeting with the Chancellor by explaining in detail how students were abusing the faculty evaluation process to write discriminatory comments in the student evaluations, and how that abuse became a permanent part of faculty records, as occurred in Professor Joritz's case. Professor Joritz also offered a solution to ending discriminatory comments in student evaluations, which could be based on EEOC standards. The Chancellor again informed Professor Joritz that she (the Chancellor) could not comment.

207.    On **04.26.16** Professor Joritz submitted an appeal to the Faculty Rights Board, listing the PTTR and other policy violations, as well as denial of due processes, which were causing her employment to be terminated at the University.

208.    On **04.30.16** the University's counsel sent its response to Professor Joritz's appeal to the Faculty Rights Board, providing Professor Joritz with a copy and exhibits. <u>Only then, **a mere two weeks before Professor Joritz would receive her letter of non-reappointment,**</u> did

<u>Professor Joritz finally receive the documents she had been requesting for months, including</u>

<u>Professor Baskett's PTTR letter.</u>

209.    On a date unknown to Professor Joritz, the University's Faculty Rights Board (FRB) met and made their determinations. The FRB did not communicate with Professor Joritz or provide Professor Joritz with a hearing. However, on **05.11.16** the FRB sent a letter with their findings to the Chancellor Gray-Little on Professor Joritz's behalf (*see* EXHIBIT F):

> *FRB finds that the Department chair for Film & Media Studies, the College Committee on Appointments, Promotion, and Tenure (CCAPT), and the Dean of CLAS relied on factually inaccurate information in their review of Professor Joritz's progress toward tenure. We believe this inaccurate information should not be relied upon in your deliberations so that Professor Joritz's rights in the PTTR process are adequately protected…*

210.    The Faculty Rights Board specifically called the Chancellor's attention to the false statements written by Professor Baskett and Stuart MacDonald, related to Professor Joritz's German-related research:

> *In Department Chair Baskett's letter to CCAPT, he stated that multiple obstacles existed which would prevent Professor Joritz from completing her proposed book on Lotte Reiniger. He stated (1) officials at the Stadtmuseum in Tubingen, Germany have denied Professor Joritz access to an archive of materials necessary to the completion of the project, and (2) potential interviewees for the project were "lapsing into senility and ill health." These statements were then repeated in CCPAT's recommendation and likely influenced Dean Lejuez's conclusion that the status of Professor Joritz's proposed book on Lotte Reiniger was unclear.*
>
> *FRB finds that these specific statements ((1) and (2) above) were not correct: Professor Joritz has access to the necessary archive, and she has been able to tape discussions with a healthy 83-year-old interviewee. Because the statements were inaccurate, FRB recommends that they be disregarded in your independent judgment of the record. Also, the Dean and CCAPT's mistaken reliance on this inaccurate information should be taken into account when weighing their respective recommendations regarding Professor Joritz's research record.*

211.    It should be noted that the FRB did not notice the discrepancy between Chair Baskett's letter and the letter written by Stuart MacDonald. Thus they missed the fact that

Stuart MacDonald, Chair of the CCAPT Committee, had "grown" Baskett's lies into even greater ones.

212.     The Faculty Rights Board did notice other policy violations committed by Chair Baskett and called the Chancellor's attention to them:

> *Additionally, we note tht* (sic) *it does not appear that Department Chair Baskett met with Professor Joritz to discuss CCAPT's evaluation as contemplated by the policy on Progress Toward Tenure Review for the College of Liberal Arts & Sciences.*

213.     The FRB further noticed policy violations committed by both Department Chair Falicov and Department Chair Baskett during Professor Joritz's two PTT Reviews, calling the Chancellor's attention to those as well:

> *Finally, FRB notes that in both years of Professor Joritz's pre-tenure reviews, the previous and current department chairs signed both as chair of the Faculty evaluation Committee and as Department Chair….Especially in cases where the department chair does not concur with the committee evaluation, this dual chair role suggests a lack of independent judgment of the candidate's record.*

214.     Despite the FRB's letter, which showed that the attacks on Professor Joritz's research by Chair Baskett, the CCCAPT, Dean Lejuez and Provost Rosen were unfounded, <u>on 05.13.16, slightly less than one month after the Chancellor's meeting with Professor Joritz, the University emailed Professor Joritz a "Notice of Non-Reappointment" letter signed by Interim Provost Sara T. Rosen informing Professor Joritz that her appointment for the 2016-2017 academic year will be a terminal appointment.</u> This letter served as notice of *"a final agency action by the University of Kansas."* (*see* EXHIBIT J).

## D.
## <u>COUNT IV– TITLE VII – HOSTILE WORK ENVIRONMENT</u>

215.     Professor Joritz repeats and re-alleges paragraphs 1 through 214 by reference as though fully set forth herein.

Professor Joritz is a "person" within the meaning of Title VII.

The University is an "employer" within the meaning of Title VII.

216.    The University created and permitted a work environment hostile to Professor Joritz including, but not limited to, the following:

217.    The University impermissibly applied different, harsher standards to Professor Joritz than to similarly situated employee in order to get Professor Joritz fired.

218.    The University repeatedly violated policies in order to humiliate Professor Joritz and get Professor Joritz fired.

219.    The University fabricated performance demands that were not in Professor Joritz's contract, her position description or in University policies in order to humiliate Professor Joritz and get Professor Joritz fired.

220.    The University repeatedly refused to grant Professor Joritz a Research Intensive Semester, applying a different standard than other similarly situated employees and in direct detriment to Professor Joritz's research. These denials also facilitated Professor Joritz's termination.

221.    The University isolated Professor Joritz from her colleagues at a time when she needed their feedback and advice, and at a time that was crucial to her colleagues' understanding of her work, thus humiliating Professor Joritz and facilitating Professor Joritz's termination of employment.

222.    The University fabricated allegations about Professor Joritz's "behavior" in violation of University policy in a punitive manner in order to get Professor Joritz fired.

223.    The University fabricated allegations about Professor Joritz's research in violation of University policy in order to get Professor Joritz fired.

224.    The University stonewalled Professor Joritz's requests for documents she was entitled to have according to University policy, and in general stonewalled her emails when she requested that issues of concern she had raised be addressed. The denial of documents facilitated Professor Joritz's termination.

225.    The University refused to report Professor Joritz's allegations of discrimination, distorted Professor Joritz's allegations of discrimination and refused to investigate them.

226.    The University ignored and/or downplayed Professor Joritz's research achievements to create the pretext of "insufficient research" in order to get Professor Joritz fired.

227.    The University constantly denied Professor Joritz due process, in violation of University policies and the US Constitution, in order to get Professor Joritz fired.

228.    As a result of the University's actions, Professor Joritz was wrongfully terminated form her employment through contract non-renewal.

**E.**
**COUNT V – TITLE VII – WRONGFUL TERMINATION**

229.    Professor Joritz repeats and re-alleges paragraphs 1 through 228 by reference as though fully set forth herein.

230.    This Complaint includes a plethora of direct evidence that proves wrongful termination. To establish a prima facie case of wrongful termination under Title VII based on *indirect* evidence, an employee bears the initial burden of showing that: (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; (4) the job was not eliminated after her discharge.

231.    These criteria are proven as follows:

(1.)    Professor Joritz is a member of the protected class of females. Further, Professor Joritz

cites the Code of Federal Regulations (CFR) as the valid authority, which recognizes national origin under Title VII claims, as does the Equal Employment Opportunity Commission (EEOC). Professor Joritz meets the CFR's definition of "national origin". The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination includes the following (Professor Joritz's emphasis):

> ***The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's,*** *or his* ***or her ancestor's, place of origin; or because an individual has the*** *physical,* ***cultural or linguistic characteristics of a national origin group.***

232.    The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination also includes:

> ***The Commission will examine with particular concern charges alleging that individuals within the jurisdiction of the Commission have been denied equal employment opportunity for reasons which are grounded in national origin considerations, such as…***
>
> ***(b) membership in, or association with an organization identified with or seeking to promote the interests of national origin groups;…***

233.    It was well known to the University that Plaintiff was involved with organizations that promoted German culture (*see* pp. 3-4, Nos. 8 – 10).

(2.) It was undisputed that Professor Joritz was very qualified for her job. (*see* pp. 3-4)

(3.) Professor Joritz received her letter of non-reappointment on May 13, 2016 (*see* p. 26).

(4.) After Professor Joritz was terminated by the University, the University hired a less qualified male, Jeff Calvert, to teach animation in the Film & Media Studies Department.

**F.**
**COUNT VII – US CONSTITUTION, 1ˢᵗ, 5ᵗʰ AND 14ᵗʰ AMENDMENTS**

234.    Professor Joritz repeats and re-alleges paragraphs 1 through 233 by reference as though fully set forth herein.

235.     Defendants denied Professor Joritz due process throughout her evaluations and at other times, as described but not limited to the allegations included in this Complaint, in order to humiliate Professor Joritz and get her fired.

236.     Defendants Chair Baskett and the University denied Professor Joritz the right to speak with other faculty members during her 2015/16 Progress Toward Tenure Review.

237.     Defendants effectively halted Professor Joritz from objecting to illegal practices by firing her.

## G.
## COUNT VI – KANSAS COMMON LAW  BREACH OF CONTRACT

238.     Professor Joritz repeats and re-alleges paragraphs 1 through 237 by reference as though fully set forth herein.

239.     Professor Joritz entered into an employment contract with the University.

240.     University policies became part of Professor Joritz's employment contract under Kansas law. Professor Joritz had a contractual interest in the proper execution of all University policies.

241.     Under the terms of the contract, certain criteria were established as the basis for evaluating Professor Joritz's job performance.

242.     Professor Joritz's had a contractual interest in the proper execution of performance evaluation proceedings as laid out by the University, free from arbitrary and capricious determinations.

243.     Professor Joritz was impermissibly evaluated upon criteria outside the scope designated in her employment contract with the University, in breach of said contract.

244.    The University failed to investigate Professor Joritz's substantive complaints, even when the basis for said complaints were corroborated by other entities.

245.    The University violated policies in other ways in order to get Professor Joritz fired.

246.    As a result of the University's breaches of contract, Professor Joritz was wrongfully terminated from her employment through contract non-renewal.

**The University breached its contract with Professor Joritz by unlawfully rescinding Professor Joritz's Hall Center for the Humanities Creative Fellowship**

247.    On January 14, 2016, Victor Bailey, the Director of the Hall Center for the Humanities of the University, informed the Professor Joritz that she had been awarded the 2016 *Hall Center for the Humanities Creative Fellowship*. He emailed her a list of the Fellowship conditions, asking her to *"Please let me know (email is fine) if you are willing to accept the fellowship on these conditions."*

248.    Condition #6 was:

> *"6: Return to their full-time KU responsibilities and serve for a minimum of one academic year at the end of the fellowship period; persons who do not return to the institution following the fellowship period shall reimburse KU for their salary and fringe benefits paid during the fellowship period."*

Professor Joritz agreed to the conditions in a return email.

249.    On May 16, 2016 Professor Joritz emailed Victor Bailey, requesting the monetary value of her Fellowship in case she would *"take it and reimburse the university for the costs…"*. Bailey responded per email the same day, claiming that the "reimbursement" was intended *"for an unexpected departure from KU"* (a stipulation never before stated) and withdrew Professor Joritz's hard-won Creative Fellowship, breaching the contract between the University and

Professor Joritz, causing Professor Joritz humiliation, monetary harm and the loss of a semester in which to focus on her research.

## CONCLUSION

Professor Joritz was a conscientious, dedicated faculty member, who excelled in teaching, research and service. She came to the University from Germany, bringing with her, her German animation and filmmaking influences, her German language fluency, and her international record of achievement, which continued to grow while Professor Joritz was employed at the University. Professor Joritz's unique background and gifts were a boon to the University and its students. Instead of recognizing this, the University facilitated and permitted the defamation of Professor Joritz's character and destruction of her teaching record by allowing discriminatory, anti-German comments about Professor Joritz, made by anonymous students, to remain in her record permanently. The University blamed Professor Joritz's German past for the student dissatisfaction, while ignoring Professor Joritz's positive German-related and other contributions to the University. After Professor Joritz engaged in the protected activity of reporting the discrimination she faced and requesting that the University remedy the situation, the University refused to investigate Professor Joritz's allegations, created a hostile work environment, stripped her of her research-related Hall Center for Humanities Creative Fellowship, denied her opportunities such as a Research Intensive Semester, ignored and/or downplayed her achievements, violated policies and lied in her performance evaluations while withholding documents from her so she could not defend herself, all with the intent and goal of getting her fired.

## PRAYER FOR RELIEF

WHEREFORE, Professor Joritz, *pro Se*, respectfully requests this Court to grant relief as follows:

a.   That judgment be entered in favor of Professor Joritz and against the University and

individually named Defendants on each and every claim in this Complaint;

b.   That Professor Joritz be granted appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of the University and Defendants;

c.   That Professor Joritz be granted appropriate equitable relief;

d.   That Professor Joritz be granted punitive damages;

e.   That Professor Joritz be reinstated to her tenure-track position at the University of Kansas immediately, with full restoration of all benefits, sick leave and lost wages;

f.   That the previously awarded University *Hall Center for Humanities Creative Fellowship*, including its monetary award, be reinstated to Professor Joritz immediately;

g.   That the University be ordered to grant Professor Joritz a University-supported *Research Intensive Semester* within one academic year following reinstatement;

h.   That, due to research time lost by the University's denial of the Professor Joritz's *Hall Center for Humanities Creative Fellowship* and the University's repeated denial of a *Research Intensive Semester,* Professor Joritz be granted one additional year to prepare for her tenure review ("tenure clock stopped for one year");

i.   That, in order to assure Professor Joritz due process in the future, the University be ordered to grant Professor Joritz the right to assemble impartial evaluators consisting of University faculty and administrators for her future evaluations, and that all discriminatory, factually inaccurate, and libelous material be ordered removed from Professor Joritz's University personnel files and record;

j.   That Professor Joritz is awarded actual money damages, compensatory damages, prejudgment interest and punitive damages in an amount to be determined upon trial;

k.  That appropriate injunctive relief, to which Professor Joritz is entitled, be ordered;

l.  That the Court grant other and appropriate relief pursuant to Counts I – VII as the

Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Professor Joritz hereby demands a trial by jury on all issues.

Dated: November 13, 2018                            Respectfully submitted,

Catherine A. Joritz, *pro Se*
PO Box 422
Perry, KS 66073
T: (630) 857-8907
E: cjanimate@aol.com