**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CATHERINE A. JORITZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:17-cv-04002-SAC-KGS |
| | ) | |
| THE UNIVERSITY OF KANSAS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**THE UNIVERSITY OF KANSAS'
ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant The University of Kansas ("KU") hereby answers Plaintiff's First Amended Complaint as follows:

**NATURE OF ACTION**

1.      This is a civil action for violations of Title VII of the Civil Rights Act of 1964 as codified under the 42 U.S.C. § 2000e, *et seq.*, and violations of the 1st, 5th and 14th United States Constitutional Amendments.  This legal action seeks damages and injunctive relief against Defendant(s) for committing acts under color of law, with the intent and for the purpose of depriving Professor Joritz of rights secured under the Constitution and laws of the United States; for wrongfully discriminating against Professor Joritz on the basis of national origin and sex/gender; for arbitrarily and capriciously denying Professor Joritz of property and liberty interests; for retaliating against Professor Joritz for her exercise of constitutionally protected speech; for subjecting Professor Joritz to a hostile work environment and for refusing or neglecting to prevent such deprivations and denials to Professor Joritz.  In addition, the University violated related provisions of Kansas' Constitution and breached Professor Joritz's contract with the University, also arising from the same case and controversy as the

DocID: 4847-9426-6004.2

aforementioned federal law claims.  Therefore, these claims are properly before this Court pursuant to Article III of the United States Constitution.

**ANSWER:**   KU admits that Plaintiff purports to bring claims against KU under Title VII and against the Individual Defendants under the 1st, 5th, and 14th Amendments to the United States Constitution.  KU denies that Plaintiff states a valid claim on any theory and denies that Plaintiff is entitled to any of the relief requested.  To the extent a further response is required, KU denies the remaining allegations in paragraph 1.

## JURISDICTION AND VENUE

2.   Professor Joritz filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC").   The first charges were filed on August 13, 2016.  Professor Joritz faxed a second charge to the EEOC on February 21, 2018 and amended that charge with additional material on April 17, 2018.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 2 and, therefore, denies them.

3.   Professor Joritz received a notice of right to sue letter from the EEOC on October 13, 2016, (EXHIBIT A).

**ANSWER:**   KU admits that the EEOC issued a right to sue notice dated October 13, 2016.   KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 3 and, therefore, denies them.

4.   This case arises under the United States Constitution, 42 U.S.C. Sections 1983 and 1988, as amended, 42 U.S.C. section 2000e *et seq.*.  This Court has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1343.

**ANSWER:**   KU admits that Plaintiff purports to state claims arising under the referenced statutes and the Constitution and that this Court has jurisdiction insofar as the claims

DocID: 4847-9426-6004.2

involve federal questions.  To the extent a further response is required, KU denies the remaining allegations in paragraph 4.

5.      All individual Defendants are sued in their individual capacities under Sec. 1983, COUNT VI.

**ANSWER:**   KU admits that Plaintiff purports to sue the Individual Defendants in their individual capacities.  To the extent a further response is required, KU denies the remaining allegations in paragraph 5.

6.      This Court has supplemental jurisdiction over any and all state law claims made herein pursuant to 28 U.S.C. Section 1367(a), as they form part of the same case or controversy under Article III of the United States Constitution.

**ANSWER:**   An answer is not required given that Plaintiff's only state law claim, for breach of contract, has been dismissed.  To the extent a further response is required, KU denies that this Court has subject matter jurisdiction over Plaintiff's claim for breach of contract because of Eleventh Amendment immunity.

7.      The facts and issues of Professor Joritz's state law claims are inextricably intertwined with those of her federal law claims.  This Court is an appropriate venue for these causes of action pursuant to 28 U.S.C. 1391(b)(I) and (b)(2).  The actions complained of took place in this judicial district; evidence and employment records relevant to the allegations are maintained in this judicial district; Professor Joritz would be employed in this judicial district but for the unlawful actions and practices of the Defendants; and the University is present and regularly conducts affairs in this judicial district.

**ANSWER:**    KU admits that venue is proper in this district and that Plaintiff's putative state law claim and federal claims all arise from the same transaction of facts and are, therefore, inextricably intertwined.  KU denies the remaining allegations in paragraph 7.

**PARTIES**

8.    Professor Joritz is an individual, an American citizen and an internationally recognized, award-winning animator and educator.  Prior to Professor Joritz's appointment as Assistant Professor at the University, she lived and worked in Germany as an animator, freelance artist and educator for over thirty years.  Professor Joritz is fluent in German and has communicated in German for most of her adult life.  Her surname "Joritz" is of German origin.

**ANSWER:**    KU admits that Plaintiff is an individual, an American citizen, and that she previously served as an assistant professor at KU.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 8 and, therefore, denies them.

9.    Professor Joritz earned her Masters of Fine Arts degree at the Bauhaus University in Weimar, Germany, a historic, innovative school of art founded by Walter Gropius in 1919. Professor Joritz has taught animation at higher educational institutions in Germany, Switzerland and the USA.  While still a resident of Germany, Professor Joritz also held full-time teaching positions at universities in the United States for a total of four academic years prior to 2012.

**ANSWER:**    KU admits that Plaintiff earned a Master of Fine Arts degree from Bauhaus University.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 9 and, therefore, denies them.

10.    Professor Joritz has been awarded eighteen grants for her independent animated shorts and research; ten awarded in Germany.  Her films are included in two German film archives, where they are identified as German productions.  Professor Joritz received

4

20 international awards for her animated films, which have been screened on TV and in film festivals in Germany, Holland, England, Ireland, Italy, Finland, France, Portugal, East Germany, Poland (when the latter two were still Eastern Bloc countries) and in the USA.  A major film festival award qualified one of her animated shorts for Oscar Nomination consideration. Professor Joritz's animated films have been included in multiple international film tours organized by the Goethe Institute (Munich, Germany), selected to represent German animation production and to promote German culture.  Professor Joritz's German animation productions also toured with the British Film Institute and Spike & Mikes Festival of Animation (USA & Canada).  Professor Joritz is recognized internationally as primarily a German filmmaker and her films are distributed by distribution companies in both Germany and France.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 10 and, therefore, denies them.

11.     In 2012, the University's Department of Film & Media Studies at its School of the Arts contracted Professor Joritz as a tenure-track assistant professor.

**ANSWER:**   Admitted.

12.     Professor Joritz is a resident of Kansas and member of the protected class of females and was at all times material to this case a tenure-track Assistant Professor employed by the University in the College of Liberal Arts & Sciences Film & Media Studies Department.

**ANSWER:**   KU admits that Plaintiff is a resident of Kansas, is female, and was previously employed by KU as an assistant professor (tenure-track) in the Department of Film and Media Studies.  To the extent a further response is required, KU denies the remaining allegations in paragraph 12.

DocID: 4847-9426-6004.2

*The Defendant University and University Defendants*

13.     The University of Kansas ("University") is a public university operating and situated in the State of Kansas.  It receives federal funding and is governed by the Kansas Board of Regents.

**ANSWER:**     Admitted.

14.     The individual Defendants are not protected by state sovereign immunity under the Eleventh Amendment.  Qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[1]  The Supreme Court has recognized that when government officials abuse their offices, "actions for damages may offer the only realistic avenue for vindication of constitutional guarantees."[2]  The circumstances of this case will show that the individual Defendants violated a clearly established constitutional right of which a reasonable official should have known, and thus are not entitled to qualified immunity.

**ANSWER:**     KU admits that the Eleventh Amendment does not protect the Individual Defendants for claims seeking to impose personal liability.  KU further admits that qualified immunity protects the Individual Defendants from liability for civil damages subject to the standards set forth in applicable Supreme Court and Tenth Circuit precedents.  KU denies the remaining allegations in paragraph 14.

15.     At all times material to this Complaint, individual Defendants BERNADETTE GRAY-LITTLE, CARL LEJUEZ, STUART J. MACDONALD and MICHAEL BASKETT were employed by the University and were residents of Kansas.  Each of these Defendants approved, facilitated, and/or voted for Professor Joritz's non-reappointment/termination.

---

[1] *Harlow v. Fitzgerald*, 457 US 800 (1982).
[2] *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (internal citations omitted).

DocID: 4847-9426-6004.2

**ANSWER:**   KU admits that, at the times giving rise to Plaintiff's claims, all four Individual Defendants were employees of KU and Kansas residents.   KU denies the remaining allegations in paragraph 15.

16.   Defendant BERNADETTE GRAY-LITTLE was the Chancellor and Chief Executive Officer of the University of Kansas during time material to this Complaint, and is sued in her individual capacities as Chancellor.

**ANSWER:**   KU admits that Defendant Gray-Little was the Chancellor and Chief Executive Officer of KU at the times giving rise to Plaintiff's claims.   KU further admits that Plaintiff purports to state claims against Defendant Gray-Little in her individual capacity.   To the extent a further response is required, KU denies the remaining allegations in paragraph 16.

17.   CARL LEJUEZ was the University's Dean of the College of Liberal Arts & Sciences during time material to this Complaint, and is sued in his individual capacities as Dean.

**ANSWER:**   KU admits that Defendant Lejuez was the Dean of the College of Liberal Arts & Sciences during the 2015-2016 academic year.   KU further admits that Plaintiff purports to state claims against Defendant Lejuez in his individual capacity.   To the extent a further response is required, KU denies the remaining allegations in paragraph 17.

18.   Professor STUART J. MACDONALD was the University's Chair of the College Committee on Appointments, Promotion and Tenure Committee (CCAPT) during time material to this Complaint, and is sued in his individual capacities as Chair of the CCAPT Committee.

**ANSWER:**   KU admits that Defendant Macdonald was Chair of the CCAPT during the 2015-2016 academic year.   KU further admits that Plaintiff purports to state claims against Defendant Macdonald in his individual capacity.   To the extent a further response is required, KU denies the remaining allegations in paragraph 18.

DocID: 4847-9426-6004.2

19.     Professor MICHAEL BASKETT began his position as the University's Department Chair of the Film & Media Studies Department during summer of 2015, and is sued in his individual capacities as Department Chair.

**ANSWER:**     KU admits that Defendant Baskett was the Chair of the Department of Film & Media Studies during the 2015-2016 academic year.  KU further admits that Plaintiff purports to state claims against Defendant Baskett in his individual capacity.  To the extent a further response is required, KU denies the remaining allegations in paragraph 19.

20.     At all times material to this Complaint, Defendants acted under color of state law.

**ANSWER:**     KU admits that it is a subdivision and arm of the State of Kansas generally immune from suit under the Eleventh Amendment.  KU further admits that the Individual Defendants were at all times acting with the course and scope of their employment and as agents for KU.  To the extent a further response is required, KU denies the remaining allegations in paragraph 20.

## CLAIMS

21.     Based upon the facts stated herein, Plaintiff asserts the following claims against the University:

A.     COUNT I– TITLE VII – Title 42 United States Code § 2000e-2 DISCRIMINATION BASED ON NATIONAL ORIGIN

B.     COUNT II – TITLE VII – Title 42 United States Code § 2000e -2 DISCRIMINATION BASED ON SEX/GENDER

C.     COUNT III – TITLE VII – Title 42 United States Code § 2000e-3 RETALIATION FOR OPPOSING UNLAWFUL EMPLOYMENT PRACTICES

D.     COUNT IV – TITLE VII – HOSTILE WORK ENVIRONMENT

E.     COUNT V– TITLE VII – WRONGFUL TERMINATION

DocID: 4847-9426-6004.2

F.       COUNT VII – KANSAS COMMON LAW BREACH OF CONTRACT

Based upon the facts stated herein, Plaintiff also asserts the following claims against the individually named Defendants:

G.       COUNT VI – US CONSTITUTION, 1st, 5th and 14th Amendments DENIAL OF FREEDOM OF SPEECH, VIOLATIONS OF DUE PROCESS

**ANSWER:**     KU admits that Plaintiff's First Amended Complaint purported to state the various claims listed in paragraph 21.  KU denies that Plaintiff states any viable claim and denies that Plaintiff is entitled to relief on any claim.

**STATEMENT OF FACTS**

**ADMINISTRATIVE PROCEDURAL HISTORY**

22.     Professor Joritz incorporates herein by reference paragraphs 1 through 21 above as though fully set forth herein.

**ANSWER:**     KU incorporates its responses to paragraphs 1 through 21 of Plaintiff's First Amended Petition as though fully set forth herein.

23.     The setting for this case is the University campus in Lawrence, Kansas.

**ANSWER:**     KU admits that Plaintiff worked on its campus in Lawrence, Kansas.  To the extent a further response is required, KU denies the remaining allegations in paragraph 23.

24.     The University hired Professor Joritz as a tenure-track Assistant Professor of primarily Animation, Experimental Production and digital Video Effects in the Film & Media Studies Department, School of the Arts, College of Liberal Arts & Sciences.  At the start of her employment on August 18, 2012, Professor Tamara Falicov was the Chair of the Film & Media Studies Department.

**ANSWER:**     Admitted.

DocID: 4847-9426-6004.2

25.     As a tenure-track professor, Professor Joritz's contract presumed contract renewal absent some cause to the contrary.

**ANSWER:**     Denied.

26.     Professor Joritz was annually evaluated on Teaching (40%), Research:  Creative and/or Scholarly Activity (40%), and Service (20%).

**ANSWER:**     KU admits that Plaintiff was evaluated annually by a committee in her Department on the listed criteria, in the listed percentages, for the 2014-2015 and 2015-2016 academic years.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 26 and, therefore, denies them.

27.     Professor Joritz always received "Good" or "Very Good" ratings for these categories. "Good" or "Very Good" ratings are consistently defined throughout University evaluation policies as meeting or exceeding expectations for tenure.

**ANSWER:**     Denied.

28.     Professor Joritz was awarded merit pay raises for her first two years of employment at the University.  Chairperson Tamara Falicov confirmed via an email dated June 11, 2016 that she believed there was a merit pay freeze after this time.

**ANSWER:**     KU admits that a pay freeze existed in 2016.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 28 and, therefore, denies them.

29.     Professor Joritz garnered praise from every faculty member who attended and observed her classes.  In 2013, Professor Hurst observed Professor Joritz's After Effects class, commenting in his evaluation (excerpt):

> *"It was clear from the conversational nature of the tutorial that Cathy has a command of the application, and she was able to explain very clearly the steps in*

*the process.  In this tutorial it was also clear that she was building upon previous instruction done in the application.  A lot of planning goes into a tutorial like this and it's clear she was well prepared."*

*"When a problem arose, Prof. Joritz solved it quickly.  She also provided the GTA with pointers when necessary.  The general tone of the classroom was relaxed, professional and encouraging."*

**ANSWER:**   KU admits that paragraph 29 accurately quotes from portions of Dr. Hurst's summary of his teaching observation from December 4, 2013.  KU denies the remaining allegations in paragraph 29.

30.    In 2014, Professor Hayes observed two of Professor Joritz's classes:  Animation and Experimental (film) Production, commenting in her evaluation (excerpt):

*"I was most impressed by the way Joritz made connections to film history and contemporary technology, reminding students of their location in a tradition.  I felt fortunate to be able to share in her original research about Lotte Reiniger, and admired the way she made the work of a previous century resonant in the present moment."*

*"It is clear that she is very knowledgeable in her area of expertise and excited to share her passion with her students as they discover new skills as well as the context of their historical development and contemporary value."*

**ANSWER:**   Admitted.

31.    In 2015, Professor Preston observed Professor Joritz's Animation class, commenting in her evaluation (excerpt):

*"Throughout her lecture she dropped in anecdotes from her own experience as an artist and a working professional.  As an artist, she talked about what it meant to switch media, from sand to painted glass animation, as Leaf had.  As a working professional she talked about what one could expect to be paid for the kind of short commercial animation she screened, and how to negotiate price with an employer or client.  Talking to them about her own professional and artistic experiences seemed to be a good way to connect with them, and position herself as a mentor and role model.*

*She talked about the kinds of practices a professional engages with, the importance of discipline and continually challenging the limits in yourself and your art.  Professor Joritz is very enthusiastic and clearly passionate about*

DocID: 4847-9426-6004.2

*animation, and she enjoys teaching.  The students responded well to that in both the lecture and studio sections."*

**ANSWER:**   KU admits that paragraph 31 correctly quotes from portions of a letter Dr. Preston wrote on January 11, 2015, summarizing her observation of one of Plaintiff's animation classes.  KU denies the remaining allegations in paragraph 31.

32.   In 2016, Professor Tucker observed Professor Joritz's Animation class, commenting in her evaluation (excerpt):

*"I was happy to see KU student animators hard at work in the surprisingly comfortable set-up of those economically arranged set of small rooms.  It was during the tour that I had the opportunity to see you interact with the students one-on-one.  It was very clear to me that the students respected you and that you respected them.  This I observed in your familiarity with each student's project and your ability to quickly offer very specific praise and/or tips on how to improve a technical aspect of their work."*

*"You then showed a delightful selection of very different examples including student work as well as professional work of a variety of styles.  I was very impressed with the way you teach basic skills, while honoring those skills and their histories and possibilities; effectively transmitting to students a respect for the artform, while inspiring creative thinking among students who bring many different kinds of interests and training."*

**ANSWER:**   KU admits that paragraph 32 correctly quotes from portions of a letter Dr. Tucker wrote on January 14, 2016 summarizing her observation of one of Plaintiff's animation classes.  KU denies the remaining allegations in paragraph 32.

33.   In 2016, Professor Joritz received the University's annual *J. Michael Young Academic Advisor Award*.   The J. Michael Young Academic Advisor Awards is student-nominated and has been awarded to exceptional professors since 2006.  Professor Joritz was the first and only Film & Media Studies faculty member to win this award. Christina Highsmith, the student who nominated Professor Joritz, wrote (excerpt):

*Professor Cathy Joritz has continually put her students in positions where they can succeed in their career goals by offering her time and energy.  She gives up her lunch breaks and weekends to help students who have questions about their*

DocID: 4847-9426-6004.2

*projects or career goals. I have not met a professor yet in any department that goes so far out of their way to drive students to events, provide us with scholarship and internship opportunities, and help students meet their goals in animation classes. During her classes, she always maintains a professional and un-biased attitude toward every student. I genuinely feel that she does all she can to help students succeed…"*

**ANSWER:**   KU admits that Plaintiff received the J. Michael Young Academic Advisor Award in 2016 and that it is given to a faculty member who demonstrates exceptional commitment to undergraduate advising. KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 33 and, therefore, denies them.

34.    Professor Joritz was an active member of her department; she developed new courses and she outfitted two new University /departmental animation studios.

**ANSWER:**   Denied.

35.    In addition to teaching, Professor Joritz continued to receive prestigious national and international recognition for her creative work (i.e. research) and began new scholarly and creative research projects at the University. In 2014, Professor Joritz's animated short Negative Man was selected for the curated exhibit *Das Schwache Geschlecht – Neue Mannsbilder in der Kunst; The Weak Sex: How Art Pictures the New Male*," exhibited in the Museum Fine Arts, Bern, Switzerland. It is extremely rare for animators to have their works exhibited in major Fine Arts museum exhibits; Upon reason and belief Professor Joritz was the only faculty member in the Film & Media Studies Department to have her work honored in this way.

**ANSWER:**   KU admits that Plaintiff's 2014 short "Negative Man" was chosen for the exhibit *Das Schwache Geschlecht – Neue Mannsbilder in der Kunst; The Weak Sex: How Art Pictures the New Male*. KU denies the remaining allegations in paragraph 35.

36.    Professor Joritz was awarded three competitive University grants and other University funding in order to research the life and work of the German silhouette animation

DocID: 4847-9426-6004.2

pioneer, Lotte Reiniger (1899 – 1981).  Professor Joritz continued this research throughout her employment at the University, teaching silhouette animation techniques and the history of Lotte Reiniger to her students.

**ANSWER**:    Denied.

37.    In May 2014, Professor Joritz was selected, in a peer-reviewed process, to present a paper about her digitally collaged images of the Virgin Mary at the Eighth International Conference of Iconographic Studies:  Christian Iconography and Modern and Contemporary Art, held at the University of Rijeka in Croatia.  The following year, Professor Joritz's paper was published by Brepols Publishers in Belgium in the international journal *IKON 8, Christian Iconography in Modern and Contemporary Art*.  The University website featured an article about Professor Joritz's work on its main page, a rare honor, especially for a new professor.

**ANSWER**:    KU admits the allegations in paragraph 37 with the exception of the allegation that featuring an article about Plaintiff on its main page was a "rare honor, especially for a new processor," which KU denies.

38.    In addition to the aforementioned projects, Professor Joritz had also begun new short animated film productions.

**ANSWER**:    KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 38 and, therefore, denies them.

39.    As a production faculty member, Professor Joritz was expected to teach a Basic Video Course on a rotating basis every few years.  She did so for the first time in the spring semester 2014.  The Basic Video Production course had a syllabus and course design that had been used for years.  Both the syllabus and course design were completely overhauled by the department after Professor Joritz taught the course.

14

**ANSWER:**   KU denies Plaintiff's characterization that the syllabus and course design were "completely overhauled" and further denies any implication that any change in the course had anything to do with Plaintiff.  KU admits the remaining allegations in paragraph 39.

40.   Several students were dissatisfied with the course but did not inform Professor Joritz.  Instead, they complained to the Department Chair Falicov, who did not send them to Professor Joritz to seek resolution, as is accepted university practice, but instead informed them that they could express their dissatisfaction at the end of the semester, in writing, via anonymous student evaluations.

**ANSWER:**   KU admits that several students were dissatisfied with the course and that they expressed their dissatisfaction via student evaluations.  KU denies the remaining allegations in paragraph 40.

41.   On March 28, 2014, Chair Falicov emailed Professor Joritz to set up a meeting regarding "how Basic Video is going" and "some issues students have".  Later the same day, she wrote to Professor Joritz, "…they aren't urgent issues."

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 41 and, therefore, denies them.

42.   Professor Joritz was first able to meet with Chair Falicov to discuss the student issues on April 22, 2014.  The semester ended soon thereafter and Professor Joritz left the country for Germany and Croatia.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 42 and, therefore, denies them.

43.   Professor Joritz received her copies of the student evaluations from the Basic Video course during the summer of 2014, after the semester was over and students had

DocID: 4847-9426-6004.2

dispersed.  Several evaluations included handwritten angry, aggressive, anti-German comments, including criticizing Professor Joritz's pronunciation of words:  "*She is a Nazi sympathizer*", she "*drove us nuts frequently mispronouncing well-known…Talked about Germany all the time*, she talked about "*German feminism*", etc.  Some students called for Professor Joritz to be fired.

**ANSWER:**  KU admits that Plaintiff received copies of the evaluations during the summer of 2014 after the course was over, that Plaintiff quotes snippets of some of the comments without context, and that at least one student commented she should be fired.  KU denies the remaining allegations in paragraph 43.

44.  The student comments were scanned and thereafter became a permanent part of Professor Joritz's University performance record.  These comments were included in every meaningful evaluation Professor Joritz underwent and thus tainted all subsequent evaluation processes with discrimination.

**ANSWER:**  KU admits that the student comments referenced in paragraph 44 were scanned and included in Plaintiff's faculty record.  KU denies the remaining allegations in paragraph 44.

45.  Professor Joritz was concerned about the anger in the student comments, which indicated a hostile work environment.  She found out later that national origin was a basis for discrimination recognized by federal and Kansas state law.  At various times Professor Joritz met with the following faculty members to discuss the discrimination and relate her concerns:  Department Chair Professor Tamara Falicov, Department Chair Professor Michael Baskett (Falicov's successor), members of the Faculty Evaluation Committee consisting of Professors Jacobson, Preston and Wilmott, University administrators including the College of Liberal Arts Dean Carl Lejuez, Associate Dean Henry Bial and Chancellor Bernadette Gray-Little.  Professor

DocID: 4847-9426-6004.2

Joritz requested that the discriminatory comments be removed from her record and suggested ways to address the issue of student discrimination against faculty in the future, specifically in student evaluations. Professor Joritz had been made aware by other women faculty that they too, experienced discrimination via anonymous, end-of-semester student evaluation evaluations. One female professor related to Professor Joritz how a student had called her a "New York bitch".

**ANSWER:** KU admits that Plaintiff raised concerns to some people of what she incorrectly labelled as "discrimination." KU denies that Plaintiff experienced discrimination, denies that the conduct Plaintiff described amounted to discrimination, and denies that Plaintiff had a good faith belief she was discriminated against based on protected status. To the extent a further response is required, KU denies the remaining allegations in paragraph 45.

46.    The University did not remove the discriminatory student comments from Professor Joritz's record and took no action to prevent such discrimination from occurring in the future.

**ANSWER:** KU admits that it did not remove student comments from Plaintiff's faculty record. KU denies the remaining allegations in paragraph 46.

47.    According to the University website, the Office of Institutional Opportunity and Access (IOA) "has an institutional responsibility to enhance and strengthen diversity and inclusion at the University of Kansas which includes the Lawrence and Edwards campuses". According to the I*nstitutional Opportunity and Access Discrimination Complaint Resolution Process Policy* p. 3: *Who must report discriminatory actions*?

> *Unit heads and others who serve in leadership roles in the university are responsible for nondiscrimination in their employment and academic environments."*

Also on p. 3:

17

*...all employees at the University of Kansas are required to contact the Office of Institutional Opportunity and Access (IOA) at 785-864-6414 or ioa@ku.edu to report incidents of discrimination and sexual harassment, including sexual violence, of which they know or have reason to believe may have occurred.*

**ANSWER:**     Admitted.

48.     Although Professor Joritz had brought the issue to his attention in 2014, Associate Dean Bial finally reported Professor Joritz's concerns to the IOA on April 6, 2016.  Professor Joritz brought her discrimination concerns to Chancellor Gray-Little on March 14, 2016, during a meeting in the Chancellor's office.  None of the "unit heads" in "leadership roles" (Department Chairs Falicov and Baskett, Associate Dean Bial, Dean Lejuez, Chancellor Gray-Little) other than Associate Dean Bial reported discrimination against Professor Joritz to the IOA, as is required by University policy.

**ANSWER:**     KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 48 and, therefore, denies them.

49.     On July 1, 2014, after the semester ending with the discriminatory student evaluation comments, Professor Joritz received an email from Department Chair Tamara Falicov regarding "the research portion" of Professor Joritz's work.  In her email, the Chair narrowed Professor Joritz's research activity to "making animations", despite the fact that the COLLEGE OF LIBERAL ARTS & SCIENCES PROCEDURE Promotion and Tenure Procedure, Film and Media Studies expressly prohibited limiting a faculty member's scope of "scholarship" (EXHIBIT B, p. 3, ¶ 4):

*In the Department of Film and Media Studies, each faculty member is expected to engage in scholarly and/or creative research.  No absolute or rigid criteria can be established to measure research quality and quantity for all candidates.*

**ANSWER:**     KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 49 and, therefore, denies them.

18

50.    The restriction to exclusively "making animations" excluded research that Professor Joritz had invested time in – creating digital collages of the Virgin Mary, for example, and her scholarly research on Lotte Reiniger.  The limitation violated Professor Joritz's position description (EXHIBIT C, p. 1, bottom paragraph), which included scholarly research as well as creative production:  "Conduct creative and/or scholarly research in film and media production and studies".

**ANSWER:**    Denied.

51.    All tenure-track professors were required to undergo a major performance evaluation, the Progress Toward Tenure Review (PTTR) at the 2.5-year mark of their employment.  It was now nearly two years after Professor Joritz began her Assistant Professor position, and the University Department Chair was communicating research requirements contradictory to Professor Joritz's employment contract.  Chair Falicov herself had no idea how long Professor Joritz's animated piece(s) should be, nor did she seem to understand that the "length" of an animation bears no relation to its quality or the amount of work invested in it.  In her email dated July 1, 2014, she wrote, "I don't know what is a reasonable length of time for an animated piece to be considered for tenure – we'd need to look at other animation professors at other research one institutions."

**ANSWER:**    Denied.

52.    The University's undefined, never stated, never agreed upon tenure expectations constituted a violation of the University Faculty Senate Rule and Regulation FSRR 6.1.2, which states:

> *6.1.2    Academic Freedom and Tenure Policy... The University of Kansas subscribes to the 1940 American Association of University Professors (AAUP) statement on Academic Freedom and Tenure and/or any amendments or revisions to that statement adopted by the Kansas Board of Regents.*

DocID: 4847-9426-6004.2

The AAUP 1940 Statement (and therefore the FSRR 6.1.2) states:  The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.

**ANSWER:**   Denied.

53.   The preparation for Professor Joritz's first Progress Toward Tenure Review (PTTR) took place in December/January 2014-2015.   The PTT Review is a multi-tiered evaluation process, for which a faculty member must prepare a "dossier".   The PTTR dossier includes all student evaluations including student comments, peer evaluations (class observations by other faculty members), a faculty member's teaching statement and research statement and a list of the faculty member's published and completed work.  *The COLLEGE OF LIBERAL ARTS & SCIENCES POLICY, Progress Toward Tenure Review for the College of Liberal Arts & Sciences* outlines the purpose of the PTT Review on p. 1 (EXHIBIT D):

> *The progress toward tenure review is intended to provide faculty members with a meaningful appraisal of their progress toward tenure and orient them toward basic aspects of the tenure process.*

**ANSWER:**   Admitted.

54.   The Departmental PTTR committee, consisting of departmental faculty colleagues, conducts an Initial Review of the "candidate's" dossier and writes a narrative for each of the evaluated criteria:  Teaching, Creative Research/Scholarship and Service.  They then evaluate if the candidate, for each category:

( )   Demonstrates progress toward tenure

( )   Improvements required for continued progress toward tenure

( )   Record not sufficient for progress toward tenure

**ANSWER:**   Admitted.

DocID: 4847-9426-6004.2

55.     On March 16, 2015, after the Review was concluded, Professor Joritz received a letter from then-Interim Dean Steeples, which included an assessment of the Review, suggestions for improvement and the determination that "improvement is required for continued progress towards tenure".   Professor Joritz was informed that she must submit to another review in 2015 -2016.   Failing the next year's review would result in "non-reappointment", i.e. employment termination.

**ANSWER**:     Admitted.

56.     Professor Joritz was befuddled by the content of the Dean Steeple's letter.  One of his recommendations stated, "In preparation for your mandatory review for promotion and tenure, however, an increase your service commitments on both the national and international level would be advised."

**ANSWER**:     KU admits that Dr. Steeples recommended that Plaintiff increase her service commitments on both the national and international level.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 56 and, therefore, denies them.

57.     The demand for service on "the national and international level" was unreasonable and capricious because it failed to follow the proscribed *Film & Media Studies (FMS) Promotion and Tenure Procedures* for promotion from assistant to associate professor. The FMS policy, p. 5, § 2, included no expectations for service on a national or international level (Professor Joritz's emphasis):

> ***For promotion to associate professor, a candidate's service contributions is expected to be focused at the departmental level, but also at the level of the School of the Arts, the College, and the University.*** *Greater amounts of service to national or international professional organizations, and the larger community will be expected later in one's career.*

And on p. 5, § 5:

21

***Greater amounts of service*** *at the School, College and University levels,* ***in national or international professional organizations, and the larger community will be expected later in a faculty member's career.*** *These additional service expectations are expected for promotion to the rank of professor.*

**ANSWER:**   Denied.

58.   On March 26, 2015 Professor Joritz emailed Erin Spiridigliozzi, Assistant Dean for Faculty and Staff Affairs, seeking information that might explain the negative PTTR decision. Professor Joritz asked if she could appeal the decision.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 58 and, therefore, denies them.

59.   On April 1, 2015 Erin Spiridigliozzi emailed Professor Joritz, informing her, "*THERE ARE NOT (sic) APPEAL PROCEDURES AVAILABLE FOR THE PTTR REVIEW.*"

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 59 and, therefore, denies them.

60.   Ms Spiridigliozzi attached a pdf document entitled "Initial Review Evaluation Documents" to her email.  This document was the detailed review that the Film & Media Studies Departmental 2015 PTTR Committee members had written about Professor Joritz (EXHIBIT E).

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 60 and, therefore, denies them.

61.   The Initial Review Evaluation arrived moments before Professor Joritz was scheduled to meet with Chair Falicov to discuss the results of the PTT Review.  Professor Joritz informed Falicov that she had just been emailed the Initial Review Evaluation but had not yet read it.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 61 and, therefore, denies them.

22

62.     Chair Falicov told Professor Joritz that she was not supposed to have a copy of the Initial Review Evaluation and told her to delete it.

**ANSWER:**    KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 62 and, therefore, denies them.

63.     Professor Joritz told Chair Falicov that she thought transparency in such matters was best. Because there is no University policy that states that a faculty member may not see the Initial Review Evaluation, and the Initial Review Evaluation was not marked "confidential", Professor Joritz did not delete the Initial Review Evaluation.

**ANSWER:**    KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 63 and, therefore, denies them.

64.     The meeting between Professor Joritz and the Chair lasted 30 minutes.  The Initial Review Evaluation was not discussed.  After the Chair left, Professor Joritz read it.

**ANSWER:**    KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 64 and, therefore, denies them.

65.     The Initial Review Evaluation revealed itself as the source for the Dean's policy violation, as it included the same unreasonable, policy-violating expectation of service, which Dean Steeples had repeated in his letter.  The Initial Review Evaluation also exposed many more procedural and policy violations, including but not limited to, a restrictive, invalid description of Professor Joritz's scope of research and misleading statements about the results of Professor Joritz's student evaluations.

**ANSWER:**    Denied.

66.     The Initial Review Evaluation also revealed that Department Chair Falicov, who should have been an ex-officio member of Professor Joritz's 2015 PTT Review Committee,

DocID: 4847-9426-6004.2

violated University procedures by serving as its Chair.  (This was later confirmed by the University Faculty Rights Board, see p. 23, #85.)  Chair Falicov also filled out the "Overall Evaluation" ratings incorrectly, leaving an incorrect and falsely negative impression of the candidate's record.  Despite Professor Joritz having received positive reviews in all three performance categories – Teaching, Research, Service – Falicov impermissibly checked boxes that read "Improvement required for continued progress toward tenure" (see p. 15, #54).

> **ANSWER**:    Denied.

67.    The Department's PTTR Initial Review Evaluation included two descriptions of expectations for Professor Joritz's research:  One description, which the Professor Joritz viewed and signed in agreement and another, which Professor Joritz never saw and did not agree to.  The second description wrongly described Professor Joritz's research as "creative research leading to short and long form animation works".  Not only was this description not a part of Professor Joritz's position description; It violated University policy.  Further, the inclusion of "long form animation works" described a Herculean task.  It created misleading and unobtainable research expectations in the minds of University committee members and administrators unfamiliar with animation production, guaranteeing that Professor Joritz's creative work would fall short of their expectations.

> **ANSWER**:    Denied.

68.    The Department's Initial Review Evaluation also revealed "secret" procedures, which faculty were not privy to.  For example, Professor Joritz was never informed that the Department Chair had an option to "not concur" with the departmental PTTR committee's recommendation and could insert a letter into her dossier with his/her reasons for

non-concurrence.   This secret procedure in particular would prove extremely destructive to Professor Joritz the following year, when her employment depended on a positive PTT Review.

**ANSWER:**    Denied.

69.    The Initial Review Evaluation included a narrative that cited Professor Joritz's German background as reason for negative student evaluations, negative student evaluation comments and for her purported communication and teaching inadequacies.  The narrative was written by an unidentified PTTR faculty committee member:

> *Some of the student observations may also be due to the fact that she taught extensively in Germany for many years before teaching at KU, and she has had some difficulty in adjusting her communicative and teaching skills to her new teaching environment and culture.*

**ANSWER:**    KU admits that paragraph 69 accurately quotes a portion of the 2014-2015 initial review evaluation.  KU denies the remaining allegations in paragraph 69.

70.    Not only did this narrative blame Professor Joritz for the anti-German discrimination and hostile work environment she faced; it reinforced the idea that Professor Joritz's German background was the problem.   Further, there was no mention of positive contributions that Professor Joritz brought to the University and its students directly *because* her background was German.

**ANSWER:**    Denied.

71.    During the same review, Film & Media Studies' Professor Matthew Jacobson violated the Faculty Senate Rules and Regulations (FSRR), 6.1.4.1, p. 10, cited under *Conflicts of Interest*, by serving on both the Film & Media Studies departmental PTTR committee and the CCAPT committee.  Department Chair Falicov violated the same policy by appointing him to the PTTR committee while he was a member of the CCAPT committee.  This conflict of interest should have been prohibited by the University but was not.

DocID: 4847-9426-6004.2

**ANSWER:**   Denied.

72.     The procedural and policy violations committed during Professor Joritz's 2014/2015 PTT Review negatively impacted and tainted it, making it impossible for any subsequent committee and/or administrator to make a fair and valid evaluation of Professor Joritz's performance.

**ANSWER:**   Denied.

73.     Despite the multiple procedural and policy violations committed during her Review, Professor Joritz was informed by the University that there were no means to appeal the PTTR decision, violating Professor Joritz's right to due process.

**ANSWER:**   Denied.

74.     Despite being refused a chance to appeal the PTT Review outcome, Professor Joritz took note of the Dean's suggestions for improvement.  She continued her creative and scholarly research and continued to receive international recognition.  For example, Professor Joritz was invited to illustrate the cover of a book published in Germany, which included writings and images from renowned women German experimental filmmakers and scholars.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny whether Plaintiff "was invited to illustrate the cover of a book published in Germany, which included writings and images from renowned women German experimental filmmakers and scholars," and therefore denies the same.  KU denies the remaining allegations in paragraph 74.

75.     On January 14, 2016, prior to her second PTT Review, Professor Joritz was awarded the highly competitive University's *Hall Center for the Humanities Creative Fellowship for her animated short entitled Film Feast*.  Per University policy, creative work constituted research, i.e. this was a research award.  The Fellowship would afford Professor Joritz a semester

DocID: 4847-9426-6004.2

free of teaching in order to concentrate on the production of an animated short.  It also included an additional office space in the Hall Center and a $1,000 stipend to spend as Professor Joritz wished.  The Fellowship was slated for the Fall Semester 2016.  No other Film & Media faculty member had ever been awarded the Creative Fellowship.

**ANSWER:**    KU admits that Plaintiff was initially selected for a Hall Center fellowship for the Fall of 2016 for the specified film and that the fellowship would have afforded her a monetary stipend and space in the Hall Center, and would typically have excused her from teaching obligations for a semester.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 75 and, therefore denies them.

76.    Despite such achievements, when evaluated again in 2016 during her second PTT Review, on which her employment depended, the University refused to consider Professor Joritz's research record as a whole:  Chair Baskett, the CCAPT committee members, Dean Lejuez, Provost Rosen and Chancellor Gray-Little all ignored, misrepresented or diminished Professor Joritz's research projects and achievements.

**ANSWER:**    Denied.

77.    On November 13, 2015 Department Chair Michael Baskett suggested that he conduct a class observation of Professor Joritz's animation class, stating "*Second, if you would send me a list of the classtimes (sic) you have available for the rest of the semester, I will be there to evaluate you so that there isn't a lack of proper department faculty evaluations for you.*" Class observations are an important component of a faculty member's teaching record, and Chair Baskett's offer made it seem as though he was supportive.  The Chair observed Professor Joritz's class on November 23, 2016.

DocID: 4847-9426-6004.2

**ANSWER:**   KU is without sufficient knowledge or information to know if "Baskett's offer made it seem as though he was supportive."   KU cannot respond to the vague characterization that observations are an "important component" of a teaching record, and therefore denies the same.  KU admits the remaining allegations in paragraph 77.

78.     The Chair's written class observation was to be included in Professor Joritz's 2016 PTT Review dossier along with other class observations.  Previously, Professor Joritz always read class observations and discussed them with the faculty members who wrote them. Chair Baskett, however, refused to allow Professor Joritz to see the observation he wrote and would not discuss his observations with her.  This violated University policy, which allows faculty to review their PTTR dossiers, of which class observations are a part.  It also contributed to a hostile work environment, causing Professor Joritz anxiety about the content of Chair Baskett's "observation".  Despite repeated requests to Chair Baskett and, after Baskett's refusals, to Associate Dean Bial, Dean Lejuez, Vice Provost Mary Lee Hummert and the Provost, Professor Joritz was still denied Baskett's observation.

**ANSWER:**   Denied.

79.     Tenure-track faculty are offered one Research Intensive Semester (RIS) – a semester without teaching – at a time of their choosing prior to their tenure review.   On November 12, 2015 Professor Joritz requested a RIS from Chair Baskett for the 2016/2017 academic year.  She had requested one from him earlier for the spring semester 2016, which he denied her, citing a "lack of faculty".  A RIS would provide Professor Joritz an opportunity to focus exclusively on her research.  Baskett delayed his response, emailing Professor Joritz that he would let her know "Probably Feb-Mar. 2016".  By not granting Professor Joritz the RIS she

requested, the Chair denied Professor Joritz the opportunity to focus on her research that other similarly situated professors were afforded.

**ANSWER:**   Denied.

80.     In December 2015 Professor Joritz approached the University's Office of Institutional Opportunity and Access (IOA) to discuss her issues of discrimination based on national origin, including the discriminatory student comments, which would again be included in her PTTR dossier and negatively impact her performance record on an ongoing basis, forever. The IOA representative asked Professor Joritz when the student comments had been made, then promptly told her that the time limit for a complaint had passed (180 days).  However, IOA policy does not cite a 180-day deadline in its *Discrimination Complaint Resolution Process Policy*.  Instead it "encourages" complainants to file their complaints within 180 days:

> *Complainants are encouraged to file their complaints within one hundred eighty (180) days of the most recent occurrence of the alleged discrimination.*

Over time, the 180-day excuse was cited by multiple IOA "investigators", who refused to investigate Professor Joritz's complaints regardless of when she reported them.  The University's unlawful discrimination and related unlawful practices against Professor Joritz were never investigated or addressed, but rather allowed to continue.

**ANSWER:**   KU admits that Paragraph 80 accurately quotes a portion of KU's "Discrimination Complaint Resolution Process."   KU denies the remaining allegations in paragraph 80.

81.     The PTTR process began again for Professor Joritz the following year (2015/16) with muddled instructions.  In November 2015 Professor Joritz and other College of Liberal Arts & Sciences' evaluation candidates received conflicting information regarding the submission of PTTR materials.  Professor Joritz sought clarity by contacting several University administrators,

including Dean Steeples.  Steeples agreed, "*...we need to clarify the instructions so that we are fully compatible internally within CLAS and also with the instructions from the Provost.*"

**ANSWER:**    Denied.

82.    Prompted by Professor Joritz's inquiry, the University attempted to change the PTTR policy without going through the proper procedures (i.e. by violating procedures).

**ANSWER:**    Denied.

83.    Professor Joritz had the reasonable expectation that the departmental 2016 PTTR process would begin early December 2015, as it did the year prior, and would remain the same, as she had not been informed of any altered procedures.

**ANSWER:**    Denied.

84.    Instead, the 2016 process was vitiated with procedural violations that began immediately.  The process began late (January 2016), was extremely rushed and Professor Joritz had to fight for the adherence to policies/procedures every step of the way.

**ANSWER:**    Denied.

85.    The Department Chair Michael Baskett, who should have been an ex-officio member of the 2016 PTT Review Committee, violated University procedures by serving as the committee's Chair, a procedure violation that occurred during both of Professor Joritz's PTT Reviews.  The University Faculty Rights Board called attention to this impropriety (among other issues) in its letter to Chancellor Gray-Little dated May 11, 2016 (EXHIBIT F, Professor Joritz's emphasis):

> *Finally, FRB notes that in both years of Professor Joritz's pre-tenure reviews, the previous and current department chairs signed both as chair of the Faculty Evaluation Committee and as Department...***Especially in cases where the department chair does not concur with the committee evaluation, this dual chair role suggests a lack of independent judgment of the candidate's record.**

DocID: 4847-9426-6004.2

**ANSWER:**   KU admits that Plaintiff attempts to quote from a letter on behalf of the Faculty Rights Board to Chancellor Gray-Little, but the quote includes a misleading omission. In full, the relevant paragraph reads:

> Finally, FRB notes that in both years of Professor Joritz's pre-tenure reviews, the previous and current department chairs signed both as chair of the Faculty Evaluation Committee and as Department Chair. Film and Media Studies policy states that the department chair serves as a non-voting member of the Faculty Evaluation Committee. We recommend that the department review the practice of the department chair also serving as committee chair. Especially in cases where the department chair does not concur with the committee evaluation, this dual chair role suggests a lack of independent judgment of the candidate's record.

KU denies the remaining allegations in paragraph 85.

86.     Chair Baskett began the PTTR process a month later than the year prior, and only after Professor Joritz prompted its initiation by emailing him.

**ANSWER:**   Denied.

87.     On January 1st 2016, Professor Joritz requested that Professor Jacobson not serve on the PTTR committee, citing sexist bias and a conflict of interest, as Jacobson was serving on the CCAPT committee, a committee that would also review Professor Joritz's record. According to University policy, Professor Joritz had the right to make this request.

**ANSWER:**   KU admits that at some time Plaintiff requested that Professor Jacobson not serve on the PTTR committee. KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 87, and therefore denies them.

88.     The Chair responded on January 5, 2016, informing Professor Joritz that the "selection of committee membership is decided by the department" when, according to the *Film & Media Studies Promotion and Tenure Procedures*, p. 7, the committee members should be appointed by the Chair: "*In the department the Initial Review Committee is made up of*

DocID: 4847-9426-6004.2

*3 members appointed by the department Chair as an ad hoc promotion and tenure committee of faculty that gathers and evaluates relevant material.*"

**ANSWER:**   KU admits that paragraph 88 accurately recites a quote from a document titled "Promotion and Tenure Procedure, Film and Media Studies."   KU denies the remaining allegations in paragraph 88.

89.   On January 7th, 2016, the Chair's part-time assistant, Sarah Sahin, informed Professor Joritz via email that Professor Joritz was not permitted to communicate with other members of the PTT Review committee:  "any questions for or communication with the committee needs to go through Michael or me."  Michael = Chair Michael Baskett.

**ANSWER:**   KU admits that Plaintiff was informed questions or communications with the committee about the PTTR needed to go through the Chair or his assistant.  KU denies the remaining allegations in paragraph 89.

90.   On January 11, 2016, Chair Baskett confirmed to Professor Joritz via email that she was not to communicate with other PTTR committee members, stipulating that the only communication, including feedback, would occur exclusively through himself and Sahin. Assistant Sahin was not an academic and thus could not give Professor Joritz proper feedback. This isolated Professor Joritz from the very faculty members who should have served as her strongest advocates and it violated Professor Joritz's constitutional rights.  It also enabled the Chair to manipulate the evaluation process by controlling all communication between Professor Joritz and the committee members, with no one present to participate in or hear their conversations.

DocID: 4847-9426-6004.2

**ANSWER:**     KU admits that sometime in the beginning of 2016, Dr. Baskett confirmed to Plaintiff that she should not communicate directly with PTTR committee members about her review, consistent with KU's practice.  KU denies the remaining allegations in paragraph 90.

[*Note: The numbering started again at 85 below in the First Amended Complaint – Numbers 85-90 are repeated twice although the allegation in each is different*].

85.     Chair Baskett controlled and manipulated all of the communication that Professor Joritz received and relayed during the evaluation process on which her livelihood depended. This practice was not "policy"; it was purposely implemented by Baskett in order to prevent her from communicating freely with members of the committee, who were tasked with writing detailed evaluations of her work.  It was also a means to demoralize Professor Joritz when she was most vulnerable, fighting to keep her job.

**ANSWER:**     Denied.

86.     Professor Joritz brought up the issue in a meeting with Dean Steeples, who said that he had never heard of a faculty member not being allowed to contact PTTR committee members.  Associate Dean Bial was present at the meeting.  At another time an Ombudsperson confirmed the same to Professor Joritz.

**ANSWER:**     KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 86 and, therefore, denies them.

87.     On February 1, 2016 Professor Joritz emailed Associate Dean Bial, informing him that Professor Baskett was prohibiting her from speaking with committee members.  Associate Dean supported Professor Joritz's imposed isolation, declaring that this had been "historically been the practice".  No University policy supports Bial's claim of actionable procedure.

DocID: 4847-9426-6004.2

**ANSWER:**   KU admits that Associate Dean Bial concurred with the prohibition on Plaintiff discussing her review directly with members of the PTTR committee, consistent with historic practice.  KU denies the remaining allegations in paragraph 87.

88.    On January 11, 2016, Chair Baskett refused to follow PTTR procedures by appointing only two faculty members to the PTTR committee instead of three.  There were less than 3 weeks to go before Professor Joritz was to turn in her final PTTR documents/dossier.  Committee members would need time to review her materials, and Professor Joritz needed their albeit indirect advice in order to refine her dossier.

**ANSWER:**   Denied.

89.    On January 13, 2016 Professor Joritz emailed Chair Baskett and cc'd Assc. Dean Bial, expressing many concerns about how the PTTR process was being conducted.  She requested again, that Professor Jacobson be recused from the committee.  Chair Baskett, the only committee member she was permitted to communicate with, did not respond to her email until January 19th, nearly a week later.

**ANSWER:**   KU admits that Plaintiff emailed Dr. Baskett and Dr. Bial to complain about several matters early in 2016.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 89 and, and therefore, denies them.

90.    On January 14, 2016 Professor Joritz was informed that she had been awarded the highly competitive *Hall Center for the Humanities Creative Fellowship* for 2016.  She communicated this research-achievement to Chair Baskett and Associate Dean Bial.  Neither responded.

**ANSWER:**   KU admits that Professor Joritz was informed on January 14, 2016 that she had been selected as "next year's Hall Center Creative Fellow."  KU denies the remaining

DocID: 4847-9426-6004.2

allegations in paragraph 90, and specifically denies any implication that a response to her e-mail was required.

91.     On January 19, 2016 the Chair finally emailed Professor Joritz the names of the PTTR committee members.  He still had the wrong number of faculty members appointed; one of them was former Chair Falicov.  He still had not finalized a PTTR schedule.  Professor Joritz's deadline to submit her materials – for which she needed feedback and time to make revisions – was a mere 2 weeks away.

**ANSWER**:     Denied.

92.     On January 21, 2016 Professor Joritz requested that Chair Baskett recuse former Chair Falicov from the committee, citing the fact that Falicov had asked Professor Joritz to destroy the Initial Review Evaluation document the prior year, twice.  This was the document that exposed Falicov violating PTTR procedures to Professor Joritz's detriment, ultimately forcing Professor Joritz to have to undergo the PTT Review twice, this time with her employment at stake.  In a gross breach of confidentiality, Chair Baskett refused to recuse Falicov, unnecessarily cc'ing his assistant Sahin his refusal, knowing Sahin was friends with Falicov.

**ANSWER**:     KU admits that Plaintiff requested that Dr. Falicov be removed from her committee.  KU denies the remaining allegations in paragraph 92.

93.     On January 25, 2016 Professor Joritz met with Interim Dean Steeples in a final effort to seek remedy for past and ongoing PTTR policy violations.

**ANSWER**:     KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 93 and, therefore, denies them.

DocID: 4847-9426-6004.2

94.      Steeples invited Associate Dean Bial to the meeting, unbeknownst to Professor Joritz. Professor Joritz gave each administrator a list of the PTTR 2015 & 2016 policy violations, which included violations committed by Professor Matthew Jacobson, former FMS Chair Tamara Falicov, Interim Dean Steeples and FMS Chair Michael Baskett.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 94 and, therefore, denies them.

95.      Professor Joritz requested that the new Dean of the College of Liberal Arts & Sciences, Carl Lejuez, be given a copy of the violations.  Carl Lejuez became the Dean of the College of Liberal Arts & Sciences on February 1, 2016.

**ANSWER:**   KU admits that Dr. Lejuez became Dean on or about February 1, 2016, and that he received a copy of Plaintiff's various allegations.   KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 95, and, therefore, denies them.

96.      The following day, on January 26, 2016, Assc. Dean Bial emailed Professor Joritz thanking her for meeting with him and Dean "Staples" "regarding your PTTR process."  He informed Professor Joritz, that "*they*" (the Provost's office) "*have advised us that the department chair should not be considered one of the three members of this committee.  Accordingly, we have advised Professor Baskett that he should appoint a third member (along with Professors Falicov and Preston) to serve in this capacity.*"   This was the only policy violation that was corrected.  Professor Joritz now had 8 days to turn in her complete PTTR dossier.

**ANSWER:**   KU admits that paragraph 96 accurately quotes from an e-mail sent from Dr. Bial to Plaintiff on January 26, 2016.  KU denies the remaining allegations in paragraph 96.

DocID: 4847-9426-6004.2

97.     On the same day, a day after Professor Joritz reported the PTT Review procedural violations to the Dean, Chair Baskett and Professor Falicov attended a department colloquium, during which Professor Joritz informally presented her research.  Both were frowning deeply.

**ANSWER:**     KU admits that Plaintiff presented material at a colloquium where Dr. Baskett and Dr. Falicov were present.  KU denies the remaining allegations in paragraph 97.

98.     Afterwards, Chair Baskett came into Professor Joritz's office and angrily told her, "*You're not doing yourself any favors by making the department look* (bad)!"  Professor Baskett stood directly in front of Professor Joritz when he said this, intimidating her both physically and psychologically.  Note:  Professor Joritz is less than 5 feet tall.  Also, she was utterly dependent on her Chair for feedback, as he had stipulated she not speak with anyone else on the committee. Months later, in an affidavit signed by Chair Baskett on April 28, 2016, he did not deny threatening Joritz but claimed loss of memory:  "*I do not recall ever telling Assistant Professor Joritz that "You're not doing yourself any favors by making the department look bad"…*"and went on to blame Professor Joritz for *"her efforts to manipulate the process...*"

**ANSWER:**     KU admits that Dr. Baskett signed an affidavit on April 28, 2016, and that paragraph 98 accurately quotes portions of that affidavit.  KU denies the remaining allegations in paragraph 98.

99.     On Jan 27, 2016 Professor John Tibbetts told Professor Joritz he was named to the PTTR committee.  This was one week before Professor Joritz was to turn in her final materials. It gave Professor Tibbetts very little time to review her record or provide feedback and even less time for Professor Joritz to make revisions to her documents based on the feedback she hoped to receive from Tibbetts through her Department Chair, as she was not permitted to communicate with Tibbetts directly.

DocID: 4847-9426-6004.2

**ANSWER:**   Denied.

100.   On January 29, 2016 Professor Joritz emailed Dean Steeples her concerns about PTTR-related issues, including but not limited to, retaliation by the former Chair, Professor Falicov and Chair, Professor Baskett.  She attached a list of the many PTTR policy violations from 2015 & 2016 so he would have a digital copy to reference.

**ANSWER:**   KU admits that Plaintiff sent an email to Dr. Steeples on January 29, 2016 raising concerns about the PTTR process.  KU denies the remaining allegations in paragraph 100.

101.   Chair Baskett still had not recused Professor Falicov from the departmental PTTR committee and so she remained a member.

**ANSWER:**   Admitted.

102.   Late January/early February:  Chair Baskett told Professor Joritz that she was to turn in her dossier two days early (February 3rd instead of February 5th), and informed her that *he* would be sending it to CLAS rather than having his assistant sent it, which was the procedure the year prior.  When Professor Joritz asked (similar to), "Isn't Sara (Sahin) sending it over?" he responded, "Don't assume you know everything." Professor Joritz posed no further questions and left his office, resigned to the hostile environment she had now come to expect.

**ANSWER:**   Denied.

103.   On March 16, 2016, Professor Joritz emailed Dean Lejuez the news that her animated short "*Zapf Dingbats - A Tribute to Hermann Zapf*" had been accepted to the 62nd International Short Film Festival Oberhausen, Germany, one of the most prestigious short film festivals in the world.  She informed him that the acceptance to this renowned festival counts as a "major peer-reviewed accomplishment".  Dean Lejuez acknowledged Professor

38

Joritz's achievement via email, but would later ignore it when he would claim that her "research indicates serious deficits" and recommend her termination.

**ANSWER:**    KU admits that Plaintiff e-mailed Dr. Lejuez regarding this event and that Dr. Lejuez acknowledged it.   KU denies the remaining allegations in paragraph 103, and specifically denies any implication that acknowledgement of an e-mail of this nature does, or should, bear any relationship to a PTTR evaluation.

104.    On March 24, 2016 Professor Joritz met with Dean Lejuez and informed him of the many PTTR procedural violations that occurred in both 2015 and 2016.  On the same day in a follow-up letter sent via email, she reiterated to him her fears of retaliation by Professor Baskett, Professor Falicov, Associate Dean Bial and other FMS professors for implicating them in the procedural violations she had reported.  Professor Joritz attached the list of procedural violations to her email.

**ANSWER:**    KU admits that the referenced meeting occurred.   KU denies the remaining allegations in paragraph 104, and specifically denies any implication that the claimed violations occurred or that Plaintiff's alleged violations are accurate.

105.    On April 2, 2016, Professor Joritz emailed Associate Dean Bial, querying how the School of Arts was dealing with discrimination based on sex and country of origin, "*...specifically related to the discrimination I have experienced?*"  Professor Joritz informed Associate Dean Bial that she had sought help "*previously with you, with Professor Baskett (10/22/15), with the FEC members (7/16/2015) and I recently discussed the matter with Dean Lejuez (3/24/16).  To date, I have not seen these issues addressed.*"  She also explained why she had requested that Professor Jacobson be recused from her PTTR committee and described what she felt was his sexist, discriminatory and biased behavior toward her.

DocID: 4847-9426-6004.2

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 105 and, therefore, denies them.

106.   On April 6, 2016, Associate Dean Bial informed Professor Joritz that he had "...referred the matter to the office of Institutional Opportunity and Access (IOA) for review. "On June 6, 2016 Bial emailed Professor Joritz that he had spoken with an IOA staff member on April 13 "*and was told that an investigator had been assigned*".  The IOA did not investigate.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 106 and, therefore, denies them.

107.   On April 8, 2016, Professor Joritz responded to Associate Dean Bial's email, including her request, "*I hope you will ensure that the IOA understands our annual and long term faculty evaluation processes...*"

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 107 and, therefore, denies them.

108.   On April 8, 2016, Professor Joritz received a letter via email from Anne Sawyer, executive assistant to the Dean Lejuez, with his letter recommending her termination.  Lejuez' conclusion:  "*Your research record indicates serious deficits*" was not supported to the appropriate standard of proof by evidence that was substantial when viewed in light of Professor Joritz's record as a whole, but instead based solely on an evaluation letter written by Chair Baskett, which included no proof whatsoever.  Lejuez's claim to Professor Joritz, "*the quantity of your major works was not sufficient as evidence of progress toward tenure*" was unsubstantiated and violated the College of Liberal Arts Procedure, Promotion and Tenure, Film and Media Studies, which did not stipulate "quantities" and clearly stated on p. 2:  "*No absolute or rigid criteria can be established to measure research quality and quantity for all candidates.*"

DocID: 4847-9426-6004.2

**ANSWER:**   KU admits that paragraph 108 accurately quotes from an April 8, 2016 letter from Dr. Lujuez to Plaintiff, and from a document titled "Promotion and Tenure Procedure, Film and Media Studies."  KU denies the remaining allegations in paragraph 108.

109.    Lejuez ignored the positive departmental Initial 2015/16 PTT Review that had been written about Professor Joritz's research, at length and in detail, by the 2016 PTTR departmental committee members, all of which was based on the solid evidence of the Professor Joritz's dossier.  Instead, Lejuez repeated the unsubstantiated allegations written in a letter by Chair Baskett regarding Professor Joritz's "inappropriate behavior".  Lejuez decreed, without basis in policy or procedure, that Professor Joritz's "behavior" "weakened" her service record. He omitted Professor Joritz's manifold examples of service, including her international service, which was a level of service expected from professors two ranks higher than Professor Joritz.

**ANSWER:**   Denied.

110.    Prior to the Dean's letter recommending her termination, Professor Joritz had no idea that Chair Baskett had written a letter that he submitted along with her PTT Review dossier. According to University policy, faculty members had the right to review their dossiers before they were forwarded up the chain of review.  Chair Baskett purposely did not inform Professor Joritz that he had inserted a toxic letter into her dossier and she had no way of knowing, as he submitted it directly himself.  (See p. 28, #102)  But now she knew, and Professor Joritz needed to rebut it.

**ANSWER:**   Denied.

111.    On April 8, 2016, Professor Joritz emailed Professor Baskett twice:  The first time she asked for a copy of the letter he had included with the Department Initial Review.  The second time she requested a copy of the class observation he wrote.  Chair Baskett refused to

DocID: 4847-9426-6004.2

provide the Professor Joritz with either.  Professor Joritz repeatedly requested the documents and the University administrators supported the Chair's repeated refusals.

**ANSWER:**   KU admits that Plaintiff requested the peer reviews and that the request was denied consistent with practice to ensure that peer reviews are objective and honest.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 111, and, therefore, denies them.

112.   On April 10, 2016, Professor Joritz requested, via email, the following PTTR documents from Anne Sawyer, who was Executive Assistant to the Dean:   the PTTR Departmental Initial Review, Chair Baskett's letter, any other documents submitted that were related to her PTT Review and the CCAPT's findings.   Ms. Sawyer responded, "*The PTTR process does not provide for sharing of the materials you have requested.*"   No University policy supported this denial.

**ANSWER:**   KU admits that Plaintiff's request for certain PTTR committee materials was denied on the specified date.  KU denies the remaining allegations in paragraph 112.

113.   On April 12, 2016, Professor Joritz emailed Dean Lejuez with questions about his letter dated April 8, 2016.  Among other issues, Professor Joritz was especially concerned about the Dean's allegations regarding her "behavior", which were apparently based on a letter from her Chair.  Professor Joritz informed the Dean that, "*this is the first I ever hear of them*" and asked him to point to a policy that justifies using "behavior" as a PTTR evaluation criteria.  Again, Professor Joritz requested documents necessary to understanding the content of the Dean's letter, such as the Initial Review, the Chair's letter, etc.

**ANSWER:**   KU admits that Plaintiff emailed Dr. Lejuez with questions about his letter.   KU is without sufficient knowledge or information to admit or deny the remaining

42

allegations in paragraph 113, and, therefore, denies them. KU specifically denies any implication that a faculty member's behavior or disruption in a department is not an appropriate consideration in a PTTR.

114.     In an email dated April 12, 2016, Dean Lejuez refused to provide Professor Joritz with documents and instructed her to direct her questions to Vice Provost Mary Lee Hummert. Whenever Professor Joritz asked for details about alleged complaints made about her and her purported "inappropriate behavior", University personnel and administrators violated University policy by stonewalling her and refusing to provide her with anything, citing issues of "confidentiality".

**ANSWER:**   KU admits that it made available to Plaintiff all of the documents regarding her PTTR process consistent with policy and practice, that said documents were made available for pickup at the Deans' Office, and that Plaintiff never came to pick them up. KU denies the remaining allegations in paragraph 114.

115.     On April 12, 2016, Mary Lee Hummert responded to Professor Joritz 's email via email, reaffirming the tiered process of the PTT Review, stating that it was the responsibility of the CCAPT Committee to "*...report the Committee's recommendation on the progress toward tenure of the faculty member to the Dean of the College.*"  Hummert attached a copy of the CCAPT's letter to the Dean, which recommended that Professor Joritz's appointment be terminated (EXHIBIT G). Hummert did not provide the Professor Joritz with any other documents Professor Joritz requested.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 115 and, therefore, denies them.

DocID: 4847-9426-6004.2

116.    The letter from the CCAPT Chairperson, Dr. Stuart Macdonald, dated April 7, 2016, claimed to be "*based on the letter CCAPT received from Professor Michael Baskett*" yet inexplicably "grew" Baskett's bizarre and false statements about Professor Joritz's research conditions to a new, even more disturbing level:  Baskett's fabricated claim that "(Professor Joritz's) *access to the private collection of* [NAME REDACTED] *in Canada is becoming limited due to his declining mental and physical condition*" morphed into Stuart MacDonald's statement, "...*potential interviewees are lapsing into senility and ill health.*"  Both men wrongly declared, "*officials at the Stadtsmuseum in Tubingen, Germany have denied access to an archive of materials necessary to the completion of the project."*, a libelous claim that the Professor Joritz clarified within days by sending a simple email inquiry to the "officials" at the Stadtmuseum.

**ANSWER:**    KU admits that the quoted language in this paragraph comes from letters written by Dr. Macdonald and Dr. Baskett, respectively.  KU denies the remaining allegations in paragraph 116.

117.    Just how did this happen?  Rachel Rolf, Associate General Counsel for the University, confirmed that Dean Lejuez – not a member of the CCAPT committee – grossly violated University procedures by directing the focus of the CCAPT committee faculty members:

> *"When Professor Joritz's record was discussed in CCAPT, Dean Carl Lejuez encouraged CCAPT to focus on Professor Joritz's existing record and documented evidence of progress towards completion of her book.  CCAPT followed that direction."*

Lejuez had no right to influence the CCAPT Committee members at all.  The tiered PTT Review process dictated that the CCAPT report their findings to the Dean.  The CCAPT Committee was to remain objective.  The Dean of Liberal Arts is the CCAPT Committee faculty members' "boss".  How could CCAPT Committee members act impartially when the "boss" was directing their "focus"?

DocID: 4847-9426-6004.2

**ANSWER:**   Denied.

118.   MacDonald's letter also extrapolated on Professor Joritz's alleged "dismissive" and "disruptive" "behavior", which was based on the hearsay in the Chair's letter.  MacDonald repeated Baskett's claim that Professor Joritz's "inappropriate behavior" "weakened" her service, a punitive concept not found in University policy.  And fact was, Baskett had never called Joritz into his office for any behavioral issues, ever.

**ANSWER:**   KU admits that in Dr. Baskett's letter of February 5, 2016, he stated: "Prof. Joritz has been reminded on various occasions against disrespectful and disruptive behavior.  Former FMS Chair Tamara Falicov and I have documented multiple complaints from students and Graduate Teaching Assistants of the candidate's disrespectful and/or dismissive behavior."  KU denies the remaining allegations in paragraph 118.

119.   April 13, 2016, morning:  Knowing that the Provost was the next person to "sign off" on her termination, Professor Joritz phoned with and emailed the Provost's secretary, Linda Bonebrake, describing to Bonebrake the multiple policy violations that occurred in the PTTR process(es).  Professor Joritz requested a meeting with Provost Sara Rosen asap so she could inform the Provost of the malfeasance.

**ANSWER:**   Denied.

120.   The same morning, Vice Provost Mary Lee Hummert emailed Professor Joritz, chastising her for attempting to meet with the Provost:  "…*it is not appropriate for her to talk with you while she is reviewing the PTTR recommendation.*", denying Professor Joritz her Freedoms of Speech and Association, violating University policy and contributing to Professor Joritz's hostile work environment.

DocID: 4847-9426-6004.2

**ANSWER:**   KU admits that Dr. Hummert sent an email advising Plaintiff that it was not appropriate for her to talk to the Provost about the PTTR process while she was reviewing the PTTR recommendation.  KU denies the remaining allegations in paragraph 120.

121.    A mere six hours later, Professor Joritz received a letter via email from Provost Rosen informing her of the Provost's recommendation for her termination.  In her letter, the Provost repeated the allegations about Professor Joritz's "behavior" without question or proof:

> *"...a pattern of inappropriate behavior toward colleagues, staff, and GTAs that has affected functioning of the department and weakened your service record."*

The Provost provided no basis of proof for concluding that Professor Joritz's research was insufficient other than referring to Dean Lejuez, who "had stated (so) in his letter" (EXHIBIT H).  And Lejuez had stated so because Baskett stated so.  As its poison made its way up the chain, the University continued to refuse Professor Joritz a copy of Baskett's letter.

**ANSWER:**   KU admits that paragraph 121 includes a quote from a letter from Dr. Rosen to Plaintiff on April 13, 2016.  KU denies the remaining allegations in paragraph 121

122.    The Provost's recommendation for her termination informed Professor Joritz that "*Under F.S.R.R. 6.4.3.3, you may appeal this recommendation to the Faculty Rights Board within fourteen (14) days of receipt of this letter by filing an appeal with the Office of University Governance, 33 Strong Hall.  Grounds for appeal are limited to violation of the procedures for non-reappointment as outlined in F.S.R.R. 7.3.2.*"  So began Professor Joritz's Trial by Ordeal: with classes still in session and other University obligations ongoing, the Professor Joritz had 2 weeks to file her appeal (i.e. fight for her job), which could be based only on procedural/policy violations.

**ANSWER:**   KU admits that paragraph 122 includes a quote from a letter from Dr. Rosen to Plaintiff on April 13, 2016.  KU denies the remaining allegations in paragraph 122.

DocID: 4847-9426-6004.2

123.    But in order to identify violations, Professor Joritz needed specific documents, which she requested repeatedly from Chair Baskett, Dean Lejuez, Mary Lee Hummert, and other University administrators.  These documents included Chair Baskett's evaluation letter, Chair Baskett's observation of Professor Joritz's class, the CCAPT Committee procedures, the CCAPT notes regarding Professor Joritz's evaluation, the Film & Media Studies departmental 2016 PTTR Initial Review, position descriptions for the Film & Media Studies Department Chair, the Associate Dean of the School of Arts, the College of Liberal Arts Dean(s), the Provost and the Chancellor.  The University refused Professor Joritz access to all of these.

**ANSWER**:    Denied.

124.    On April 15, 2016 Chancellor Gray-Little spontaneously agreed to meet with Professor Joritz in her office.  The Chancellor explained to Professor Joritz that, while she was not permitted to discuss Professor Joritz's evaluation, she would listen to her for 15 minutes.  Professor Joritz told the Chancellor about the procedural violations and the student discrimination she experienced.  Professor Joritz told the Chancellor that there existed an extremely detrimental evaluation letter, which was untrue, written by Professor Joritz's Chair but kept secret from Professor Joritz.  The Chancellor listened and advised Professor Joritz to make sure that those in the administrative chain were also informed about what Professor Joritz had related to her.  Professor Joritz assured the Chancellor that they were informed…

**ANSWER**:    KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 124 and, therefore, denies them.

125.    Professor Joritz met the deadline for her appeal and filed it with the Office of University Governance, which in turn sent a copy to the University's Faculty Rights Board and to the University Counsel.

DocID: 4847-9426-6004.2

**ANSWER:**    Admitted.

126.    Professor Joritz left for Germany to be present at the screening of her new animated short film, *Zapf Dingbats – A Tribute to Hermann Zapf*, at the prestigious short film festival, the Internationale Oberhausen Kurzfilmtage.

**ANSWER:**    KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 126 and, therefore, denies them

127.    On Saturday, April 30, 2016 Rachel Rolf, Associate General Counsel for the University, sent the Faculty Rights Board a response to Professor Joritz's appeal.  On the first page of her response, University Attorney Rolf violated University policy by repeating the incorrect expectation of service that Dean Steeples and Professor Joritz's department had made during Professor Joritz's first PTT Review:  "*Her* (Professor Joritz's) *service record was also identified as an area of concern*".  This exemplifies how the University failed or refused to correct its own violations in its incessant quest to terminate Professor Joritz's employment.

**ANSWER:**    KU admits that Ms. Rolf, as counsel to KU, sent a response to the Faculty Rights Board.  KU denies the remaining allegations in paragraph 127.

128.    In the University Counsel's response, Rachel Rolf also revealed that Dean Carl Lejuez had violated the Bylaws of the College Assembly in the College of Liberal Arts and Sciences by impermissibly inserting himself into the CCAPT committee review process.  As mentioned previously, the CCAPT evaluation is required to conduct its evaluations impartially and independent of the Dean.  The University Bylaws confirm this independent, tiered process (Professor Joritz's emphasis):

*3.    The College Committee on Appointments, Promotions and Tenure (CCAPT) shall:*

*b.    Address itself to matters of policy pertaining to faculty rank and status and report its recommendations to the Dean.*

DocID: 4847-9426-6004.2

However, as Rolf revealed, Dean Lejuez had directed the focus of the CCAPT faculty members when they evaluated Professor Joritz:

> "When Professor Joritz's record was discussed in CCAPT, Dean Carl Lejuez encouraged CCAPT to focus on Professor Joritz's existing record and documented evidence of progress towards completion of her book.   CCAPT followed that direction."

**ANSWER:**   Denied.

129.   The response from the University General Counsel included many of the documents that Professor Joritz had been requesting for months.  The University had denied Professor Joritz these documents, which were vital to her appeal, filing grievances, due process, etc.; then used them against her in its response.

**ANSWER:**   Denied.

130.   The University's Faculty Rights Board (FRB), which was the recipient of Professor Joritz's appeal, met and made a determination without communicating with Professor Joritz.  The FRB did not provide Professor Joritz with a hearing.  However, on May 11, 2016, the FRB sent a letter to Chancellor Gray-Little regarding their findings.  In its letter Faculty Rights Board recommended that the inaccurate statements made by Chair Baskett in his letter to CCAPT "*be disregarded in your independent judgment of the record*."  The FRB noted that these statements were repeated in the CCAPT recommendation and "*likely influenced Dean Lejuez's conclusion…*".  (see EXHIBIT F)

**ANSWER:**   KU admits that paragraph 130 contains quotes from a letter sent on behalf of the Faculty Rights Board to Dr. Gray-Little.   KU denies the remaining allegations in paragraph 130.

131.   After receiving the University response to her appeal and finally, the documents, which proved a plethora of policy and procedural violations, Professor Joritz requested

permission from the Faculty Rights Board to include the (for her) newly discovered violations in an amended appeal.  She was not permitted to do so.

**ANSWER:**   Denied.

132.   As outlined in the University *General Instructions Progress Toward Tenure Review* 2015–2016 policy, Chair Baskett was required to schedule a formal feedback conference with Professor Joritz within two weeks of Professor Joritz receiving her non-reappointment letter from the Dean, i.e. by April 22, 2016.  Baskett did not, thus violating yet another policy and denying Professor Joritz the due process of questioning him regarding his letter.  The Faculty Rights Board made note of this violation in their letter to the Chancellor stating, "*we believe the University should nevertheless ensure that the Department of Film Studies facilitates this meeting in all future reviews.*"

**ANSWER:**   KU admits that this paragraph accurately quotes from a letter from the Faculty Rights Board to Dr. Gray-Little.  KU denies the remaining allegations in paragraph 132 and specifically denies that the lack of a formal feedback conference violates policy or any due process right.

133.   Chair Baskett, the CCAPT Committee and every University administrator upwards, with the exception of the Chancellor, cited Professor Joritz's "behavior" as reason to punish her by terminating her employment.  Aside from the fact that the Chair's allegations were hearsay and not true, the punitive measure of terminating employment is impermissible according to University policy.  University policy outlines formal disciplinary policies and procedures, under Articles III, V, and VI in its *Faculty Code of Rights, Responsibilities and Conduct*, pp. 4 & 5 in order to address misconduct.  Article V categorizes proscribed conduct. Article VI lists "*formal sanctions and are steps taken beyond informal complaints about one's*

DocID: 4847-9426-6004.2

*performance, verbal admonitions to improve or change one's behavior, and negative comments concerning one's performance as stated in the annual evaluations.*"  The sanctions are "*listed in order of increasing severity*", with *5. Recommendation of Dismissal* being the last, most severe sanction.

**ANSWER:**   KU admits that paragraph 133 contains a quote from the Faculty Code of Rights, Responsibilities, and Conduct.  KU denies the remaining allegations in paragraph 133.

134.   Article VI then states, "*Although listed in order of severity, the sanctions need not be applied serially, and a more serious sanction may be applied without a less serious one having been previously applied.*"  Fortunately, Article VI is tempered by Article III, #7 which states (EXHIBIT I, p. 2, #7):  Faculty members have a right to due process in all disciplinary matters.  Faculty members have the right to due process in all disciplinary matters.  *Faculty members have the right to peer judgment through the hearing process.  The sanctions listed in Article VI of this Code may not be imposed upon a faculty member without notice of the charges against him or her and the opportunity to request a hearing before the Judicial Board or the Faculty Rights Board.*"  Recommendation for dismissal could not be applied as a sanction because Professor Joritz was never informed of any charges against her and logically, also never received any type of hearing.

**ANSWER:**   KU admits that paragraph 134 contains a quote from the Faculty Code of Rights, Responsibilities, and Conduct.  KU denies the remaining allegations in paragraph 134.

135.   Professor Joritz had never been previously sanctioned for anything.   No grievances had ever been filed against Professor Joritz.  Professor Joritz repeatedly requested information about the purported charges against her, but the University refused to provide her with anything.   The University even denied her the Chair's letter – the very letter, which

sabotaged the PTT Review her employment depended on; a letter she saw only days before her termination.

**ANSWER:**   KU is without sufficient knowledge or information admit or deny whether Plaintiff had ever "been previously sanctioned for anything" or whether any "grievances" had been filed against her, and therefore denies the same.  KU denies the remaining allegations in paragraph 135.

136.   In a concerted effort to get her fired, Chair Baskett, Associate Dean Bial, Dean Carl Lejuez, Vice Provost Mary Lee Hummert and Provost Rosen violated Professor Joritz's rights by refusing to inform Professor Joritz of allegations made against her, denying her the opportunity to know of and to refute allegations made against her and denying Professor Joritz any means of defending herself against the secret allegations and egregious, ongoing policy violations.

**ANSWER:**   Denied.

137.   On May 2, 2016 Professor Joritz was awarded the University's *J. Michael Young Academic Advisor Award* for her teaching.  Professor Joritz was the only faculty member in her department to receive this teaching award, which had been awarded annually for over a decade.

**ANSWER:**   KU admits that Plaintiff received the J. Michael Young Academic Advisor Award on April 27, 2016.  KU denies the remaining allegations in paragraph 137.

138.   On May 13, 2016, the University emailed Professor Joritz a "Notice of Non-Reappointment" letter signed by Interim Provost Sara T. Rosen informing Professor Joritz that her appointment for the 2016-2017 academic year will be a terminal appointment.  This letter served as notice of "*a final agency action by the University of Kansas.*"  (EXHIBIT J)

**ANSWER:**   Admitted.

DocID: 4847-9426-6004.2

139.   In the University's "Notice of Non-Reappointment" letter, the University offered no evidence to substantiate its determination; the Provost simply wrote, "*Even excluding consideration of the information in the Chair's letter, the Chancellor determined that your research record demonstrated insufficient progress toward tenure, warranting non-reappointment.*"

**ANSWER:**   KU admits that paragraph 139 contains a quote from a letter from Dr. Rosen to Plaintiff dated May 13, 2016.  KU denies the remaining allegations in paragraph 139.

140.   After receiving the letter, Professor Joritz requested from Provost Rosen per email "*a more detailed response*", inquiring "*2. How did my research record demonstrate insufficient progress toward tenure?*"   Neither the Provost, the Chancellor, nor the University provided Professor Joritz with a response.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 140 and, therefore, denies them.

141.   With nothing articulated to support its determination that Professor Joritz's "research record demonstrated insufficient progress toward tenure", the University's absence of argument runs counter to the clear evidence of Professor Joritz's national and international research record.  The University's decision is unreasonable and without foundation in fact.

**ANSWER:**   Denied.

### Other Statements of Fact

142.   Until June 30, 2015, the Department Chair of the Film and Media Studies had been Professor Tamara Falicov. Professor Michael Baskett was her successor.  Among the Chair's listed "duties and responsibilities" is:   *e. Executes University policy in the unit effectively.*

**ANSWER:**   Admitted.

53

143.    Professor Joritz's employment was terminated based on a pre-tenure review.  The standards for pre-tenure should demonstrate "progress toward tenure", not the fulfillment of tenure requirements.  Professor Joritz's record, based on the standard of proof by evidence that is substantial when viewed in light of the record as a whole, proved beyond a doubt that she had made progress toward tenure in all criteria subject to review:  Teaching, Research and Service.

**ANSWER:**    Denied.

144.    According to University policy, international recognition for research is expected for the promotion from Associate Professor to Full Professor.  Although Professor Joritz was an Assistant Professor (lower than Associate), the University failed to recognize the continuous international recognition that her research received.

**ANSWER:**    Denied.

145.    The Defendants violated University policies, making Professor Joritz's PTT Reviews adversarial and punitive to the point of stripping from Professor Joritz her hard-won Creative Fellowship, denying Professor Joritz her livelihood and destroying Professor Joritz's reputation and career.

**ANSWER:**    Denied.

### "Insufficient Research" – A Pretext for Termination

146.    The University claims to have terminated Professor Joritz's employment due to "insufficient research".   Research, as delineated in all performance evaluation policies, constitutes 40% of a faulty member's responsibilities.

**ANSWER:**    Denied.

147.    In order to show pretext, evidence must create a genuine issue that the University's proffered reason for terminating Professor Joritz's employment was pretextual.  The

DocID: 4847-9426-6004.2

University claimed that Professor Joritz's research was "insufficient".   Evidence shows, that claims of Professor Joritz's research as being "insufficient" was based on:

    a.    Gently put, "factual inaccuracies" fabricated by Chair Michael Baskett, which he included in a "secret" letter to the CCAPT committee.  These "inaccuracies" were subsequently "grown" into larger, more absurd "inaccuracies" by Dr. Stuart MacDonald, in his CCAPT recommendation letter addressed to Dean Lejuez.  The "inaccuracies" were fabricated in order to sabotage Professor Joritz's positive and internationally recognized research record.

    b.    Chair Falicov's violation of University policy in order to mischaracterize the findings of the 2014/15 PTT Review Committee's positive review of Professor Joritz's research.

    c.    The purposeful downplaying and outright omission of Professor Joritz's accomplishments in evaluations of her research.

    d.    Impermissible, restrictive criteria, in violation of University policy, erroneously applied to Professor Joritz's research.

**ANSWER:**   KU admits that Plaintiff bears the burden of coming forward with evidence to demonstrate that KU's legitimate, non-discriminatory or non-retaliatory reasons for its actions were pretextual.  KU denies the remaining allegations in paragraph 147.

148.   Evidence shows that Professor Joritz's creative work/research was always evaluated as "Good" or "Very Good", including in her PTT Reviews.  These ratings indicated that Professor Joritz was "on track" for tenure.   In Professor Joritz's annual performance evaluation dated June 11, 2014, her Creative Research was rated by the faculty evaluation committee as "Very Good".  The 2014/2015 Departmental Progress Toward Tenure Review

DocID: 4847-9426-6004.2

Committee also rated Professor Joritz's research as "Very Good", praising the "*ambitious work she is undertaking on Lotte Reiniger*".  Nevertheless, when Chair Tamara Falicov impermissibly, in violation of policy, filled out the "overall evaluation" on the PTTR form, she checked the box for "*Improvement required for continued progress toward tenure*", directly contradicting the committee's findings and facilitating Professor Joritz's termination.  The PTTR document itself instructs,

> "The final judgment *(i.e. the checked boxes)* **should reflect the detailed evaluation of each area and the accompanying documentation.**"

**ANSWER:**   KU admits that the Initial Review Committee evaluated Plaintiff's research to be "Very Good" in her 2014-2015 Progress Toward Tenure Review Initial Evaluation Documents and that the "Overall Evaluations" section of that same document, under the category of "Research, Scholarship, Creative or Artistic Performance," has a box checked next to "Improvement required for continued progress toward tenure."   KU further admits that the document states: "The final judgment should reflect the detailed evaluation of each area and the accompanying documentation."   KU denies the remaining allegations in paragraph 148.

149.   Chair Falicov, in a move she thought Professor Joritz would never see, in an evaluation document Chair Falicov instructed Professor Joritz to delete, impermissibly checked the wrong box, making it appear as though the PTTR committee found Professor Joritz's research to be under par.  This began the process of firing Professor Joritz using the pretext of "insufficient research".  This can also be viewed as retaliation, as Chair Falicov did the "box checking" after Professor Joritz had reported discrimination to her and Henry Bial.

**ANSWER:**   Denied.

150.   Chair Falicov didn't stop there:  She also inaccurately checked the PTTR rating for "Teaching and Advising" as "Improvement required for continued progress toward tenure",

DocID: 4847-9426-6004.2

again directly contradicting the committee's findings, which gave Professor Joritz a "Good" rating for teaching.   With the two most important ratings and 80% of Professor Joritz's responsibilities wrongly checked by Chair Falicov as "Improvement required for continued progress toward tenure", Professor Joritz failed the first PTT Review and was forced to undergo it a second time the following year, this time with her employment at stake.

**ANSWER:**   KU admits that "Overall Evaluations" section of Plaintiff's 2014-2015 Progress Toward Tenure Review Initial Evaluation Documents, under the category of "Teaching and Advising," has a box checked next to "Improvement required for continued progress toward tenure."   KU denies the remaining allegations in paragraph 150.

151.   The following year, the PTT Review (2015/16) Committee again praised Professor Joritz's Lotte Reiniger project:

> *"Over the last three years, Joritz has won research grants from the department of Film and Media Studies, the College , as well as the Office of International Programs to travel to various archives in Germany and Canada where she uncovered artifacts and photographs, and conducted interviews…Professor Joritz is an ideal researcher for this project given her extensive knowledge of the history of animation and the animator, her access to undiscovered documents about the animator, as well as her proficiency in the German language.*

**ANSWER:**   KU admits that the quote contained in this paragraph appears in her 2015-2016 Progress Toward Tenure Review Initial Evaluation Documents.   KU denies the remaining allegations in paragraph 151.

152.   Again, a Department Chair sabotaged Professor Joritz's PTT Review; this time it was Chair Baskett.   The only way to destroy Professor Joritz's stellar record and ensure her termination was to violate policies and fabricate lies about her research.   The Faculty Rights Board pointed directly to Professor Joritz's research when it determined the most obvious "inaccuracies" that were repeated up the University chain of command letters calling for Professor Joritz's termination:

DocID: 4847-9426-6004.2

*Also, the Dean and CCAPT's mistaken reliance on this inaccurate information should be taken into account when weighing their respective recommendations regarding Professor Joritz's research record.*

**ANSWER:**   KU admits that paragraph 152 accurately quotes a portion of the Faculty Review Board's letter to Dr. Gray-Little.  KU denies the remaining allegations in paragraph 152.

153.    In the University's "Notice of Non-Reappointment" letter to Professor Joritz, the Provost wrote, "*Even excluding consideration of the information in the Chair's letter, the Chancellor determined that your research record demonstrated insufficient progress toward tenure, warranting non-reappointment*."    However, the University offered no evidence to substantiate its determination.

**ANSWER:**   KU admits that paragraph 153 accurately quotes from a letter from Dr. Rosen to Plaintiff dated May 13, 2016.  KU denies the remaining allegations in paragraph 153.

154.    After receiving the letter, Professor Joritz requested from Provost Rosen per email "a more detailed response", inquiring "*2. How did my research record demonstrate insufficient progress toward tenure?*"   The Provost/University/Chancellor Gray-Little provided Professor Joritz no basis for its decision.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 154 and, therefore, denies them.

155.    It is likely that additional evidence relating to issues of disparate treatment will be obtained through discovery

**ANSWER:**   Denied.

### A.
### COUNT I– TITLE VII – Title 42 United States Code § 2000e-2
### DISCRIMINATION BASED ON NATIONAL ORIGIN

156.    Professor Joritz repeats and re-alleges paragraphs 1 through 155 by reference as though fully set forth herein.

DocID: 4847-9426-6004.2

**ANSWER:**    KU incorporates its responses to paragraphs 1 through 155 of Plaintiff's First Amended Petition as though fully set forth herein.

157.    The Code of Federal Regulations (CFR) is a valid authority, which recognizes national origin under Title VII claims, as does the Equal Employment Opportunity Commission (EEOC). Professor Joritz meets the CFR's definition of "national origin".  The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination includes the following (Professor Joritz's emphasis):

> *The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.*

**ANSWER:**    Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU admits that Plaintiff accurately quotes a portion of the relevant CFR but denies the CFR's definition of national origin discrimination is controlling.

158.    The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination also includes:

> *The Commission will examine with particular concern charges alleging that individuals within the jurisdiction of the Commission have been denied equal employment opportunity for reasons which are grounded in national origin considerations, such as...*
>
> (*b*)    *membership in, or association with an organization identified with or seeking to promote the interests of national origin groups; ...*

**ANSWER:**    Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU admits that Plaintiff accurately quotes a portion of the relevant CFR but denies the CFR's definition of national origin discrimination is controlling.

159.    It was well known to the University that Plaintiff was involved and associated with organizations that promoted German culture.

DocID: 4847-9426-6004.2

**ANSWER:**   Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU denies the allegations in paragraph 159.

[**_Unnumbered in original_**].   The University permitted hostile, anti-German student evaluation comments to remain in Professor Joritz's performance record permanently, thus tainting every performance evaluation that followed.

**ANSWER:**   Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU denies the allegations in the unnumbered paragraph.

160.   When Professor Joritz complained about anonymous, hostile, anti-German comments in her student evaluations, expressing her concerns about discrimination, the University refused to take her concerns seriously, refused to remove them and did nothing to prevent such discrimination from occurring in the future.

**ANSWER:**   Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU denies the allegations in paragraph 160.

161.   Professor Joritz became a "closet German" as a result, fearing that even talking about Germany could result in more anti-German sentiment and comments.

**ANSWER:**   Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU denies the allegations in paragraph 161.

162.   In an evaluation critical to her career at the University, Professor Joritz's German past was blamed for the negative student comments:  "_Some of these student observations may also be due to the fact that she taught extensively in Germany for many years before teaching at KU, and she has had some difficulty in adjusting her communicative and teaching skills to her teaching environment and culture._"   The University communicated to Professor Joritz that she was expected to change, i.e. improve her teaching skills and that students could do as they

DocID: 4847-9426-6004.2

wished, even when it meant discriminating against her for her word pronunciation, the fact that she spoke about Germany, and calling her the worst, most offensive insult you can call a German:  a Nazi and Nazi sympathizer.

**ANSWER:**   Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU denies the allegations in paragraph 162.

163.    Chair Baskett and Chair Stuart MacDonald lied about the conditions of Professor Joritz's German-related research in their efforts to halt her German-related research by having Professor Joritz fired.   Especially Professor Baskett also targeted Professor Joritz's German-related research in other ways.  In the toxic letter he wrote with the intent of sabotaging Professor Joritz's career, Chair Baskett falsely claimed that Professor Joritz was being denied access to archival materials by German "officials" he had never contacted.  He claimed that Professor Joritz had limited access to a collection of Lotte Reiniger's work in Canada (the subject of Joritz's research) when Professor Joritz had, in fact, through her research efforts, access to a vast treasure of materials, including documents, original art, films, audio recordings, articles and more that are unknown and unavailable to the rest of the world.  Chair Baskett, with the "help" of Chair Stuart MacDonald, who grew Chair Baskett's falsehoods into even larger, more grotesque falsehoods, purposely targeted Professor Joritz's German-related research ONLY.   They commented on none of her other research projects, such as animation productions-in-progress, digital collages, etc.

**ANSWER:**   Because the Court already dismissed Count I, a response is not required. To the extent a response is required, KU denies the allegations in paragraph 163.

164.    The University not only permitted the discriminatory, unethical targeting of Professor Joritz's research:  at every administrative level the targeting was not questioned but

instead supported.  Based on outrageously false statements and omissions of fact, the University

advocated for Professor Joritz's termination at every administrative level.

**ANSWER:**    Because the Court already dismissed Count I, a response is not required.

To the extent a response is required, KU denies the allegations in paragraph 164.

165.    As a result of Defendants' actions, Professor Joritz was wrongfully terminated

from her employment through contract non-renewal.

**ANSWER:**    Because the Court already dismissed Count I, a response is not required.

To the extent a response is required, KU denies the allegations in paragraph 165.

**B.**
**COUNT II – TITLE VII – Title 42 United States Code § 2000e-2**
**DISCRIMINATION BASED ON SEX/GENDER**

166.    Professor Joritz repeats and re-alleges paragraphs 1 through 165 by reference as

though fully set forth herein.

**ANSWER:**    KU incorporates its responses to paragraphs 1 through 165 of Plaintiff's

First Amended Petition as though fully set forth herein.

167.    The University wrongfully held Professor Joritz to a standard different than

similarly situated employees who were male.

**ANSWER:**    Denied.

168.    When Professor Joritz complained to her male Department Chair, Professor

Baskett, that a male professor, Matt Jacobson, had berated and acted aggressively toward

Professor Joritz at a meeting about her own performance evaluation, Chair Baskett did nothing to

address or investigate Professor Joritz's concerns.  Instead he used her complaint as an example

of a lack of "collegiality" in a letter kept secret from her, intended to sabotage her career.

Professor Joritz had informed Chair Baskett that the male professor had applied a harsher

"double standard" to her, that he did not apply to himself.  Professor Joritz further informed the

Chair that Professor Jacobson had shown Beginning Video Production students an excerpt from a notoriously misogynist film called "Clockwork Orange", while detailing the symbolism in the film that referred to male masturbation.  Professor Jacobson had berated Professor Joritz for showing in class a non-sexual, non-offensive film excerpt in which one of the adult characters said the word "rape", without giving students a "trigger-warning".  Yet Professor Jacobson gave his students no trigger warning when he screened an excerpt of a film about male masturbation and no trigger warning when he described the scene in detail.  Chair Baskett demonstrated a pro-male/anti-female bias by defending Professor Jacobson to the CCAPT Committee and every administrator up the chain of command, and by describing Professor Joritz's complaint as though she were malicious while omitting the context of her complaint:

> *On other occasions, the candidate has disparaged and impinged the reputation of PTTR Committee members in unsolicited emails to the Chair without producing credible evidence.*

**ANSWER:**   Denied.

169.    When Professor Joritz won a competitive, student-nominated advisor award, the University refused to recognize her in the School of Arts Social Media platform.  When a male faulty member from the School for the Arts won the same award the following year, he was not only recognized in in the School of Arts Social Media platform; he was promoted to full professor.  In further contrast, Professor Joritz was fired the year she won the award.

**ANSWER:**   Denied.

170.    When Chair Baskett threatened Professor Joritz in her office, he displayed a bullying, aggressive, anti-female bias.  He does not display this type of behavior toward men.

**ANSWER:**   Denied.

171.    The fact that not a single complaint of discrimination that Professor Joritz made was taken seriously or investigated by the University is itself an indication of discrimination.

DocID: 4847-9426-6004.2

**ANSWER:**     Denied.

172.     As a result of the University's actions, Professor Joritz was wrongfully terminated from her employment through contract non-renewal.

**ANSWER:**     Denied.

**C.**
**COUNT III – TITLE VII – RETALIATION**

173.     Professor Joritz repeats and re-alleges paragraphs 1 through 172 by reference as though fully set forth herein.

**ANSWER:**     KU incorporates its responses to paragraphs 1 through 172 of Plaintiff's First Amended Petition as though fully set forth herein.

174.     The University discriminated against Professor Joritz because she opposed illegal practices and complained about discrimination based on national origin and sex/gender.

**ANSWER:**     Denied.

175.     As a result of the University's actions, Professor Joritz was wrongfully terminated from her employment through contract non-renewal.

**ANSWER:**     Denied.

176.     The Courts recognize that engaging in the protected activity of reporting discrimination and/or seeking to end or remedy discriminatory practices may result in retaliation, a violation of Title VII. § 2000e-3(a) *et seq.*:

> *It is well-settled that retaliatory conduct is within the broad prohibition of "discrimination" made unlawful by Title IX.   Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).*[3]

---

[3] *Tackett v. University of Kansas*, 234 F. Supp. 3d 1100 - Dist. Court, D. Kansas 2017
https://scholar.google.com/scholar_case?case=12102632485922536080&q=Tackett+v.+University+of+Kansas+&hl=en&as_sdt=2006

DocID: 4847-9426-6004.2

**ANSWER:**     KU admits that Plaintiff correctly quotes a portion of the Supreme Court decision referenced.  To the extent any further response is required, KU denies the remaining allegations in paragraph 176.

177.    The criteria for establishing a prima facie case for retaliation is clear:

*In order to establish a prima facie case of retaliation, Mr. Proctor must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.  "Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir.2006) (citing Burlington N. & Santa Fe Ry. Co. v. White, U.S., 126 S. Ct. 2405, 2414-1 5, 165 L.Ed.2d 345 (2006)).[4][4]*

**ANSWER:**     KU admits that Plaintiff correctly quotes a portion of the Tenth Circuit decision referenced.  To the extent any further response is required, KU denies the remaining allegations in paragraph 177.

178.    Professor Joritz repeatedly engaged in protected opposition to discrimination by reporting illegal discrimination practices directed against her to multiple University employees, including, but not limited to:  Joshua Jones (University's Office of Institutional Opportunity and Access, December 2015), Film & Media Studies Department Chair Tamara Falicov (12.18.14 and prior), Film & Media Studies Department Chair Michael Baskett, Associate Dean of the College of Liberal Arts/Director of the School of the Arts Henry Bial (on 12.18.14 and 04.02.16), members of the Film & Media Studies faculty evaluation committee:  Professor Catherine Preston, Professor Kevin Wilmott and Professor Matt Jacobson (7/16/2015), Dean Lejuez (3/24/16), Chancellor Gray-Little, Shane McCreery, Director/Title IX Coordinator of the Office of Institutional Opportunity & Access (IOA) (multiple times), and Jennifer Ananda, Deputy Title IX Coordinator of the Office of Institutional Opportunity & Access (IOA) (multiple

---

[4] *Proctor v. United Parcel Service*, 502 F. 3d 1200 - Court of Appeals, 10th Circuit 2007
https://scholar.google.com/scholar_case?case=11127325474211562443&q=Proctor+v+United+Parcel+Services+&hl=en&as_sdt=2006

times).  After being repeatedly turned away without results and also retaliated against, Professor

Joritz filed charges with the EEOC (August 13, 2016) and Kansas Human Right Commission.

All this fulfills the first criteria.

**ANSWER:**    KU admits that Plaintiff filed charges of discrimination with the EEOC

and Kansas Human Rights Commission.  KU denies the remaining allegations in paragraph 178.

179.    Several of the persons listed above were University administrators, who held

influence and power over Professor Joritz's continued employment.  Department Chair Tamara

Falicov, Department Chair Michael Baskett, Dean Lejuez, Chancellor Gray-Little and initially

Henry Bial, all failed to report Professor Joritz's complaints of discrimination to the IOA, as was

required by University policy.  None of these University administrators took action to address or

prevent the discrimination Professor Joritz reported, even though Professor Joritz had provided

the Dean and Chancellor with effective ideas for doing so.  Instead, they all facilitated and

approved Professor Joritz's non-reappointment/termination of her employment.

**ANSWER:**    KU admits that some of the persons Plaintiff identifies in paragraph 178

are (or were) administrators of KU.  KU denies the remaining allegations in paragraph 179.

180.    The Courts recognize a materially adverse employment action as one that changes

"the terms and conditions" of employment.  *Yon Gunten v. Maryland, 2 43 F. 3d 858, 866 (CA4*

*2001);* see *Robinson v. Pittsburgh, 120 F. 3d 1286, 1300 (CA3 1997)*. Because termination of

employment constitutes a materially adverse employment action, which any reasonable

employee would recognize, criteria No. 2 is met.

**ANSWER:**    KU admits that Plaintiff accurately quotes a portion of the Fourth Circuit

case referenced.   To the extent a further response is required, KU denies the remaining

allegations in paragraph 180.

DocID: 4847-9426-6004.2

181.     Establishing a causal connection is the third criteria and can be satisfied by demonstrating a temporal relationship between Professor Joritz's engagement in protected activity and the materially adverse, i.e retaliatory, employment actions she suffered.  Although case law differs on the amount of temporal proximity necessary to establish a probable causal connection, the following examples are more than sufficient to establish causation:

**ANSWER:**     KU admits that, in order to establish a *prima facie* case of retaliation, Plaintiff will have to prove a causal connection between legally protected activity and alleged retaliatory acts.  KU denies the remaining allegations in paragraph 181.

### EXAMPLE 1:  CHAIR BASKETT'S RECOMMENDATION FOR PROFESSOR JORITZ'S NON-REAPPOINTMENT

182.     Summary:  On **10.22.15** Professor Joritz brought up the issue of discrimination based on country of origin during a personal meeting with Chair Baskett.

**ANSWER:**     KU admits that Plaintiff brought up the issue of what she called "discrimination" based on country of origin with Dr. Baskett.  KU denies that Plaintiff suffered any discrimination and further denies that she had a good faith basis to believe she suffered any discrimination.   KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 182, and, therefore, denies them.

183.     **January 2016**:   Chair Baskett delayed and bumbled Professor Joritz's PTT Review process, which was vitiated with his procedural violations that began immediately. Chair Baskett began the process late (January 2016; all documents, meetings, review of materials, etc. were to be completed by February 5, 2016), making the process on which Professor Joritz's career depended, extremely rushed.   Professor Joritz had to fight for the adherence to policies/procedures every step of the way.

**ANSWER:**     Denied.

67

DocID: 4847-9426-6004.2

184.    On 1.04.16 Professor Joritz requested, via email, that Chair Baskett remove Professor Matt Jacobson from the PTTR committee.   Professor Joritz cited a "disturbing" "double standard" (i.e. disparate treatment):

> *I feel he has shown hostility and a double standard toward me that is disturbing.*
>
> *One example:   I had mentioned to the FEC (Faculty Evaluation Committee) members last summer that some of the student evaluation comments for FMS 275 contained outright lies.   My example was the following comment:   "To show "dialogue" she (Professor Joritz) had to show a scene about rape WITHOUT any sort of warning.   "(This scene, btw, comes from the book "Master Shots Vol 2: Shooting Great Dialogue Scenes" by Christopher Kenworthy.)*
>
> *I explained that the scene was not "about rape" but rather about the love a mother had for her son, who had been the product of a rape.   Matt immediately admonished me, raising his voice (almost yelling), stating that the student did not lie, reminding me of how important trigger warnings are and how we, as faculty, have a responsibility to make sure we announce potential triggers...*
>
> *When Matt, however, showed students a misogynist excerpt from Clockwork Orange in FMS 275, he gave students no trigger warning whatsoever.   He explained in detail to students the symbolism in the clip that referred to (male) masturbation, he spoke about the notoriety of Clockwork Orange and highly encouraged students to watch the entire film on their own.   No trigger warning.*

**ANSWER:**   KU admits that Plaintiff accurately quotes a portion of an email that she sent to Dr. Baskett and that she requested Dr. Jacobson be removed from the PTTR committee. KU denies the remaining allegations in paragraph 184.

185.    In the same email, Professor Joritz also mentioned how Professor Jacobson had cited her German past as being detrimental to her teaching ability in the previous year's PTT Review:

> *Matt authored the PTTR narrative about my teaching and focused heavily on my student evaluations, putting them, in my opinion, in the worst light possible.   He seemed to conclude that my "German past" was the problem:   "Some of these student observations may also be due to the fact that she taught extensively in Germany for many years before teaching at KU, and she has had some difficulty in adjusting her communicative and teaching skills to her new teaching environment and culture."*

**ANSWER:**     KU admits that Plaintiff correctly quotes a portion of an email that she sent.  KU denies the remaining allegations in paragraph 185.

186.     Professor Joritz went on to describe how Professor Jacobson had ignored her positive departmental contributions in the same, important PTTR and how Professor Jacobson had purposely included inaccurate, detrimental information in her PTTR, acted inappropriately and misadvised her.

**ANSWER:**     Denied.

187.     Professor Joritz's request was stonewalled by Chair Baskett for weeks, despite the fast approaching deadline.  On **01.19.16** Chair Baskett finally informed Professor Joritz who the PTTR committee members were.  They did not include Professor Jacobson.  Chair Baskett then violated PTTR procedures by not appointing enough members to the committee.  Professor Joritz brought this to Chair Baskett's attention to no avail.  He refused to appoint another committee member.

**ANSWER:**     Denied.

188.     On **01.11.16**, Chair Baskett informed Professor Joritz via email that she was not to communicate with other PTTR committee members, stipulating that the only communication, including feedback, would occur exclusively through himself and his assistant, Sara Sahin.  This isolated Professor Joritz from the very faculty members who should have served as her strongest advocates and it violated Professor Joritz's constitutional rights to due process, freedom of speech and freedom of association.  It also enabled the Chair to manipulate the evaluation process by controlling all communication between Professor Joritz and the committee members, with no one present to participate in or hear their conversations.

**ANSWER:**     Denied.

DocID: 4847-9426-6004.2

189.    On **01.25.16**, Professor Joritz reported policy violations committed by Chair Baskett, former Chair, Tamara Falicov, and Professor Matthew Jacobson to interim Dean Don Steeples and Henry Bial, who was, at the time, Associate Dean of the College of Liberal Arts and Director of the School of the Arts.  One violation was corrected as a result of that meeting.

**ANSWER:**   KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 189 and, therefore, denies them.

190.    On **01.26.16** Chair Baskett threatened Professor Joritz in her office, telling her, "You're not doing yourself a favor by making the department look (bad)."  Professor Baskett stood directly in front of Professor Joritz when he said this, intimidating her both physically and psychologically.  Note:  Professor Joritz is less than 5 feet tall.  Also, she was utterly dependent on her Chair for feedback, as he had stipulated she not speak with anyone else on the committee. Months later, in an affidavit signed by Chair Baskett on April 28, 2016, he claimed, "*I do not recall ever telling Assistant Professor Joritz that "You're not doing yourself any favors by making the department look bad*"...and went on to blame Professor Joritz for "*her efforts to manipulate the process...*"

**ANSWER:**   Denied.

191.    On **02.05.16**, Chair Baskett sabatoged *[misspelled in original]* Professor Joritz's otherwise positive PTT Review by writing a toxic evaluation letter (EXHIBIT K), which he inserted into Professor Joritz's PTT Review dossier without her knowledge, leaving Professor Joritz with the impression she had seen her entire dossier before it was forwarded to the next committee.  Chair Baskett included extreme, defamatory statements about Professor Joritz's "behavior" and outright lies about Professor Joritz's German-related research.  Chair Baskett's letter included discriminatory speculation about Professor Joritz's ability to complete her book

DocID: 4847-9426-6004.2

on Lotte Reiniger (targeting again, her German-related research), while ignoring Professor Joritz's many research-related achievements, international recognition while at the University and Professor Joritz's other research projects.

**ANSWER:**   Denied.

192.   Professor Joritz became aware of Chair Baskett's letter only months later, when she read references to it in subsequent non-reappointment letters.   Despite Professor Joritz's repeated requests, Chair Baskett. [*Incorrect punctuation in original*], Dean Lejuez, Henry Bial and other University administrators refused to provide Professor Joritz access to his letter, making it impossible for Professor Joritz to know of its contents, refute or respond to it.   This too, was retaliation, as denying Professor Joritz access to Chair Baskett's letter denied Professor Joritz due process.   Professor Joritz could not even hope for remedy by filing for example, a grievance, before the letter made its way up the University's administrative chain of command, where it garnered "recommendations for non-reappointment" from each administrator, who read it and facilitated Professor Joritz's termination.   Without access to the letter, it was also impossible for Professor Joritz to file an EEOC complaint based its content.

**ANSWER:**   Denied.

193.   When Professor Joritz finally received a copy of Chair Baskett's letter on **April 30, 2016, two weeks prior to being informed of the Chancellor's decision to terminate her employment**, Professor Joritz was able to see how Chair Baskett described her request to have Professor Jacobson recused from the PTTR committee:

> *On other occasions, the candidate has disparaged and impinged the reputation of PTTR Committee members in unsolicited emails to the Chair without producing credible evidence.*

**ANSWER:**   KU admits that Plaintiff correctly quotes a portion of a letter signed by Dr. Baskett.   KU denies the remaining allegations in paragraph 193.

DocID: 4847-9426-6004.2

194.   Not only had Chair Baskett refused to take Professor Joritz's allegations of discrimination seriously; he weaponized her allegations by disparaging her in his letter for even reporting them to him, labeling them as "unsolicited".   Professor Baskett used the fact that Professor Joritz called the discriminatory behavior of a male colleague to his attention as means to  discredit Professor Joritz in an evaluation on which her career depended.   Baskett described Professor Joritz's action as a "lack of collegial behavior" and an example of "a larger pattern of inappropriate behavior" in his letter written with the intent in order to have Professor Joritz fired.

**ANSWER:**   KU admits that Dr. Baskett referenced Plaintiff's "lack of collegial behavior" and a "larger pattern of inappropriate behavior."  KU denies the remaining allegations in paragraph 194.

### EXAMPLE 2:  DEAN'S RECOMMENDATION FOR PROFESSOR JORITZ'S NON-REAPPOINTMENT

195.   Summary:  On **03.16.16**, Professor Joritz emailed Dean Lejuez the news that her animated short "*Zapf Dingbats - A Tribute to Hermann Zapf*" had been accepted to the "62. Internationalen Kurzfilmtagen Oberhausen" (62nd International Short Film Festival Oberhausen, Germany), one of the most prestigious short film festivals in the world.   She informed him that the acceptance to this renowned festival counted as a "major peer-reviewed (research) accomplishment".

**ANSWER:**   Admitted.

196.   On **03.16.16** Dean Lejuez congratulated Professor Joritz for her accomplishment via email.

**ANSWER:**   KU admits that Dr. Lejuez acknowledged Plaintiff's email.  KU denies the remaining allegations in paragraph 196.

72

197.     On **03.24.16**, Professor Joritz met with the Dean of Liberal Arts, Carl Lejuez, informing him of the many PTTR procedural violations that occurred in both 2015 and 2016, which detrimentally affected the outcome of the evaluation process.  She also related to him that she felt she had been discriminated against, and her fears of retaliation by faculty and administrators for implicating them in the procedural violations she had reported.

**ANSWER:**     KU admits that Plaintiff met with Dr. Lejuez and reported several complaints about her PTTR process.  KU denies the remaining allegations in paragraph 197 and specifically denies that any of Plaintiff's complaints were valid.

198.     That same day, **03.24.16**, Professor Joritz wrote a follow-up letter to Dean Lejuez, specifically reiterating concerns she had raised during their meeting, including additional concerns *[period missing in original]*.  These included, among other issues, discrimination by both students and faculty based on her country of origin and ideas she had proposed to Dean Lejuez that "would increase (students') awareness of federal laws regarding discrimination and better prepare them for future employment."

**ANSWER:**     KU is without sufficient knowledge or information to admit or deny the allegations in paragraph 198, and, therefore, denies them.

199.     On **04.07.16**, the Chair of the College Committee on Appointments, Promotion & Tenure (CCAPT), Dr. Stuart Macdonald, sent a letter to Dean Lejuez, recommending Professor Joritz's termination.  Dr. Stuart Macdonald claimed to base the committee's findings "*on the letter CCAPT received from Professor Michael Baskett*", yet Dr. Macdonald's letter inexplicably "grew" Chair Baskett's bizarrely inaccurate statements about the Professor Joritz's research conditions to a new, even more disturbing level:  Chair Baskett had fabricated the claim that "her (Professor Joritz) access to the private collection of [INDIVIDUAL PERSON'S NAME

DocID: 4847-9426-6004.2

REDACTED] *in Canada is becoming limited due to his declining mental and physical condition*" morphed into Dr. Macdonald's/the CCAPT's statement, "*...potential interviewees are lapsing into senility and ill health.*"  (*see* EXHIBIT G)

**ANSWER:**   KU admits that Dr. Macdonald recommended Plaintiff's non-reappointment and that Plaintiff correctly quotes portions of Dr. Macdonald's letter.  KU denies the remaining allegations in paragraph 199.

200.   Just how did the reference to an individual person with an allegedly declining condition morph into a group of persons, who were all "*lapsing into senility and ill health*" occur?  Rachel Rolf, Associate General Counsel for the University, in her written response to Professor Joritz's appeal, confirmed that Dean Lejuez – not a member of the CCAPT committee – violated University *Bylaws of the College Assembly in the College of Liberal Arts and Sciences* by impermissibly inserting himself into the CCAPT committee review process.  As stipulated by University policy, the CCAPT evaluation should conduct its evaluations impartially and independent of the Dean.   The University Bylaws confirm this independent, tiered process (Professor Joritz's emphasis):

> *3.     The College Committee on Appointments, Promotions and Tenure (CCAPT) shall:*
>
> *b.     Address itself to matters of policy pertaining to faculty rank and status and <u>report its recommendations to the Dean</u>.*

**ANSWER:**   Denied.

201.   Attorney Rolf revealed that Dean Lejuez – who was not a member of the committee –purposely and with full knowledge, directed the focus of the CCAPT faculty members when they evaluated Professor Joritz:

> "*When Professor Joritz's record was discussed in CCAPT, Dean Carl Lejuez encouraged CCAPT to focus on Professor Joritz's existing record and*

DocID: 4847-9426-6004.2

*documented evidence of progress towards completion of her book. CCAPT followed that direction."*

Dean Lejuez violated University policy with the intent of having Professor Joritz fired.

**ANSWER:**    Denied.

202.    **Two weeks after Dean Lejuez's meeting with Professor Joritz and one day after receiving his "ammunition" via Dr. Stuart McDonald's CCAPT letter**, Dean Carl Lejuez informed Professor Joritz, in a letter dated **on 04.08.16**, that he was "recommending your non-reappointment to the Provost" (EXHIBIT L). Carl Lejuez informed Professor Joritz that he had based his decision on the "assessment of your record by CCAPT", the very "assessment" HE had improperly influenced.

**ANSWER:**    KU admits that Dr. Lejuez recommended Plaintiff not be reappointed and that such recommendation was reported to the Provost and was based in part on the assessment of the CCAPT. KU denies the remaining allegations in paragraph 202.

203.    In his letter, Dean Lejuez tellingly referred to Professor Joritz's reports of discrimination:

*It is notable that during the PTTR process, you raised a number of concerns with me (and several others), including that prejudicial statements were included in the departmental review.*

**ANSWER:**    KU admits that Plaintiff accurately quotes a sentence from Dr. Lejuez's letter. KU denies the remaining allegations in paragraph 203.

### EXAMPLE 3:  CHANCELLOR GRAY-LITTLE'S RECOMMENDATION FOR PROFESSOR JORITZ'S NON-REAPPOINTMENT

204.    On **04.13.16** Professor Joritz requested a meeting with Provost Sara Rosen so she could inform the Provost of the discrimination and malfeasance she had been facing during the PTT Review(s). Vice Provost Mary Lee Hummert emailed Professor Joritz, chastising her for attempting to meet with the Provost: "*...it is not appropriate for her to talk with you while she is*

DocID: 4847-9426-6004.2

*reviewing the PTTR recommendation.*", denying Professor Joritz her constitutional Freedoms of Speech, Association, and due process, violating University policy, contributing to Professor Joritz's hostile work environment and facilitating Professor Joritz's termination.  Six hours after Professor Joritz's inquiry, she received a letter via email from Provost Rosen informing her of the Provost's recommendation for her termination.  In her letter, the Provost repeated the allegations about Professor Joritz's "behavior", which had originated in Chair Baskett's letter and were repeated "up the administrative chain" without question or proof.

**ANSWER:**   KU admits that Plaintiff attempted to meet with Dr. Rosen and that such request was noted by Dr. Hummert as being inappropriate.  KU further admits that Dr. Rosen's letter to Plaintiff referred to Dr. Lejuez's statement regarding Plaintiff's inappropriate behavior. KU denies the remaining allegations in paragraph 204.

205.    On **04.14.16** Chancellor Gray-Little spontaneously agreed to meet with Professor Joritz in Chancellor Gray-Little's office.  The Chancellor explained to Professor Joritz that, while she was not permitted to discuss Professor Joritz's evaluation, she would listen to her for 15 minutes.   Professor Joritz related to the Chancellor that she had suffered procedural violations, discrimination and had been denied due process.  Professor Joritz also informed the Chancellor that she would be reading things about Professor Joritz in an extremely detrimental evaluation letter written by Joritz's Chair, but kept secret from Professor Joritz, which were untrue.  Professor Joritz also informed the Chancellor that she would be reading that her research was insufficient, but that her film "A Tribute to Hermann Zapf" had just been accepted to a major international film festival in Germany, and that she had been awarded the *Hall Center for Humanities Creative Fellowship* for her research, both of which Dean Lejuez was aware of. Professor Joritz explained to the Chancellor that she had three films that would soon be finished,

DocID: 4847-9426-6004.2

i.e. prior to a tenure review.  The Chancellor listened and advised Professor Joritz to make sure that those in the administrative chain were informed about what Professor Joritz had related to her.  Professor Joritz assured the Chancellor that they were …

**ANSWER:**   KU admits that Dr. Gray-Little met with her and Plaintiff raised some concerns.  KU denies the remaining allegations in paragraph 205 and specifically denies that Plaintiff's concerns had merit.

206.    Professor Joritz finished her meeting with the Chancellor by explaining in detail how students were abusing the faculty evaluation process to write discriminatory comments in the student evaluations, and how that abuse became a permanent part of faculty records, as occurred in Professor Joritz's case.   Professor Joritz also offered a solution to ending discriminatory comments in student evaluations, which could be based on EEOC standards.  The Chancellor again informed Professor Joritz that she (the Chancellor) could not comment.

**ANSWER:**   Denied.

207.    On **04.26.16** Professor Joritz submitted an appeal to the Faculty Rights Board, listing the PTTR and other policy violations, as well as denial of due processes, which were causing her employment to be terminated at the University.

**ANSWER:**   KU admits that Plaintiff filed an appeal with the Faculty Rights Board and claimed to identify procedural violations and denial of due process.  KU denies the remaining allegations in paragraph 207.

208.    On **04.30.16** the University's counsel sent its response to Professor Joritz's appeal to the Faculty Rights Board, providing Professor Joritz with a copy and exhibits.  Only then, **a mere two weeks before Professor Joritz would receive her letter of non-reappointment,** did

DocID: 4847-9426-6004.2

Professor Joritz finally receive the documents she had been requesting for months, including Professor Baskett's PTTR letter.

**ANSWER:**   KU admits that its counsel submitted a response to Plaintiff's appeal on April 30, 2016.  KU denies the remaining allegations in paragraph 208.

209.   On a date unknown to Professor Joritz, the University's Faculty Rights Board (FRB) met and made their determinations.  The FRB did not communicate with Professor Joritz or provide Professor Joritz with a hearing.  However, on **05.11.16** the FRB sent a letter with their findings to the Chancellor Gray-Little on Professor Joritz's behalf (*see* EXHIBIT F):

> *FRB finds that the Department chair for Film & Media Studies, the College Committee on Appointments, Promotion, and Tenure (CCAPT), and the Dean of CLAS relied on factually inaccurate information in their review of Professor Joritz's progress toward tenure.  We believe this inaccurate information should not be relied upon in your deliberations so that Professor Joritz's rights in the PTTR process are adequately protected...*

**ANSWER:**   KU admits that the Faculty Rights Board met and determined Plaintiff's appeal.  KU further admits that the Faculty Rights Board sent a letter to Dr. Gray-Little on May 11, 2016, and that Plaintiff accurately quotes a portion of that letter.  KU denies the remaining allegations in paragraph 209.

210.   The Faculty Rights Board specifically called the Chancellor's attention to the false statements written by Professor Baskett and Stuart MacDonald, related to Professor Joritz's German-related research:

> *In Department Chair Baskett's letter to CCAPT, he stated that multiple obstacles existed which would prevent Professor Joritz from completing her proposed book on Lotte Reiniger.  He stated (1) officials at the Stadtmuseum in Tubingen, Germany have denied Professor Joritz access to an archive of materials necessary to the completion of the project, and (2) potential interviewees for the project were "lapsing into senility and ill health."  These statements were then repeated in CCPAT's recommendation and likely influenced Dean Lejuez's conclusion that the status of Professor Joritz's proposed book on Lotte Reiniger was unclear.*

78

> *FRB finds that these specific statements ((1) and (2) above) were not correct: Professor Joritz has access to the necessary archive, and she has been able to tape discussions with a healthy 83-year-old interviewee.  Because the statements were inaccurate, FRB recommends that they be disregarded in your independent judgment of the record.  Also, the Dean and CCAPT's mistaken reliance on this inaccurate information should be taken into account when weighing their respective recommendations regarding Professor Joritz's research record.*

**ANSWER:**   KU admits that paragraph 210 accurately quotes a portion of the Faculty Review Board's letter to Dr. Gray-Little.  KU denies the remaining allegations in paragraph 210.

211.    It should be noted that the FRB did not notice the discrepancy between Chair Baskett's letter and the letter written by Stuart MacDonald.  Thus they missed the fact that Stuart MacDonald, Chair of the CCAPT Committee, had "grown" Baskett's lies into even greater ones.

**ANSWER:**   Denied.

212.    The Faculty Rights Board did notice other policy violations committed by Chair Baskett and called the Chancellor's attention to them:

> *Additionally, we note tht (sic) it does not appear that Department Chair Baskett met with Professor Joritz to discuss CCAPT's evaluation as contemplated by the policy on Progress Toward Tenure Review for the College of Liberal Arts & Sciences.*

**ANSWER:**   KU admits that paragraph 212 accurately quotes a portion of the Faculty Review Board's letter.  KU denies the remaining allegations in paragraph 212.

213.    The FRB further noticed policy violations committed by both Department Chair Falicov and Department Chair Baskett during Professor Joritz's two PTT Reviews, calling the Chancellor's attention to those as well:

> *Finally, FRB notes that in both years of Professor Joritz's pre-tenure reviews, the previous and current department chairs signed both as chair of the Faculty evaluation Committee and as Department Chair…Especially in cases where the department chair does not concur with the committee evaluation, this dual chair role suggests a lack of independent judgment of the candidate's record.*

DocID: 4847-9426-6004.2

**ANSWER:**   KU admits that paragraph 213 accurately quotes a portion of the Faculty Review Board's letter to Dr. Gray-Little.  KU denies the remaining allegations in paragraph 213.

214.   Despite the FRB's letter, which showed that the attacks on Professor Joritz's research by Chair Baskett, the CCCAPT, Dean Lejuez and Provost Rosen were unfounded, <u>on **05.13.16**, slightly less than one month after the Chancellor's meeting with Professor Joritz, the University emailed Professor Joritz a "Notice of Non-Reappointment" letter signed by Interim Provost Sara T. Rosen informing Professor Joritz that her appointment for the 2016-2017 academic year will be a terminal appointment.</u>  This letter served as notice of "*a final agency action by the University of Kansas.*"  (*see* EXHIBIT J).

**ANSWER:**   KU admits that Dr. Rosen sent Plaintiff a notice of non-reappointment on May 13, 2016 and that the letter served as a final agency action.  KU denies the remaining allegations in paragraph 214.

### D.
### COUNT IV– TITLE VII – HOSTILE WORK ENVIRONMENT

215.   Professor Joritz repeats and re-alleges paragraphs 1 through 214 by reference as though fully set forth herein.

**ANSWER:**   KU incorporates its responses to paragraphs 1 through 214 of Plaintiff's First Amended Petition as though fully set forth herein.

[*Unnumbered in original*].   Professor Joritz is a "person" within the meaning of Title VII.

**ANSWER:**   Admitted.

[*Unnumbered in original*].   The University is an "employer" within the meaning of Title VII.

**ANSWER:**   Admitted.

DocID: 4847-9426-6004.2

216.     The University created and permitted a work environment hostile to Professor Joritz including, but not limited to, the following:

**ANSWER:**     Denied.

217.     The University impermissibly applied different, harsher standards to Professor Joritz than to similarly situated employee in order to get Professor Joritz fired.

**ANSWER:**     Denied.

218.     The University repeatedly violated policies in order to humiliate Professor Joritz and get Professor Joritz fired.

**ANSWER:**     Denied.

219.     The University fabricated performance demands that were not in Professor Joritz's contract, her position description or in University policies in order to humiliate Professor Joritz and get Professor Joritz fired.

**ANSWER:**     Denied.

220.     The University repeatedly refused to grant Professor Joritz a Research Intensive Semester, applying a different standard than other similarly situated employees and in direct detriment to Professor Joritz's research.   These denials also facilitated Professor Joritz's termination.

**ANSWER:**     Denied.

221.     The University isolated Professor Joritz from her colleagues at a time when she needed their feedback and advice, and at a time that was crucial to her colleagues' understanding of her work, thus humiliating Professor Joritz and facilitating Professor Joritz's termination of employment.

**ANSWER:**     Denied.

DocID: 4847-9426-6004.2

222.    The University fabricated allegations about Professor Joritz's "behavior" in violation of University policy in a punitive manner in order to get Professor Joritz fired.

**ANSWER:**    Denied.

223.    The University fabricated allegations about Professor Joritz's research in violation of University policy in order to get Professor Joritz fired.

**ANSWER:**    Denied.

224.    The University stonewalled Professor Joritz's requests for documents she was entitled to have according to University policy, and in general stonewalled her emails when she requested that issues of concern she had raised be addressed.  The denial of documents facilitated Professor Joritz's termination.

**ANSWER:**    Denied.

225.    The University refused to report Professor Joritz's allegations of discrimination, distorted Professor Joritz's allegations of discrimination and refused to investigate them.

**ANSWER:**    Denied.

226.    The University ignored and/or downplayed Professor Joritz's research achievements to create the pretext of "insufficient research" in order to get Professor Joritz fired.

**ANSWER:**    Denied.

227.    The University constantly denied Professor Joritz due process, in violation of University policies and the US Constitution, in order to get Professor Joritz fired.

**ANSWER:**    Denied.

228.    As a result of the University's actions, Professor Joritz was wrongfully terminated form her employment through contract non-renewal.

**ANSWER:**    Denied.

DocID: 4847-9426-6004.2

**E.**
**COUNT V– TITLE VII – WRONGFUL TERMINATION**

229.    Professor Joritz repeats and re-alleges paragraphs 1 through 228 by reference as though fully set forth herein.

**ANSWER:**   KU incorporates its responses to paragraphs 1 through 228 of Plaintiff's First Amended Petition as though fully set forth herein.

230.    This Complaint includes a plethora of direct evidence that proves wrongful termination.  To establish a prima facie case of wrongful termination under Title VII based on indirect evidence, an employee bears the initial burden of showing that:  (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; (4) the job was not eliminated after her discharge.

**ANSWER:**   Denied.

231.    These criteria are proven as follows:

(1.)    Professor Joritz is a member of the protected class of females.  Further, Professor Joritz cites the Code of Federal Regulations (CFR) as the valid authority, which recognizes national origin under Title VII claims, as does the Equal Employment Opportunity Commission (EEOC). Professor Joritz meets the CFR's definition of "national origin".  The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination includes the following (Professor Joritz's emphasis):

> ***The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's,*** *or his* ***or her ancestor's, place of origin; or because an individual has the*** *physical* ***, cultural or linguistic characteristics of a national origin group.***

**ANSWER:**   KU admits that Plaintiff is female and that she accurately quotes a portion of the cited CFR.  KU denies the remaining allegations in paragraph 231.

DocID: 4847-9426-6004.2

232.    The Code of Federal Regulations' (29 CFR 1606.1) definition of national origin discrimination also includes:

> ***The Commission will examine with particular concern charges alleging that individuals within the jurisdiction of the Commission have been denied equal employment opportunity for reasons which are grounded in national origin considerations, such as...***
>
> ***(b)    membership in, or association with an organization identified with or seeking to promote the interests of national origin groups; ...***

**ANSWER:**    KU admits that Plaintiff accurately quotes a portion of the cited CFR.  KU denies the remaining allegations in paragraph 232.

233.    It was well known to the University that Plaintiff was involved with organizations that promoted German culture (see pp. 3-4, Nos. 8–10).

(2.)    It was undisputed that Professor Joritz was very qualified for her job.  (see pp  3-4)

(3.)    Professor Joritz received her letter of non-reappointment on May 13, 2016 (*see* p. 26).

(4.)    After Professor Joritz was terminated by the University, the University hired a less qualified male, Jeff Calvert, to teach animation in the Film & Media Studies Department.

**ANSWER:**    KU admits that Plaintiff received her notice of non-reappointment on May 13, 2016.  KU denies the remaining allegations in paragraph 233.

### F.
### COUNT VII – US CONSTITUTION, 1st, 5th AND 14th AMENDMENTS

234.    Professor Joritz repeats and re-alleges paragraphs 1 through 233 by reference as though fully set forth herein.

**ANSWER:**    Because Count VII is not directed at KU, a response is not required.  To the extent a response is required, KU incorporates its responses to paragraphs 1 through 233 of Plaintiff's First Amended Petition as though fully set forth herein.

DocID: 4847-9426-6004.2

235.    Defendants denied Professor Joritz due process throughout her evaluations and at other times, as described but not limited to the allegations included in this Complaint, in order to humiliate Professor Joritz and get her fired.

**ANSWER:**    Because Count VII is not directed at KU, a response is not required.  To the extent a response is required, KU denies the allegations in paragraph 235.

236.    Defendants Chair Baskett and the University denied Professor Joritz the right to speak with other faculty members during her 2015/16 Progress Toward Tenure Review.

**ANSWER:**    Because Count VII is not directed at KU, a response is not required.  To the extent a response is required, KU denies the allegations in paragraph 236.

237.    Defendants effectively halted Professor Joritz from objecting to illegal practices by firing her.

**ANSWER:**    Because Count VII is not directed at KU, a response is not required.  To the extent a response is required, KU denies the allegations in paragraph 237.

### G.
### COUNT VI – KANSAS COMMON LAW BREACH OF CONTRACT

238.    Professor Joritz repeats and re-alleges paragraphs 1 through 237 by reference as though fully set forth herein.

**ANSWER:**    Because the Court has already dismissed Count VI for breach of contract, no response is required.  To the extent a response is required, KU incorporates its responses to paragraphs 1 through 237 of Plaintiff's First Amended Petition as though fully set forth herein.

239.    Professor Joritz entered into an employment contract with the University.

**ANSWER:**    Because the Court has already dismissed Count VI for breach of contract, no response is required.  To the extent a response is required, KU admits that Plaintiff had an employment contract with KU, subject to the terms and conditions specified in her notice of

DocID: 4847-9426-6004.2

appointment and the various Board of Regents and KU policies and procedures that applied to her employment.

240.     University policies became part of Professor Joritz's employment contract under Kansas law.  Professor Joritz had a contractual interest in the proper execution of all University policies.

**ANSWER:**     Because the Court has already dismissed Count VI for breach of contract, no response is required.  To the extent a further response is required, KU admits that Plaintiff was subject to various KU policies as part of her employment.  To the extent a further response is required, KU denies the allegations in paragraph 240.

241.     Under the terms of the contract, certain criteria were established as the basis for evaluating Professor Joritz's job performance.

**ANSWER:**     Because the Court has already dismissed Count VI for breach of contract, no response is required. KU admits that Plaintiff was evaluated based on certain specified criteria.  KU denies the remaining allegations in paragraph 241.

242.     Professor Joritz's had a contractual interest in the proper execution of performance evaluation proceedings as laid out by the University, free from arbitrary and capricious determinations.

**ANSWER:**     Because the Court has already dismissed Count VI for breach of contract, no response is required.  To the extent a response is required, KU denies the allegations in paragraph 242.

243.     Professor Joritz was impermissibly evaluated upon criteria outside the scope designated in her employment contract with the University, in breach of said contract.

DocID: 4847-9426-6004.2

**ANSWER:**   Because the Court has already dismissed Count VI for breach of contract, no response is required.   To the extent a response is required, KU denies the allegations in paragraph 243.

244.   The University failed to investigate Professor Joritz's substantive complaints, even when the basis for said complaints were corroborated by other entities.

**ANSWER:**   Because the Court has already dismissed Count VI for breach of contract, no response is required.   To the extent a response is required, KU denies the allegations in paragraph 244.

245.   The University violated policies in other ways in order to get Professor Joritz fired.

**ANSWER:**   Because the Court has already dismissed Count VI for breach of contract, no response is required.   To the extent a response is required, KU denies the allegations in paragraph 245.

246.   As a result of the University's breaches of contract, Professor Joritz was wrongfully terminated from her employment through contract non-renewal.

**ANSWER:**   Because the Court has already dismissed Count VI for breach of contract, no response is required.   To the extent a response is required, KU denies the allegations in paragraph 246.

**The University breached its contract with Professor Joritz by unlawfully rescinding Professor Joritz's Hall Center for the Humanities Creative Fellowship**

247.   On January 14, 2016, Victor Bailey, the Director of the Hall Center for the Humanities of the University, informed the Professor Joritz that she had been awarded the 2016 *Hall Center for the Humanities Creative Fellowship*.   He emailed her a list of the

DocID: 4847-9426-6004.2

Fellowship conditions, asking her to "*Please let me know (email is fine) if you are willing to accept the fellowship on these conditions.*"

    **ANSWER:**    Because the Court has already dismissed Count VI for breach of contract, no response is required.  To the extent a response is required, KU admits that Plaintiff was initially selected for a Hall Center Fellowship in early 2016.  KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 247 and, therefore, denies them.

    248.    Condition #6 was:

> "6:    *Return to their full-time KU responsibilities and serve for a minimum of one academic year at the end of the fellowship period; persons who do not return to the institution following the fellowship period shall reimburse KU for their salary and fringe benefits paid during the fellowship period.*"

Professor Joritz agreed to the conditions in a return email.

    **ANSWER:**    Because the Court has already dismissed Count VI for breach of contract, no response is required.  To the extent a response is required, KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 248 and, therefore, denies them.

    249.    On May 16, 2016 Professor Joritz emailed Victor Bailey, requesting the monetary value of her Fellowship in case she would "*take it and reimburse the university for the costs…*".  Bailey responded per email the same day, claiming that the "reimbursement" was intended "*for an unexpected departure from KU*" (a stipulation never before stated) and withdrew Professor Joritz's hard-won Creative Fellowship, breaching the contract between the University and Professor Joritz, causing Professor Joritz humiliation, monetary harm and the loss of a semester in which to focus on her research.

DocID: 4847-9426-6004.2

**ANSWER:**     Because the Court has already dismissed Count VI for breach of contract, no response is required.   To the extent a response is required, KU admits that Plaintiff was initially selected for a Hall Center Fellowship in early 2016.   KU is without sufficient knowledge or information to admit or deny the remaining allegations in paragraph 249 and, therefore, denies them.

## GENERAL DENIAL

KU denies and any and all other allegations and assertions contained in Plaintiff's First Amended Petition unless explicitly admitted herein.   KU further denies that Plaintiff states a valid claim under any of her theories and denies that she is entitled to any relief, whether monetary or equitable.

## RESPONSE TO PRAYER FOR RELIEF

KU denies that Plaintiff is entitled to any of forms of relief specified in her "Prayer for Relief."

## JURY DEMAND

KU demands a trial by jury on all issues so triable.

## AFFIRMATIVE DEFENSES

1.      Any state law claims that Plaintiff has asserted or may attempt to assert against KU are barred by KU's immunity under the Eleventh Amendment.   As an arm and subdivision of the State of Kansas, KU does not consent to a suit for money damages or injunctive relief in federal court.   Congress has not explicitly or validly waived KU's immunity under the Eleventh Amendment.

2.      All of Plaintiff's claims in her First Amended Petition are barred by collateral estoppel and res judicata based on Plaintiff's entry into a Stipulated Dismissal With Prejudice of

DocID: 4847-9426-6004.2

her Title VII claim first asserted in her state court proceeding styled *Joritz v. University of Kansas*, No. 2016-CV-000254 (Douglas County District Court) insofar as the claims she asserts before this Court arise from the same transaction of facts and are inextricably intertwined with her claims in state court.

3.      All of Plaintiff's claims in her First Amended Petition will be barred by res judicata upon the final disposition of her state court proceeding styled *Joritz v. University of Kansas*, No. 2016-CV-000254 (Douglas County District Court) insofar as the claims she asserts before this Court arise from the same transaction of facts and are inextricably intertwined with her claims in state court.

4.      Plaintiff's claims are untimely and barred by failure to administratively exhaust to the extent that Plaintiff relies on any alleged acts of discrimination or adverse actions that occurred more than 300 days prior to the date on which she filed her charges of discrimination.

5.      To the extent Plaintiff has incurred any recoverable damages, she has failed to mitigate those damages by, among other things, failing to seek full time employment commensurate with her education and has instead proliferated pro se litigation against KU and the Individual Defendants.

6.      Plaintiff fails to state a claim upon which relief can be granted.

DocID: 4847-9426-6004.2

Respectfully submitted,

/s/ Derek T. Teeter

DEREK T. TEETER         KS BAR NO. 23242
MICHAEL T. RAUPP        KS BAR NO. 25831
HUSCH BLACKWELL LLP
4801 Main St., Suite 1000
Kansas City, MO  64112
(816) 983-8000
(816) 983-8080 (FAX)
derek.teeter@huschblackwell.com
michael.raupp@huschblackwell.com

**Attorneys for Defendants**

DocID: 4847-9426-6004.2

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on April 22, 2019, I filed the foregoing document via the Court's ECF system, which will provide notice to all counsel of record receiving electronic notice.  On the same day, a paper copy was mailed via first-class, prepaid U.S. Mail and by email to:

      Catherine A. Joritz, pro se
      PO Box 422
      Perry, KS  66073
      630.857.8907
      Email:  cjanimate@aol.com

                /s/ Derek T. Teeter
                ***Attorney for Defendants***

DocID: 4847-9426-6004.2