FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**July 27, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

_____

CATHERINE A. JORITZ,

      Plaintiff - Appellee,

v.

BERNADETTE GRAY-LITTLE; CARL
LEJUEZ; STUART J. MACDONALD;
MICHAEL BASKETT,

      Defendants - Appellants,

and

THE UNIVERSITY OF KANSAS,

      Defendant.

No. 19-3078
(D.C. No. 5:17-CV-04002-SAC-JPO)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **MATHESON**, **BACHARACH**, and **McHUGH**, Circuit Judges.

_____

    Catherine A. Joritz filed a pro se amended complaint against her former

employer, the University of Kansas (KU), and four of its administrators, Bernadette

_____

    [*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

Gray-Little, Carl Lejuez, Stuart Macdonald, and Michael Baskett (administrators), claiming, among other things, that she was fired in retaliation for exercising her First Amendment rights. The administrators moved to dismiss based on qualified immunity, and the district court denied the motion. We now reverse.

## I

As an initial matter, we have jurisdiction over this interlocutory appeal. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable final decision within the meaning of 28 U.S.C. § 1291." *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011) (internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (holding that, "provid[ed] it turns on an issue of law," "a district court's order rejecting qualified immunity at the motion-to-dismiss stage . . . is a final decision within the meaning of [28 U.S.C.] § 1291" (internal quotation marks omitted)). This appeal involves a question of law, namely whether Joritz's speech addressed a matter of public concern. We therefore turn to the merits.

## II

Because this claim was resolved on a motion to dismiss, "we accept the facts alleged in the [amended] complaint as true and view them in the light most favorable to [Joritz]," *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018) (internal quotation marks omitted). "In resolving a motion to dismiss based on qualified immunity, the court considers (1) whether the facts that a plaintiff has alleged make out a violation of constitutional right, and (2) whether the right at issue was clearly established at the

time of defendant's alleged misconduct." *Keith v. Koerner*, 707 F.3d 1185, 1188

(10th Cir. 2013) (internal quotation marks omitted). We review the denial of

qualified immunity on a motion to dismiss de novo. *See id.* at 1187. We afford

Joritz's pro se materials a solicitous construction. *See Van Deelen v. Johnson*,

497 F.3d 1151, 1153 n.1 (10th Cir. 2007).

According to the amended complaint, Joritz is an American citizen who has

lived and worked in Germany for over thirty years. She is fluent in German, has a

German surname, and holds a master's degree in fine arts from a German university.

She has taught animation at institutions in Germany, Switzerland, and the United

States; she has received numerous grants and awards; and she is internationally

recognized as a German filmmaker.

In 2012, Joritz was hired by KU as a tenure-track professor of animation. She

initially received good or very good annual performance appraisals, but in 2014 she

received student evaluations complaining that: "She is a Nazi sympathizer, she drove

us nuts frequently mispronouncing well-known words," and "[she] [t]alked about

Germany all the time," including "about German feminism." Aplt. App., Vol. 1 at

162, ¶ 43 (italics and internal quotation marks omitted). Joritz alleged these

comments created a hostile work environment and constituted national origin

discrimination. Consequently, she met with several administrators, including her

former department chair, Tamara Falicov; Falicov's successor, Michael Baskett; the

Dean, Carl Lejuez; and KU's Chancellor, Bernadette Gray-Little, to request that the

student evaluations be removed from her permanent performance record. Her request

was denied and, although her concerns were supposed to be forwarded to KU's

Office of Institutional Opportunity and Access (IOA), nothing was done to prevent

similar student comments in the future.

In December 2014, Joritz was preparing for "a major performance evaluation,"

*id.* at 164, ¶ 51, that was a prerequisite for tenure.  This evaluation, called the

"Progress Toward Tenure Review (PTTR)," "is a multi-tiered evaluation process, for

which a faculty member must prepare a dossier" that "includes all student evaluations

. . ., peer evaluations . . ., a faculty member's teaching statement and research

statement[,] and a list of the faculty member's published and completed work."  *Id.* at

165-66, ¶ 53 (internal quotation marks omitted).  The dossier is submitted to a PTTR

committee, which conducts an initial review and evaluates the faculty member for

tenure based on specific criteria.

Joritz submitted her dossier to the initial PTTR committee, and in March 2015

she was notified that "improvement [was] required for continued progress towards

tenure."  *Id.* at 166, ¶ 55 (internal quotation marks omitted).  She was required to

submit to another PTTR the following academic year, and if she failed that review,

she would be recommended for "non-reappointment," *i.e*, termination.  *Id.* (internal

quotation marks omitted).  The PTTR committee also advised Joritz to "increase

[her] service commitments on both the national and international level."  *Id.* at 166,

¶ 56 (internal quotation marks omitted).  Believing the decision was unreasonable,

Joritz contacted the Assistant Dean of Faculty and Staff Affairs for an explanation

and to determine whether she could appeal.  She was told there was no appeal process.  However, after obtaining a copy of the PTTR committee's Initial Review Evaluation, Joritz determined there were procedural and policy violations that led to the committee's adverse decision.  In particular, she alleged 1) the then-department chair, Falicov, was not authorized to also chair the PTTR committee and 2) the Initial Review Evaluation cited her German background as the basis for the discriminatory student evaluations.  Joritz asserted these and other violations of KU policies and procedures would make it impossible for the next PTTR committee to fairly evaluate her performance.

Nonetheless, Joritz continued her work.  In November 2016, Baskett, who had become the department chair, observed one of her classes.  He refused to turn over his observation notes, however—allegedly in violation of KU policy—and refused to discuss his observations with her.  And when Joritz requested a "Research Intensive Semester," which is available to all tenure-track professors sometime before their review, Baskett delayed his response, which effectively denied her "the opportunity to focus on her research," *id.* at 172, ¶ 79.  Then, when the second PTTR process began, Baskett attempted to improperly serve as the chair of the second PTTR committee despite being the department chair.

During the second PTTR process, Joritz requested that a committee member be recused because he was sexist and because he had a conflict of interest.  Her request was denied.  Also, Baskett's assistant informed Joritz that she could not directly communicate with the committee members and that all communications were to be

directed through Baskett's office.  Joritz reported to the Interim Dean that Baskett was restricting her from contacting the other PTTR members.  Although the Interim Dean indicated he had never heard of such a restriction, the Associate Dean stated that such restrictions were consistent with historical practice.  Joritz continued to express her concerns with the PTTR process to Baskett and the Associate Dean, but Baskett did not timely respond.  Instead, he appointed Falicov, the former department chair who had chaired the previous PTTR committee, as another committee member.  And when Joritz asked that Falicov be recused, Baskett denied her request.

Approximately one week before her dossier submission, Joritz met with the Interim and Associate Dean and provided them with a list of policy violations that she alleged had been committed by the Interim Dean and the second PTTR committee.  The next day, the Associate Dean emailed Joritz and acknowledged that Baskett should not sit on the PTTR committee.  Baskett later went to her "office and angrily told her, 'You're not doing yourself any favors by making the department look (bad)!'" *Id.* at 177-78, ¶ 98 (italics omitted).  Baskett was replaced on the PTTR committee, but there was little time for Joritz to revise her dossier, and she still could not solicit feedback from the committee members because she was restricted from communicating with them.  Moreover, Baskett informed Joritz that he, rather than his assistant, would submit the dossier to the committee, and when Joritz questioned him, he replied, "Don't assume you know everything," *id.* at 179, ¶ 102 (internal quotation marks omitted).  Thus, Joritz once again contacted the Interim Dean to express her concerns with the PTTR process and her fears of retaliation by Baskett, Falicov, and

others.  This time, the Associate Dean responded by informing her that her concerns were referred to the IOA office.

On April 8, 2016, after Lejuez became Dean, Joritz received a letter from Lejuez stating that she would be recommended for non-reappointment.  Although the second PTTR committee had recommended finding that Joritz made satisfactory progress toward tenure, that recommendation was forwarded to the College Committee on Appointments, Promotion and Tenure (CCAPT), which disagreed and recommended that Joritz be terminated.  The letter stated that Joritz's "research record indicate[d] serious deficits" and "the quantity of [her] major works was not sufficient as evidence of progress toward tenure."  *Id.* at 180, ¶ 108 (italics and internal quotation marks omitted).  The letter also referenced her "inappropriate behavior."  *Id.*, ¶ 109 (internal quotation marks omitted).

Joritz alleged these comments were unsubstantiated, the recommendation ignored positive findings from the first PTTR committee, and the adverse conclusions were based on allegations made by Baskett in a letter that he included with her dossier to the second PTTR committee.  She therefore requested a copy of Baskett's letter that he included with her dossier, as well as his class observation notes, but Baskett repeatedly refused her requests with the support of the other administrators.  Joritz also requested these documents from Lejuez, but he, too, denied her requests and instructed her to direct her concerns to the Vice Provost.

The Vice Provost gave Joritz a copy of the CCAPT committee's letter, which was authored by the CCAPT chair, Stuart Macdonald.  Joritz alleged the CCAPT

committee had been influenced by Lejuez and that Macdonald improperly repeated Baskett's false allegations that she exhibited "disruptive" and "inappropriate behavior." *Id.* at 183, ¶ 118 (internal quotation marks omitted).  Joritz requested a meeting with the Provost to inform her of the alleged malfeasance surrounding her termination, but hours later, the Provost recommended that Joritz be terminated, noting her "pattern of inappropriate behavior toward colleagues, staff, and GTAs that has affected the functioning of the department and weakened [her] service record." *Id.* at 184, ¶ 121 (italics and internal quotation marks omitted).

Joritz appealed the Provost's decision to KU's Faculty Rights Board.  During that process, she learned that Lejuez violated KU bylaws by attempting to influence the CCAPT committee.  She requested to amend her appeal, but the Faculty Rights Board denied her request, although it did recommend to Chancellor Gray-Little that she disregard inaccurate statements contained in Baskett's letter to the CCAPT committee.  The Faculty Rights Board also acknowledged that Baskett violated KU policy by failing to provide her with feedback within two weeks of recommending her non-reappointment.  Nonetheless, and despite Joritz receiving a teaching award, on May 13, 2016, the Provost notified Joritz that her appointment for 2016-2017 academic year would be a terminal appointment, stating, "Even excluding consideration of the information in [Baskett's] letter, the Chancellor determined that your research record demonstrated insufficient progress toward tenure, warranting non-reappointment." *Id.* at 189, ¶ 139 (italics and internal quotation marks omitted).

Joritz requested a more detailed response, but she did not receive one.  She then commenced legal action.

III

Joritz initially filed suit in state court, seeking judicial review under state law. She raised several state claims alleging she was wrongfully terminated, and she claimed KU discriminated against her based on sex and national origin and retaliated against her for opposing and reporting its unlawful practices in violation of Title VII, 42 U.S.C. §§ 2000e to 2000e-17, *see* Aplt. App., Vol. 2 at 315.  The parties to that suit jointly stipulated to the dismissal of the Title VII claims with prejudice, but the parties here have not informed us of the status of her state-law claims.

Joritz subsequently filed this action in federal court, reasserting her Title VII claims against KU for sex and national origin discrimination, as well as retaliation for reporting the alleged discrimination.  KU moved to dismiss, but Joritz sought leave to amend her complaint to name the four administrators as defendants in their individual and official capacities.  She expanded her Title VII claims to include the administrators, alleging they, too, discriminated against her based on sex and national origin and retaliated against her for reporting the alleged discrimination.  She also claimed all defendants subjected her to a hostile work environment and wrongfully terminated her.  Additionally, Joritz claimed under 42 U.S.C. § 1983 that the administrators violated her due process and First Amendment rights.  Finally, she claimed under state law that the administrators and KU were liable for breaching her employment contract.

9

The district court adopted a magistrate judge's report and recommendation to grant in part and deny in part the motion to amend. The court denied Joritz leave to add the Title VII claims against the administrators, the § 1983 official capacity claims, and the state law contract claim against the administrators. However, the court granted leave to add the Title VII hostile work environment and wrongful termination claims against KU, the § 1983 due process and First Amendment claims against the administrators in their individual capacities, and the state law contract claim against KU. Thus, the claims presented in the amended complaint were the Title VII claims against KU for national origin discrimination (Count I), sex discrimination (Count II), retaliation (Count III), hostile work environment (Count IV), and wrongful termination (Count V); the § 1983 claims against the administrators in their individual capacities for due process and First Amendment violations (Count VI); and the state law breach of contract claim against KU (Count VII).[1]

KU and the administrators filed separate motions to dismiss, which the district court granted in part and denied in part. Regarding KU, the court dismissed Joritz's Title VII national origin claim and her state contract claim. But the court declined to dismiss her Title VII gender discrimination and retaliation claims. As for the administrators, the court concluded they were entitled to qualified immunity on Joritz's procedural due process claim and she failed to plausibly allege a substantive

---

[1] The amended complaint incorrectly designates Count VI as Count VII and Count VII as Count VI. We have renumbered them in proper numerical sequence.

due process claim.  Further, the court granted the administrators qualified immunity
on the First Amendment claim to the extent Joritz alleged Baskett infringed on her
free speech rights by prohibiting her from communicating with the PTTR committee.
But the court denied the administrators qualified immunity to the extent the First
Amendment claim alleged Joritz was fired in retaliation for complaining about
discriminatory conduct.  Thus, the district court's ruling's left pending Joritz's Title
VII claims against KU for gender discrimination and retaliation, and her First
Amendment retaliation claim against the administrators.

     The administrators then brought this interlocutory appeal from the denial of
qualified immunity on the First Amendment retaliation claim.  Afterwards, KU
moved the district court to stay further proceedings on the Title VII gender
discrimination and retaliation claims.  And Joritz, for her part, moved the district
court under Fed. R. Civ. P. 59(e) to reconsider its dismissal of her national origin
claim.  A magistrate judge granted KU's motion for stay, and the district court
overruled Joritz's objections.  Consequently, proceedings on the Title VII gender
discrimination and retaliation claims against KU are stayed in the district court
pending resolution of this appeal involving the separate First Amendment retaliation
claim against the administrators.  As for Joritz's Rule 59(e) motion, the district court
denied it.  We express no opinion on that ruling or on the merit or disposition of any
of Joritz's other claims.  This appeal challenges only the denial of qualified immunity
on Joritz's First Amendment retaliation claim against the administrators.  We now
consider that ruling.

IV

Joritz claimed in Count VI of the amended complaint that the administrators violated her First Amendment rights.  Although she incorporated by reference all of her allegations, her claim was premised on two specific facts.  First, she alleged Baskett and KU denied her the right to speak with other committee members regarding her progress toward tenure during the second PTTR.  The administrators moved to dismiss this aspect of the claim, arguing that Joritz's allegations failed to show that her speech was a matter of public concern.  The district court agreed and granted qualified immunity on that aspect of her claim.  That ruling is not before us.

Second, Joritz alleged the administrators "effectively halted [her] from objecting to illegal practices by firing her," *id.* at 214, ¶ 237, which the district court construed as a retaliation claim.  Again, the administrators argued that the allegations failed to establish that Joritz engaged in constitutionally protected speech—*viz.*, she did not speak on a matter of public concern.  This time, however, the district court rejected that argument and ruled that the administrators were not entitled to qualified immunity.  Contrasting its previous conclusion, the court stated that although "it is not clearly established that restrictions upon [Joritz's] contact with faculty members of her PTTR committee violated the First Amendment," the court could not "say the same regarding [Joritz's] *reports or complaints of discrimination* in other situations." *Id.*, Vol. 2 at 499 (emphasis added).  Thus, the court appears to have treated Joritz's reports and complaints of discrimination as a matter of public concern.  On this score, we disagree.

12

*A. No Constitutional Violation*

Because Joritz was a public employee, our analysis of her First Amendment claim requires that we balance her free speech interests as a private citizen against the efficiency interests of the state, as an employer, using the five elements of the *Garcetti/Pickering* test. *See Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). The five elements require that:

1. The protected speech was not made pursuant to an employee's official duties.

2. The protected speech addressed a matter of public concern.

3. The government's interests as an employer did not outweigh the employee's free-speech interests.

4. The protected speech was a motivating factor in the adverse employment action.

5. The defendant would not have made the same employment decision in the absence of the protected speech.

*Lincoln*, 880 F.3d at 538.

The parties dispute, and we find dispositive, the second element—whether Joritz's speech addressed a matter of public concern. *See Helget v. City of Hays*, 844 F.3d 1216, 1222 (10th Cir. 2017) (confining analysis to dispositive element). This inquiry is a question of law for the courts to assess. *See id.* "Matters of public concern are those of interest to the community, whether for social, political, or other reasons." *Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012) (internal quotation marks omitted). "Speech that pertains to a public agency's discharging its governmental responsibilities ordinarily will be regarded as speech on

13

a matter of public concern." *David v. City & Cty. of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996) (internal quotation marks omitted). But "speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." *Id.* In distinguishing between these two types of speech, "[w]e must consider the speaker's motivation: Was the speech calculated to redress personal grievances or did it have some broader public purpose?" *Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1228 (10th Cir. 2014). We examine "the content, form, and context of a given statement, as revealed by the whole record." *Morris*, 666 F.3d at 661 (internal quotation marks omitted).

Joritz's claim is predicated on her complaints of discrimination stemming from the student evaluations. She alleged the administrators stopped her from objecting to the alleged discrimination by declining to recommend her for tenure. But her complaints were not a matter of public concern because they focused entirely on the conditions of her own employment and the impact the allegedly discriminatory student evaluations would have on her own prospects for tenure. Speech of this nature is not a matter of public concern. *See David*, 101 F.3d at 1356-57 (holding that allegations of sexual harassment focusing on the conditions of the plaintiff's own employment were not a matter of public concern); *Baca v. Sklar*, 398 F.3d 1210, 1219 (10th Cir. 2005) (holding that complaints of discrimination and retaliation against university for personal reasons did not involve matters of public concern, but reports of illegal financial dealings between university and state agency seeking to reveal official impropriety did involve matters of public concern); *see also*

14

*Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) (concluding that allegations of sexual harassment were not matters of public concern absent any indication that plaintiff sought "to debate issues of sex discrimination" or otherwise reveal official misconduct) (internal quotation marks omitted)).   Indeed, Joritz did not levy a broad challenge to "pervasive and systematic misconduct by a public agency or public officials," nor did she attempt "to correct allegedly unlawful practices or bring them to public attention."  *Saulpaugh*, 4 F.3d at 143 (internal quotation marks omitted).   Rather, she simply requested that the allegedly discriminatory student evaluations be removed from her employment record.

Joritz disputes this conclusion, asserting she did not merely complain about the alleged discrimination directed at her; she expressed to the Chancellor her larger concerns about students abusing the student evaluation process, and she recommended ways to prevent it from happening to other faculty members.  *See* Aplee. Br. at 21-22.   But the allegations in her amended complaint demonstrate she focused exclusively on her own employment situation.   Joritz cites the following allegation:

> Professor Joritz finished her meeting with the Chancellor by explaining in detail how students were abusing the faculty evaluation process to write discriminatory comments in the student evaluations, and *how that abuse became a permanent part of faculty records, as occurred in Professor Joritz's case.*  Professor Joritz also offered a solution to ending discriminatory comments in student evaluations, which could be based on EEOC standards.  The Chancellor again informed Professor Joritz that she (the Chancellor) could not comment.

Aplt. App., Vol. 1 at 208, ¶ 206 (emphasis added).  This allegation does not state that

other faculty members were subjected to discrimination or that Joritz sought to

expose any such discrimination.  Elsewhere, the amended complaint similarly alleges

she "requested that the discriminatory comments be removed from her record[,] and

[she] suggested ways to address the issue of student discrimination against faculty in

the future, specifically in student evaluations."  *Id.* at 163, ¶ 45.  Joritz added that she

"had been made aware" that other women faculty had been discriminated against in

the student evaluations.  *Id.*  Although this latter allegation references discrimination

against other women faculty, there is no indication that Joritz reported it.  At most,

these allegations might suggest that other faculty members could benefit from

revising the student evaluation process, but the context of Joritz's complaints makes

clear her motivation:  she did not seek to vindicate the interests of anyone else or

expose discrimination against any other faculty member—instead, she focused

exclusively on herself and her own working conditions.  *Cf. Wulf v. City of Wichita*,

883 F.2d 842, 849-50, 857 (10th Cir. 1989) (holding that allegations in letter to

Attorney General that included a report of sexual harassment of an officer by a

supervisor involved matters of public concern); *Wren v. Spurlock*, 798 F.2d 1313,

1317-18 & n.1 (10th Cir. 1986) (holding that allegations in letter from majority of

teachers to state education association that included report of sexual harassment of

several students and other teachers involved matter of public concern).

Yet even if Joritz *was* partially motivated to report discrimination of others,

we could not conclude, on these allegations, that her speech involved a matter of

16

public concern.  In *Singh v. Cordle*, 936 F.3d 1022, 1035 (10th Cir. 2019), we recognized "[i]t is not enough . . . that the public interest was part of the employee's motivation."  *Singh* was an appeal from the denial of qualified immunity on a First Amendment retaliation claim involving similar factual circumstances.  The plaintiff worked as an untenured assistant professor at a state university, and although he initially received positive performance evaluations, he complained about his salary and asserted his performance evaluations were not positive enough.  *See id.* at 1028, 1030.  Additionally, the plaintiff was born in India, and there was evidence that the Dean (who had several disputes with the plaintiff) and other faculty members exhibited anti-Asian bias.  *See id.* at 1030.  Eventually, the university's Faculty Promotion Committee (FPC) recommended that the plaintiff's contract not be renewed.  *Id.* at 1031.  The Dean concurred with that recommendation and forwarded it to the Provost for consideration.  *Id.*

While the FPC's non-renewal recommendation was pending with the Provost, the plaintiff submitted to the Provost a lengthy binder challenging the non-renewal recommendation and expressing other concerns he had throughout his employment. *See id.*  The binder also contained a section entitled, "'Unfairness, Favoritism and Discrimination,' which alleged that [the university] had a biased culture and a high turnover rate among faculty of color."  *Id.* (internal quotation marks omitted). Ultimately, the Provost disagreed with the FPC and the Dean's rationale for not renewing the plaintiff's contract, but the Provost nonetheless accepted the nonrenewal recommendation based on the plaintiff's failure to work constructively

with his colleagues. *Id.* The plaintiff was assigned to teach several courses during the year of his terminal appointment, but the Dean took them away after the plaintiff filed formal discrimination complaints with the university and the relevant state administrative agency. *See id.* at 1032. The Dean and the Provost also changed the locks on the plaintiff's office door. *See id.* When the plaintiff's formal grievances proved to be unavailing, he filed suit in federal court, asserting various claims under Title VII and 42 U.S.C. §§ 1981 & 1983. *See Singh*, 936 F.3d at 1032-33.

Relevant here, the plaintiff claimed the Provost retaliated against him in violation of the First Amendment for submitting the binder, which alleged discrimination by the university. *See id.* at 1033. The district court denied qualified immunity on this claim, but we reversed. *See id.* We explained that "the relevant legal question [is] whether the employee's *primary* purpose was to raise a matter of public concern." *Id.* at 1035. We acknowledged that at least some of the binder's content touched on a matter of public concern because it asserted a discriminatory workplace. *See id.* Moreover, adopting the district court's findings, we recognized there was "evidence that Plaintiff was motivated to submit his binder at least in part by concern about department-wide discrimination." *Id.* Indeed, we "rejected [the Provost's] suggestion that Plaintiff raised concerns about discrimination for the sole purpose of retaining his job." *Id.* (brackets and internal quotation marks omitted). Nonetheless, in evaluating the *context* of the speech, we focused, once again, on "the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's

18

interest." *Id.* (internal quotation marks omitted).  We then discussed our precedent recognizing that speech is not a matter of public concern if the plaintiff's *principal* motive is to serve her own personal interests rather than to expose some kind of governmental wrongdoing.  *See id.* at 1035-36.

Here, unlike in *Singh*, Joritz did not complain of discrimination by the administrators; rather, her complaints focused on the *students'* evaluations evidencing discrimination.  Thus, the element of governmental misconduct is lacking.  Nonetheless, even if we solicitously construe her allegations and infer that she intended, at least in part, to report discrimination against other faculty members, as emphasized in *Singh*, the *context* of her reports clearly manifests that her primary motive was personal.  She sought to have the student evaluations removed from her own personnel records.  Of course, she also says she referenced how the allegedly discriminatory student comments "became a permanent part of faculty records," Aplt. App., Vol. 1 at 208, ¶ 206, and she suggested ways to address the issue of student discrimination against faculty in the future," *id.* at 163, ¶ 45.  But she made these references in the context of seeking to have the student evaluations removed from her *own* records, not anyone else's records.  Joritz also alleged that she "had been made aware" that other women faculty had been discriminated against in student evaluations.  *Id.*  Yet conspicuously absent from this allegation is any indication that she reported these instances of discrimination against other women, which strongly suggests that a concern for discrimination against others was not her principal motive.

19

We have no doubt that discrimination and harassment in the workplace are issues of significant social interest, but that does not automatically translate an employee's speech on those issues into matters of public concern for First Amendment purposes. *See Morris*, 666 F.3d at 663 ("[A] statement does not attain the status of public concern simply because its *subject matter* could, in different circumstances, have been the topic of a communication to the public that might be of general interest." (internal quotation marks omitted)); *see also Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) ("While we heartily agree . . . that sexual harassment in the workplace is a matter of important social interest, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." (internal quotation marks omitted)). As the Supreme Court has recognized, "the public may always be interested in how government officers are performing their duties," but the First Amendment does not "transform everyday employment disputes into matters for constitutional litigation." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011). Because Joritz's complaints of discrimination and its potential impact on her prospects for tenure did not involve matters of public concern, she failed to allege a constitutional violation.

### B.   No Clearly Established Law

Joritz also failed to show the law was clearly established. Indeed, it was her burden to show the administrators were not entitled to qualified immunity. *See Lincoln*, 880 F.3d at 537. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.  While [there need not be] a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted).

Joritz cites no cases demonstrating it was clearly established that her complaints of discriminatory student evaluations in faculty records were a matter of public concern.  Indeed, the law in this circuit is to the contrary:  it is *not* clearly established that complaints of discrimination, motivated primarily by personal grievance, are matters of public concern—even if a plaintiff also references broader discrimination of others.  *See Singh*, 936 F.3d at 1035-36.  Consequently, the administrators were entitled to qualified immunity on this aspect of Joritz's First Amendment retaliation claim.  Our disposition obviates any need to consider the parties' remaining arguments.

V

The judgment of the district court is reversed, and this case is remanded for further proceedings consistent with this order and judgment.  We reiterate that we express no opinion on the merit or disposition of Joritz's other claims.

Entered for the Court

Carolyn B. McHugh
Circuit Judge